EXECUTION COPY

(ii) In addition, after the distribution of the Allocable Share to Investors pursuant to Subparagraph 3(d)(i), the Trustee will allocate the amount of the Allocable Share for that Covered Trust in the reverse order of previously allocated Realized Losses, to increase the Class Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance, as applicable, of each class of Certificates or Notes (or Components thereof) (other than any class of REMIC residual interests) to which Realized Losses have been previously allocated, but in each case by not more than the amount of Realized Losses previously allocated to that class of Certificates or Notes (or Components thereof) pursuant to the Governing Agreements. For the avoidance of doubt, for Covered Trusts for which the Senior Credit Support Depletion Date shall have occurred prior to the allocation of the amount of the Allocable Share in accordance with the immediately preceding sentence, in no event shall the foregoing allocation be deemed to reverse the occurrence of the Senior Credit Support Depletion Date in such Covered Trust. Holders of such Certificates or Notes (or Components thereof) will not be entitled to any payment in respect of interest on the amount of such increase for any interest accrual period relating to the distribution date on which such increase occurs or any prior distribution date. Any such increase shall be applied pro rata to the Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance of each Certificate or Note of each class. For the avoidance of doubt, this Subparagraph 3(d)(ii) is intended only to increase Class Certificate Balances, Component Balances, Component Principal Balances, and Note Principal Balances, as provided for herein, and shall not effect the distribution of the Settlement Payment provided for in Subparagraph 3(d)(i).

(iii) In no event shall the deposit or distribution of any amount hereunder into any Covered Trust be deemed to reduce the collateral losses experienced by such Covered Trust.

(iv) For any of the Covered Trusts in which there is a third-party guaranty or other financial guaranty provided for one or more tranches by an entity that has not previously released the right to seek repurchase of Mortgage Loans, notwithstanding anything else in this Settlement Agreement, Bank of America and Countrywide shall, up to the Approval Date, have the option to exclude such Covered Trust from the Settlement, unless and until an agreement is reached by Bank of America, Countrywide, and the third-party guarantor or financial guaranty provider, pursuant to which the third-party guarantor or financial guaranty provider agrees not to make any

- 12 -

EXECUTION COPY

repurchase demands with relation to that Covered Trust. In the event that a Covered Trust is excluded under this Subparagraph 3(d)(iv), it shall be treated in accordance with Subparagraph 4(a).

(v) Nothing in Subparagraphs 3(d)(i), (ii), or (iii) is intended to or shall be construed to amend any Governing Agreements; a modification of Subparagraphs 3(d)(i), (ii), or (iii) (in each case in a manner consistent with the Governing Agreements) by the Settlement Court shall not constitute a material change to the terms of this Settlement Agreement.

(vi) The Trustee shall administer the distribution of the Allocable Share pursuant to this Settlement Agreement and the Governing Agreements. Under no circumstances shall Bank of America or Countrywide have any liability to the Trustee, the Investors, the Covered Trusts, or any other Person in connection with such determination, administration, or distribution (including distribution within each Covered Trust) of the Allocable Share, including under any indemnification obligation provided for in any Governing Agreement (including as clarified by the side-letter attached as Exhibit C to this Settlement Agreement).

(e) <u>Determinations by the Expert</u>. In the absence of bad faith or manifest error, the Expert's determinations and calculations in connection with the Allocable Share of each Covered Trust shall be treated as final and accepted by all Parties for purposes of Paragraph 3.

4. <u>Effect of Exclusion of Trusts</u>.

(a) <u>Excluded Covered Trusts</u>. In the event that any Covered Trust is excluded from the Settlement (an "Excluded Covered Trust"), the Allocable Share that would otherwise become payable to that Excluded Covered Trust shall be paid to Bank of America (as a matter of convenience for allocation as between Bank of America and Countrywide as appropriate), and there shall be no obligation by any of the Bank of America Parties or the Countrywide Parties to make any payments or provide any of the benefits of the Settlement to such Excluded Covered Trust or to Investors therein, or to comply with any of the provisions of Paragraphs 5 or 6 (except as specifically provided therein) with respect to such Excluded Covered Trust. The Trustee shall not be limited in the actions that it may take with respect to any Excluded Covered Trust (subject to the provisions of Paragraphs 17 and 20).

- 13 -


154

(b) <u>Withdrawal From Settlement</u>. In the event that one or more Covered Trusts, holding, in the aggregate, Mortgage Loans with unpaid principal balances as of the first Trustee report after the Signing Date aggregating in excess of a confidential percentage of the total unpaid principal balance of the Covered Trusts as of that date, such percentage having been provided to the Trustee by Bank of America and Countrywide prior to the execution of this Settlement Agreement, shall become Excluded Covered Trusts, Bank of America and Countrywide shall have the option, in their sole discretion, to withdraw from the Settlement with like effect as if Final Court Approval had become legally impossible. For purposes of calculating the unpaid principal balance of Excluded Covered Trusts in connection with this Subparagraph 4(b), the unpaid principal balance of Covered Trusts that become Excluded Covered Trusts at the election of Bank of America or Countrywide pursuant to Subparagraph 3(d)(iv) shall not be included.

5. <u>Servicing</u>. The Master Servicer shall implement the following servicing improvements (the "Servicing Improvements"). Material compliance with the provisions of this Paragraph 5 shall satisfy the Master Servicer's obligation to service the Mortgage Loans prudently in accordance with the relevant provisions of the Governing Agreements:

(a) <u>Subservicer Selection and Assignment</u>. In conformity with the subservicing provisions of the Governing Agreements:

(i) Within thirty (30) days of the Signing Date, the Institutional Investors and the Master Servicer shall agree on a list (the "Agreed List") of no fewer than eight and no more than ten subservicers (each a "Subservicer" and together the "Subservicers") to service High Risk Loans (as defined in Subparagraph 5(b)) and submit the Agreed List to the Trustee for review. If agreed by the Institutional Investors and the Master Servicer, the Master Servicer or an affiliate of the Master Servicer may serve as a Subservicer (in addition to the eight to ten to be otherwise agreed) and be included on the Agreed List. Within forty-five (45) days of receipt of the Agreed List, the Trustee, after consulting with an expert of its choice (whose advice shall be deemed full and complete authorization and protection in respect of the Trustee's decision), may object to any of the Subservicers on the Agreed List or reduce the maximum number of Mortgage Loans from the Covered Trusts that any such Subservicer may service at any one time to less than

- 14 -

30,000; provided that the Trustee may object to a Subservicer, or reduce the maximum number of Mortgage Loans from the Covered Trusts that any such Subservicer may service at any one time, only on the grounds listed in Exhibit D hereto and none other. The Trustee shall act in good faith in its approval decisions and shall include in any decision to object to a particular Subservicer the grounds for such objection. In the absence of an objection by the Trustee, all of the Subservicers on the Agreed List shall be deemed to be approved. If the Trustee objects to one or more Subservicers, all of the Subservicers on the Agreed List as to which there has been no objection shall be deemed approved. The Subservicers approved, or deemed approved, by the Trustee shall make up the "Approved List."

(ii) If the Trustee objects to a Subservicer on the Agreed List, or if a Subservicer on the Approved List at any time fails to meet, or ceases to meet, any of the qualifications described in Subparagraph 5(a)(iii), the Master Servicer shall remove such Subservicer from the Agreed List and/or the Approved List, as applicable, and may: (A) propose to replace any such Subservicer with a new subservicer by written notice to the Trustee, subject to such new subservicer meeting the qualifications described in Subparagraph 5(a)(iii) or (B) if applicable, re-submit such Subservicer to the Trustee for approval, provided that the Master Servicer has a commercially reasonable basis for believing that the grounds for the Trustee's objection to the subservicer are no longer applicable. Within fourteen (14) days of receipt of such notice or re-submission, the Trustee, after consulting with an expert of its choice (whose advice shall be deemed full and complete authorization and protection in respect of the Trustee's decision), may object to the proposed subservicer or reduce the maximum number of Mortgage Loans from the Covered Trusts that such proposed subservicer may service at any one time to less than 30,000; provided that the Trustee may object to a proposed subservicer or reduce the maximum number of Mortgage Loans from the Covered Trusts only on the grounds listed in Exhibit D hereto and none other. In the absence of an objection, the proposed subservicer shall be deemed approved and included on the Approved List. If the Trustee objects to a proposed subservicer, the Master Servicer may propose another subservicer pursuant to the process set out above, which process may be repeated multiple times. If the Trustee, pursuant to this Subparagraph 5(a)(ii), reduces the maximum number of Mortgage Loans that a Subservicer may service at any one time to less than 30,000, the Master Servicer may request from time to time that the Trustee lift or revise any such reduction of the maximum number of Mortgage Loans that that Subservicer may service

- 15 -



(subject to the maximum of 30,000 outstanding Mortgage Loans at any one time established by this Paragraph 5), and the Trustee, after consulting with an expert of its choice (whose advice shall be deemed full and complete authorization and protection in respect of the Trustee's decision), may agree or disagree, provided that the Trustee shall make such decision only on the grounds listed in Exhibit D hereto and none other. Nothing herein shall be construed as requiring the Master Servicer to obtain the Trustee's approval prior to terminating a Subservicer for cause.

(iii) To qualify for the transfer of loans for subservicing, a Subservicer must: (1) possess and maintain all material state and local licenses and registrations and be qualified to do business in the relevant jurisdictions, (2) agree to comply, and comply, with any laws, regulations, orders, mandates, or rulings of any Governmental Authority and/or any agreement or settlement between the Master Servicer or any of the other Bank of America Parties with any Governmental Authority applicable to subservicing, (3) maintain sufficient capable staff and facilities located in the United States, agree to meet, and meet, specified service level and performance requirements, and meet reasonable financial criteria, (4) agree to indemnify and hold harmless the Master Servicer for any servicing failures or breaches committed by it, (5) be eligible to service in accordance with the Home Affordable Modification Program ("HAMP") either pursuant to a Servicer Participation Agreement or an Assignment and Assumption Agreement with the U.S. Department of the Treasury, (6) meet, and otherwise be subject to, all relevant third-party provider requirements of the Office of the Comptroller of the Currency, (7) meet, and otherwise be subject to, the Master Servicer's vendor management policies, provided that such policies are of general application and do not address the specific requirements for performance under this Settlement Agreement, any agreement for the transfer of loans to subservicing, or any agreement for the sale of servicing rights, and (8) otherwise meet the requirements of the subservicing provisions of the Governing Agreements. In determining whether a Subservicer meets the qualifications described in this Subparagraph 5(a)(iii), the Master Servicer shall act in good faith and shall use commercially reasonable standards. Notwithstanding any other provision of this Settlement Agreement, the Master Servicer shall have no obligation to, and shall not, enter into a subservicing contract with, or transfer any Mortgage Loan for subservicing to, any Subservicer that does not meet the qualifications described in this Subparagraph 5(a)(iii) at the relevant time. Any Subservicer on the Approved

- 16 -

List that, at any time, does not meet the qualifications described in this Subparagraph 5(a)(iii) and that subsequently has a commercially reasonable basis for believing that it can meet the qualifications described in this Subparagraph 5(a)(iii), can request that the Master Servicer re-evaluate whether it meets the qualifications described in this Subparagraph 5(a)(iii), and if the Master Servicer determines that the Subservicer meets the qualifications described in this Subparagraph 5(a)(iii), such Subservicer shall be considered eligible for the transfer of High Risk Loans (subject to, if applicable, negotiation of a subservicing contract pursuant to Subparagraph 5(a)(iv)).

(iv) Beginning on the date of the Trustee's approval (or deemed approval, as applicable) of at least four Subservicers, the Master Servicer shall negotiate a servicing contract that includes commercially reasonable terms (including without limitation the right to terminate the Subservicer for cause) and map the computer-transfer of Mortgage Loans without less than one Subservicer per quarter until all of the Subservicers on the Approved List are operational. The terms on which the Subservicers are compensated shall be commercially reasonable pool performance incentives and/or activity-based incentives substantially similar to, and not materially less favorable than, those set forth on Exhibit E hereto. The servicing contract with each Subservicer shall prohibit the Subservicer from subcontracting the servicing, subservicing, selling the servicing rights, or otherwise transferring the servicing rights of any of the High Risk Loans to another party, provided that nothing herein shall be construed to limit the right of the Subservicers to engage third-party vendors or subcontractors to perform tasks that prudent mortgage banking institutions commonly engage third party vendors or subcontractors to perform with respect to mortgage loans and related property, including, but not limited to, tax monitoring, insurance monitoring, property inspection, reconveyance, services provided by licensed field agents, and brokering REO property ("Routinely Outsourced Tasks").

(v) The Master Servicer will complete the contract negotiation and computer-transfer mapping for each Subservicer in a three-month time period running from the commencement of computer-transfer mapping with that Subservicer, provided, however, that the Master Servicer shall have no obligation to contract with any Subservicer that does not meet the qualifications described in Subparagraph 5(a)(iii) or on terms that are not commercially reasonable, and shall incur no liability whatsoever nor be subject to any other form of remedy if it cannot comply with

- 17 -



any provision of this Paragraph 5 because it is unable to contract with such a Subservicer on commercially reasonable terms (provided, however, that the other provisions of this Paragraph 5 shall remain in force).

(vi) If the Master Servicer exceeds the three month time frame to complete the required computer mapping specified in Subparagraph 5(x)(v), the Master Servicer shall retain a competent third party, at its own expense, to complete the computer mapping as soon as reasonably practical (and shall have no other liability for exceeding the time frame provided that it retains such third party and proceeds diligently to complete the computer mapping).

(vii) After at least one Subservicer is operational, the Master Servicer shall initiate the transfer of Mortgage Loans to at least one Subservicer per quarter; provided, however, that each Subservicer shall have no more than 30,000 outstanding Mortgage Loans from the Covered Trusts at any one time. If each operational Subservicer has 30,000 outstanding Mortgage Loans from the Covered Trusts (or such lesser maximum number as the Trustee directs pursuant to Subparagraphs 5(x)(i) and (ii), as applicable), the Master Servicer shall have no obligation to transfer any Mortgage Loans until such time as an operational Subservicer has enough less than 30,000 outstanding Mortgage Loans from the Covered Trusts (or such lesser maximum number as the Trustee directs pursuant to Subparagraphs 5(x)(i) and (ii), as applicable) so as to make a transfer of Mortgage Loans commercially reasonable.

(viii) Only one Subservicer shall be assigned to each Covered Trust.

(ix) Any Mortgage Loan in subservicing for which twelve (12) consecutive timely payments have been made by or on behalf of the borrower shall be transferred back to the Master Servicer. The Master Servicer shall include a provision to this effect in the subservicing contract with each Subservicer. This provision shall not apply to any Mortgage Loan for which the Master Servicer has sold the servicing rights.

(x) All costs associated with implementation of these subservicing provisions shall be borne by the Master Servicer and/or the Subservicers, as applicable; provided, however, that the costs of the Subservicer compensation described in Subparagraph 5(x)(iv) and on Exhibit E hereto shall be borne by the Master Servicer. For the avoidance of doubt, if a Mortgage Loan is

- 18 -

transferred to subservicing, the Master Servicer shall retain all rights to receive payment for accrued but unpaid Master Servicing Fees and to be reimbursed for outstanding Advances at the same time and in the same manner as if the Master Servicer had retained the servicing function.

(xi) Beginning on the date of the Trustee's approval or deemed approval of at least four Subservicers, the Master Servicer may, at its option, sell the servicing rights on High Risk Loans to any Subservicer on the Approved List, provided that: (1) such sale complies with the applicable provisions of the applicable Governing Agreements; (2) the Subservicer possesses all material state and local licenses and registrations and is qualified to do business in the relevant jurisdictions; (3) the Subservicer maintains sufficient capable staff and facilities located in the United States, meets specified service level and performance requirements, and meets reasonable financial criteria; (4) the Subservicer complies with applicable laws, regulations, orders, mandates, or rulings of any Governmental Authority; (5) the Master Servicer ensures that the terms of the contract of sale include terms not materially less favorable than, similar to, and designed to substantially maintain the effect of, the commercially reasonable pool performance incentives and/or activity-based incentives set forth on Exhibit E hereto; (6) the total number of outstanding Mortgage Loans from the Covered Trusts serviced by any Subservicer, whether as a result of a sale of servicing rights or of a transfer to subservicing, shall not exceed 30,000 at any one time; (7) the Master Servicer covenants to provide Advance financing on commercially reasonable terms or otherwise guarantee such payment, if necessary to ensure the creditworthiness of the Subservicer in connection with Advances; (8) the Master Servicer ensures that the terms of the contract of sale prohibit the Subservicer from subcontracting the servicing, subservicing, selling the servicing rights, or otherwise transferring the servicing rights of any of the High Risk Loans to another party, provided that the Master Servicer is not required to restrict the Subservicer's ability to engage third-party vendors or subcontractors to perform Routinely Outsourced Tasks; (9) the Master Servicer shall enforce its rights under any contract of sale in good faith; (10) the Master Servicer ensures that the terms of the contract of sale include provisions similar to, and that are designed to substantially maintain the effect of, Subparagraphs 5(d) and 5(e); and (11) the Master Servicer obtains whatever powers of attorney may be necessary from the Trustee (which power of attorney shall not be unreasonably withheld) and the Subservicer so that the Master Servicer may cure document exceptions and comply with its obligations pursuant to Paragraph 6. For the avoidance of doubt, (1) nothing in this

- 19 -

157

Settlement Agreement shall limit in any way the Master Servicer's rights, if any, under the Governing Agreements, to sell servicing rights on current Mortgage Loans; (2) the Master Servicer's sale of servicing rights in conformity with this Subparagraph 5(a)(xi) shall be the equivalent of transferring High Risk Loans to subservicing for the purposes of satisfying the obligation of the Master Servicer under this Paragraph 5 to transfer High Risk Loans; and (3) in any quarter in which the Master Servicer is obligated to transfer High Risk Loans to subservicing, the Master Servicer shall remain obligated to do so unless it sells servicing rights on High Risk Loans pursuant to this Subparagraph 5(a)(xi).

(xii) Nothing in this Settlement Agreement shall limit in any way the Master Servicer's right to sell, transfer, or assign the servicing rights for the loans in the Covered Trusts, including High Risk Loans, to a bank affiliate of the Master Servicer reasonably expected to be capable of performing the obligations of the Master Servicer under this Settlement Agreement and the Governing Agreements, and the provisions of Subparagraph 5(a)(xi) shall not apply to such a sale, transfer, or assignment. Upon the sale, transfer, or assignment of servicing rights for any loans in the Covered Trusts to such a bank affiliate of the Master Servicer, it shall be deemed to be a Master Servicer for purposes of this Settlement Agreement and all provisions of this Settlement Agreement applicable to the Master Servicer shall be fully applicable to it.

(b) Subservicing Implementation for High Risk Loans. Mortgage Loans in groups (i) through (v) below shall be termed "High Risk Loans" for the purposes of this Settlement Agreement. High Risk Loans shall be transferred to subservicing in the following priority, provided that Mortgage Loans from groups (i), (ii), and (iii) below may be grouped together for transfer and treated as a single group for priority purposes:

(i) Mortgage Loans that are 45+ days past due without right party contact (i.e., the Master Servicer has not succeeded in speaking with the borrower about resolution of a delinquency);

(ii) Mortgage Loans that are 60+ days past due and that have been delinquent more than once in any rolling twelve (12) month period;

- 20 -

(iii) Mortgage Loans that are 90+ days past due and have not been in the foreclosure process for more than 90 days and that are not actively performing on trial modification or in the underwriting process of modification;

(iv) Mortgage Loans in the foreclosure process that do not yet have a scheduled sale date; and

(v) Mortgage Loans where the borrower has declared bankruptcy regardless of days past due.

(c) Servicing Improvements for Mortgage Loans Not in Subservicing. Beginning five (5) months after the Signing Date or on the Approval Date, whichever is later, the servicing improvements set forth below shall apply to all Mortgage Loans that are (i) not in subservicing pursuant to Subparagraphs 5(a) and 5(b) or (ii) for which the servicing rights have not been sold to a Subservicer; except that for Mortgage Loans secured by collateral in the state of Florida, the Industry Standard benchmarks set forth in Subparagraph 5(c)(i)(B) and any associated Master Servicing Fee Adjustment shall not apply until the Approval Date or until twenty-four (24) months after the Signing Date, whichever is later; provided, however, that the Master Servicer shall have no liability under this Subparagraph 5(c) until such time as eight Subservicers have been approved or been deemed approved by the Trustee.

(i) The Master Servicer shall, on a monthly basis, benchmark its performance against the following industry standards (the "Industry Standards"). For the avoidance of doubt, only one Industry Standard shall apply to each Mortgage Loan:

(A) First-lien Mortgage Loans Only: Delinquency status of borrower at time of referral to the Master Servicer's foreclosure process: 150 days. This benchmark will exclude for each Mortgage Loan all time period during which the borrower is in bankruptcy.

(B) First-lien Mortgage Loans Only: Time period between referral to the Master Servicer's foreclosure process and foreclosure sale or other liquidation event: The relevant state timeline in the most current (as of the time of each calculation) FHFA referral to foreclosure timelines. This benchmark will exclude for each Mortgage Loan all time periods during which

- 21 -

158

(a) the borrower is in bankruptcy or (b) the borrower is performing pursuant to HAMP or other loss mitigation efforts mandated by Law.

(C) Second-lien Mortgage Loans Only: Delinquency status of borrower at the time of reporting of charge-off to Trustee: Standards in relevant Governing Agreement.

(ii) The Master Servicer shall, once a month on the last business day of the month, send to the Trustee statistics for each Covered Trust comparing its performance for the prior month with respect to the Mortgage Loans in each Covered Trust to the Industry Standards (the "Monthly Statement"). The Trustee shall use reasonable commercial efforts to make such statement available on its Global Corporate Trust Investor Reporting website (https://www.gctinvestorreporting.bnymellon.com or any successor thereto) within five (5) business days of its receipt of such Monthly Statement.

(iii) Once a month, in connection with the preparation of the Monthly Statement, the Master Servicer shall calculate for the prior month: (a) a Compensatory Fee (as defined below) for each Mortgage Loan in each Covered Trust; (b) a Loan Level Amount (as defined below) for each Mortgage Loan in each Covered Trust; (c) whether there is a Master Servicing Fee Adjustment (as defined below) owed for each Covered Trust; and shall report to the Trustee as a line item on the Monthly Statement the Master Servicing Fee Adjustment, if any, for the relevant Covered Trust. The "Compensatory Fee" for a Mortgage Loan shall be calculated by multiplying the coupon applicable to that Mortgage Loan times the unpaid principal balance for that Mortgage Loan, and dividing the product of those two numbers by twelve (12). The "Loan Level Amount" for each Mortgage Loan shall be the amount equal to the applicable percentage in the applicable table below of the Compensatory Fee for such Mortgage Loan. The "Master Servicing Fee Adjustment" for each Covered Trust shall be the greater of zero and the sum of all the Loan Level Amounts for all the Mortgage Loans in such Covered Trust for that month.

- 22 -

Days Delinquent at Time of Referral to the Master Servicer's Foreclosure Process (First-lien Mortgage Loans only)

| Days Foreness to Industry Standard (150 days) | % |
|---|---|
| Earlier than -60 | -50% |
| -60 to -30 | -20% |
| -30 to 0 | 0% |
| 0 to 15 | 0% |
| 15 to 30 | 0% |
| 30 to 60 | 40% |
| 60 to 90 | 60% |
| 90 to 120 | 80% |
| Over 120 | 100% |

Days Borrower Referred to Foreclosure Process and Foreclosure Sale or Other Liquidation Event (First-lien Mortgage Loans only)

| Days Foreness to Schedule Rate's Timeline as set Forth in the PSA's Referral to Foreclosure Timeline | % |
|---|---|
| Earlier than -120 | -50% |
| -120 to -90 | -40% |
| -90 to -60 | -30% |
| -60 to -30 | -20% |
| -30 to 0 | 0% |
| 0 to 15 | 0% |
| 15 to 30 | 0% |
| 30 to 60 | 20% |
| 60 to 90 | 30% |
| 90 to 120 | 40% |
| 120 to 150 | 50% |
| 150 to 180 | 60% |
| 180 to 210 | 80% |
| Over 210 | 100% |

- 23 -

159

Days Delinquent at Time of Reporting of Charge Off (Second-lien Mortgage Loans only)

| Day Past Due to Standard in the Governing Agreement | % |
|---|---|
| 0 to 30 | 0% |
| 30 to 60 | 40% |
| 60 to 90 | 60% |
| 90 to 120 | 80% |
| Over 120 | 100% |

(iv) For each Covered Trust other than CWHEQ 2006-A and CWHEQ 2007-G, the Master Servicer shall, on a monthly basis, deduct the Master Servicing Fee Adjustment from unreimbursed Advances due to it. For each of CWHEQ 2006-A and CWHEQ 2007-G, the Master Servicer shall, on a monthly basis, wire the Master Servicing Fee Adjustment to the Collection Account for the applicable Covered Trust and the Trustee shall distribute the Master Servicing Fee Adjustment in the same manner as is specified for an Allocable Share pursuant to Subparagraph 3(d)(i), provided, however, that the provisions of Subparagraph 3(d)(ii) shall not apply to Master Servicing Fee Adjustments.

(d) Loss Mitigation Requirements Applicable to All Loans. Beginning on the Signing Date, for each borrower with a Mortgage Loan in the Covered Trusts that is considered for modification programs, the Master Servicer and/or each of the Subservicers, as applicable, shall simultaneously evaluate the borrower's eligibility for all applicable modification programs in accordance with the factors set forth in Subparagraph 5(e) (including, as applicable, HAMP and proprietary modification programs, which programs may, pursuant to the Governing Agreements, include principal reductions), and shall render a decision within sixty (60) days of receiving all requested documents from the borrower; provided that nothing herein shall be deemed to create an obligation on the part of Master Servicer to offer any modification or loss mitigation strategy to any borrower.

(e) Loss Mitigation Considerations. In considering modifications and/or other loss mitigation strategies, including, without limitation, short sales and deeds in lieu of foreclosure, the Master Servicer and all Subservicers shall consider the following factors: (a) the net present value of the Mortgage Loan at the time the modification and/or other loss mitigation strategy is

considered and whether the contemplated modification and/or other loss mitigation strategy would have a positive effect on the net present value of the Mortgage Loan as compared to foreclosure; (b) where loan performance is the goal, whether the modification and/or other loss mitigation strategy is reasonably likely to return the Mortgage Loan to permanently performing status; (c) whether the borrower has the ability to pay, but has defaulted strategically or is otherwise acting strategically; (d) reasonably available avenues of recovery of the full principal balance of the Mortgage Loan other than foreclosure or liquidation of the loan; (e) the requirements of the applicable Governing Agreement; (f) such other factors as would be deemed prudent in its judgment; and (g) all requirements imposed by applicable Law. When the Master Servicer and/or Subservicer, in implementing a modification and/or other loss mitigation strategy (which may, pursuant to the Governing Agreements, include principal reductions), considers the factors set forth above, and/or acts in accordance with the policies or practices that the Master Servicer is then applying to its or any of its affiliates' "held for investment" portfolios, the Master Servicer shall be deemed to be in compliance with its obligation to service the Mortgage Loans prudently in keeping with the relevant servicing provisions of the relevant Governing Agreement and the requirements of this Subparagraph 5(e), the modification and/or other loss mitigation strategy so implemented shall be deemed to be permissible under the terms of the applicable Governing Agreement, and the judgments in applying such factors to a particular loan shall not be subject to challenge under the applicable Governing Agreement, this Settlement Agreement, or otherwise. Notwithstanding anything else in this Subparagraph 5(e), no principal modification by the Master Servicer or any Subservicer shall reduce the principal amount due on any Mortgage Loan below the current market value of the property, as determined by a third-party broker price opinion, using a fair market value method, applying normal marketing time criteria and excluding REO or short sale comparative sales in the valuation calculation.

(f) Reporting and Attestation of Compliance with Servicing Improvements. Beginning on the Approval Date, the Master Servicer shall: (i) report monthly to the Trustee, for each Covered Trust, concerning its compliance with the Servicing Improvements required by this Settlement Agreement (the "Monthly Report"); and (ii) pay for an annual attestation report for the Covered Trusts as a group (the "Attestation Report") to be completed no later than February 15 of each year that any Covered Trust holds Mortgage Loans (or owns real estate related to liquidated Mortgage Loans). The Trustee shall use reasonable commercial efforts to make such

160

EXECUTION COPY

report available on its Global Corporate Trust Investor Reporting website (https://www.gctinvestorreporting.bnymellon.com or any successor thereto) within five (5) business days of its receipt of such report.

(i) The Attestation Report shall be prepared by an audit firm selected in accordance with the following selection process: (A) the Master Servicer shall propose in writing to the Trustee an audit firm meeting the qualifications described in Subparagraph 5(f)(ii); (B) within seven (7) business days of receipt of such written notice, the Trustee may object to the Master Servicer's selection if it reasonably determines that the proposed audit firm does not meet the qualifications described in Subparagraph 5(f)(ii); (C) if the Trustee objects to a proposed audit firm in accordance with Subparagraph 5(f)(i)(B) above, a different audit firm shall be selected by repeating the process set out in Subparagraphs 5(f)(i)(A) and 5(f)(i)(B) above; and (D) in the absence of an objection by the Trustee within the time frame set out in Subparagraph 5(f)(i)(B) above, the proposed audit firm shall be deemed approved.

(ii) To qualify to prepare the Attestation Report, a firm must (A) possess sufficient relevant expertise in the mortgage loan servicing industry; (B) be duly licensed to conduct its business in all relevant jurisdictions; (C) not be indicted in any state; and (D) not be engaged by Bank of America, Countrywide, or any of their respective subsidiaries and affiliates for any major engagement.

(iii) The Attestation Report shall be distributed to all Investors as part of the Trustee's Monthly Statement for April of each year, provided that the Trustee shall not be required to execute, sign, or deliver to the audit firm any consent, acknowledgement, or other documentation whatsoever in connection with its receipt of the Attestation Report or the making of the Attestation Report available to the Investors.

(g) No Amendment. Nothing in this Paragraph 5 is, or shall be construed to be, an amendment of any Governing Agreement.

(h) Governmental Authority. The Master Servicer shall: (i) have no liability (and shall be subject to no other remedy) to the Covered Trusts, the Trustee, or the Investors under any part of this Settlement Agreement or under the provisions of the Governing Agreements that

- 26 -

EXECUTION COPY

relate to the matters and aspects of servicing addressed in whole or in part by the provisions of this Paragraph 5, including no liability for any Master Servicing Fee Adjustment, if it becomes commercially impracticable for the Master Servicer to perform its obligations under this Paragraph 5 in a manner reasonably similar to the intent thereof because any provision of this Paragraph 5 is rendered inoperative or invalid by Law and (ii) not be liable for any portion of a Master Servicing Fee Adjustment that is the result of actions mandated or required by Law.

(i) Cost of Compliance with Law. All expenses associated with compliance with Law related to the servicing of the Mortgage Loans in the Covered Trusts shall be borne by the Master Servicer and/or the Subservicers, as applicable, provided that (i) any modification or other loss mitigation strategy that may be required or permitted by Law, and/or (ii) any Advance that is required or permitted by Law, that is permissible under the terms of this Settlement Agreement and/or the Governing Agreements shall not be deemed to be an expense associated with compliance with Law related to the servicing of the Mortgage Loans in the Covered Trusts, and any Realized Loss associated with the implementation of such modification or loss mitigation strategy shall be borne by the relevant Covered Trust.

(j) Effect of Failure to Meet Timelines. The Master Servicer's failure to complete any task or obligation set forth in this Paragraph 5 in the time period required by this Paragraph 5 shall not be deemed a material breach of this Settlement Agreement, provided that the Master Servicer has used and is using reasonable best efforts to comply with the time periods set forth in this Paragraph 5 and that the Master Servicer completes the task or obligation in no more than 133% of the time period required by this Paragraph 5. For the avoidance of doubt, nothing in this Subparagraph 5(j) shall affect the amount of any Master Servicing Fee Adjustment otherwise due under Subparagraph 5(c).

(k) Effect of Legal Impossibility of Final Court Approval; Excluded Covered Trust. If Final Court Approval becomes legally impossible, then at such time, neither the Master Servicer nor the Trustee shall have any further obligations under Subparagraph 5(a) or under Subparagraph 5(b) and Subparagraphs 5(c) and 5(f) shall be null and void. Subparagraphs 5(d) and 5(e) shall remain binding upon the Master Servicer and the Trustee. As to any trust that shall become an Excluded Covered Trust, neither the Master Servicer nor the Trustee shall have

- 27 -



any further obligations with respect to such Excluded Covered Trust under Subparagraph 5(a) or under Subparagraph 5(b) and Subparagraphs 5(c) and 5(f) shall be null and void with respect to such Excluded Covered Trust; Subparagraphs 5(d) and 5(e) shall remain binding upon the Master Servicer and the Trustee as to such Excluded Covered Trust.

**6. Cure of Certain Document Exceptions.**

(a) *Initial Exceptions Report Schedule.* Not later than six (6) weeks after the Signing Date, the Master Servicer shall submit to the Trustee an "Initial Exceptions Report Schedule" as provided for below. Subject to Paragraph 12, the Trustee shall use reasonable best efforts to make the Initial Exceptions Report Schedule available on the Trustee's Global Corporate Trust Investor Reporting website (https://www.gctinvestorreporting.bnymellon.com, or any successor thereto) within five (5) business days of its receipt of such report.

(i) The Initial Exceptions Report Schedule shall be prepared in good faith, after reasonable diligence, and shall include each Mortgage Loan in the Covered Trusts (including, for the avoidance of doubt, Mortgage Loans for which the servicing rights are sold following the Signing Date) that, on the Trustee's Loan-Level Exception Reports (as defined below), is subject to both (A) a document exception relating to mortgages coded "photocopy" (CO), "copy with recording information" (CR), "document missing" (DM), "county recorded copy with comments" (IN), "certified copy not recorded" (NR), "original with comments" (OO), "unrecorded original" (OO), "pool review pending" (PR), "contract" (CONT), and "certified copy-issues" (CI) on the Trustee's Loan-Level Exception Reports, ("Mortgage Exceptions") and (B) a document exception relating to title policies or their legal equivalent coded "document missing" (DM), "title commitment" (CM), or "pre liminary title report" (PL) on the Trustee's Loan-Level Exception Reports, ("Title Policy Exceptions"), provided that it shall exclude any such Mortgage Loans registered on the Mortgage Electronic Registration Systems ("MERS"). Mortgage Loans paid in full or liquidated as of the Signing Date shall not be included in the Initial Exceptions Report Schedule.

(ii) The Master Servicer may elect, in its sole discretion, to resolve any Mortgage Exception or Title Policy Exception listed on the Initial Exceptions Report Schedule, in which

- 28 -

case the Trustee shall cooperate in good faith with the Master Servicer to resolve any such Mortgage Exception or Title Policy Exception.

(iii) If any Mortgage Loan is Cured (as defined below), the Master Servicer shall promptly provide evidence of such cure to the Trustee.

(iv) "Trustee's Loan-Level Exception Reports" shall mean the loan level exception reports for the Covered Trusts provided by the Trustee to the Master Servicer on April 14, 2011, April 27, 2011, and April 28, 2011.

(b) *Monthly Exceptions Report.* Beginning the first month following the month in which the Master Servicer submits the Initial Exceptions Report Schedule, the Master Servicer shall provide to the Trustee on the last business day of each month a Monthly Exceptions Report listing all Mortgage Loans on the Initial Exceptions Report Schedule exclusive of any Mortgage Loan that has been Cured and shall separately list all Mortgage Loans that have been Cured.

(i) A Mortgage Loan listed on the Initial Exceptions Report Schedule shall be considered "Cured" for all purposes if (A) either the Mortgage Exception or Title Policy Exception associated with that Mortgage Loan has been resolved, (B) the Mortgage Loan has been paid in full or otherwise satisfied as a first lien, (C) the Mortgage Loan has been liquidated as a first lien on the Mortgaged Property, or (D) pursuant to Subparagraph (6)(c), the Master Servicer has reimbursed the Covered Trust for 100% of any related Realized Loss associated with that Mortgage Loan's liquidation.

(ii) Within fifteen (15) business days of receipt of each Monthly Exceptions Report, the Trustee shall determine whether reasonable evidence has been provided in respect of each Mortgage Loan listed as Cured in such report. In the event that the Trustee determines that a decision by the Master Servicer to list a loan as Cured is not supported by reasonable evidence, after consultation with the Master Servicer regarding the reasonableness of such evidence, the Trustee shall direct the Master Servicer to issue a revised Monthly Exceptions Report. All of the Trustee's reasonable costs and expenses associated with performing its obligations under this Subparagraph 6(b)(ii) that exceed the Trustee's ordinary costs and expenses in connection with its record-keeping duties under the Governing Agreements shall be borne by the Master Servicer.

- 29 -



EXECUTION COPY

(iii) The Master Servicer shall continue providing Monthly Exceptions Reports until such time as all Mortgage Loans listed in the Initial Exceptions Report Schedule have been Cured.

(iv) Subject to Paragraph 12, the Trustee shall use reasonable best efforts to make each Monthly Exceptions Report available on its Global Corporate Trust Investor Reporting website (https://www.gctinvestorreporting.bnymellon.com or any successor thereto) within five (5) business days of its receipt of such report.

(c) Remedy for Uncured Exceptions. If, at the time of liquidation, a Mortgage Loan (including, for the avoidance of doubt, Mortgage Loans for which the servicing rights are sold following the Signing Date) is listed on the then-current Monthly Exceptions Report as having an outstanding Mortgage Exception and an outstanding Title Policy Exception, the Master Servicer shall promptly provide notice to the Trustee and shall reimburse the trust that owns the Mortgage Loan for 100% of any Realized Loss (as defined in the applicable Governing Agreements) (i) if the Master Servicer is prevented from foreclosing as a first-lien holder by reason of an outstanding Mortgage Exception and the trust is not made whole by a title policy or equivalent by reason of an outstanding Title Policy Exception within the earlier of (A) twelve (12) months after the denial of such foreclosure or (B) thirty (30) days after the Master Servicer determines that no insurance will be payable or (ii) if a court of competent jurisdiction denies foreclosure as a first-lien holder by reason of an outstanding Mortgage Exception and the trust is not made whole by a title policy or equivalent by reason of an outstanding Title Policy Exception within the earlier of (A) twelve (12) months after the denial of such foreclosure or (B) thirty (30) days after the Master Servicer determines that no insurance will be payable. In the event that the Master Servicer makes the trust whole with respect to any Mortgage Loan pursuant to this Subparagraph 6(c), the Master Servicer shall be entitled to reimbursement for such make-whole payment from any proceeds that it or the trust subsequently receives from any title policy or equivalent with respect to such Mortgage Loan.

(d) If Final Court Approval becomes legally impossible, then at such time, neither the Master Servicer nor the Trustee shall have any further obligations or rights under this Paragraph 6 and the remedy provisions of Subparagraph 6(c) shall be null and void. Likewise, if the trust in

- 30 -

EXECUTION COPY

which the Mortgage Loan is held is designated an Excluded Covered Trust pursuant to Subparagraph 4(a), then at such time, neither the Master Servicer nor the Trustee shall have any further obligations or rights under this Paragraph 6 and the remedy provisions of Subparagraph 6(c) shall be null and void with respect to such Mortgage Loan. Notwithstanding the foregoing, the Master Servicer may elect in its sole discretion to resolve any Mortgage Exception or Title Policy Exception that is outstanding, in which case the Trustee shall cooperate in good faith with the Master Servicer to resolve any such Mortgage Exception or Title Policy Exception.

7. Extension of Forbearance; Tolling. The Parties agree (and the Institutional Investors have so agreed in the Institutional Investor Agreement) that the Agreement entered into by certain of the Parties on December 9, 2010 and extended on January 28, 2011, February 28, 2011, March 31, 2011, April 19, 2011, May 2, 2011, May 9, 2011, May 25, 2011, and June 13, 2011 (the "Forbearance Agreement") is hereby extended and shall remain in effect in all respects until the first to occur of: (a) the Approval Date, (b) a date ninety (90) days after Final Court Approval shall become legally impossible, (c) a date ninety (90) days after the Settlement Agreement has been terminated in accordance with its terms, or (d) a date ninety (90) days after the cure period has expired for any uncured material breach of the Settlement Agreement by Bank of America and Countrywide for which notice has been provided (the cure period being the ninety (90) days following such notice of such breach provided by a party to this Settlement Agreement or the Institutional Investor Agreement). For Covered Trusts not subject to the Forbearance Agreement, all statutes of limitation, repose, or laches related to the Trust Released Claims shall be tolled, for the benefit of the Released Persons, to the same extent that they are tolled under the Forbearance Agreement; provided that, except as set forth in this Settlement Agreement, all Parties expressly reserve all rights, arguments, and defenses, including all rights, arguments, and defenses with respect to Investor voting rights and interest requirements under the Governing Agreements. If the Forbearance Agreement is extended pursuant to Subparagraphs 7(b) or 7(c) herein, the Parties agree (and the Institutional Investors have so agreed in the Institutional Investor Agreement) during the first eighty (80) days of such time periods to use their reasonable best efforts to negotiate an alternate settlement of the Trust Released Claims on terms that are economically substantially equivalent to the Settlement and not inconsistent with any final ruling of the Settlement Court or on any appeal therefrom, and

- 31 -



(during the same time periods) not to pursue any non-consensual actions or remedies with respect to the Covered Trusts except as the Trustee may be directed by the Settlement Court.

**8. Retraction of Notice.** The Trustee agrees (and the Institutional Investors have so agreed in the Institutional Investor Agreement) that, as of the Approval Date, any notice that may have been contained in the letters sent by and on behalf of certain of the Institutional Investors on June 17, 2010, October 18, 2010, and November 12, 2010 and addressed to the Trustee and/or the Master Servicer, as well as any notice that may have been contained in a letter deemed to have been provided under the Forbearance Agreement and its extensions (the "Letters"), is and shall be rendered null and void. The Letters themselves shall thereafter be rendered inoperative, as if never sent, and shall be deemed for all purposes to be withdrawn with prejudice (the Institutional Investors have so agreed by the Institutional Investor Agreement).

**9. Release.**

(a) Effective as of the Approval Date, except as set forth in Paragraph 10, the Trustee on behalf of itself and all Investors, the Covered Trusts, and/or any Persons claiming by, through, or on behalf of any of the Trustee, the Investors, or the Covered Trusts or under the Governing Agreements (collectively, the Trustee, Investors, Covered Trusts, and such Persons being defined together as the "Precluded Persons"), irrevocably and unconditionally grants a full, final, and complete release, waiver, and discharge of all alleged or actual claims, counterclaims, defenses, rights of setoff, rights of rescission, liens, disputes, liabilities, Losses, debts, costs, expenses, obligations, demands, claims for accountings or audits, alleged Events of Default, damages, rights, and causes of action of any kind or nature whatsoever, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, in contract, tort, or otherwise, secured or unsecured, accrued or unaccrued, whether direct, derivative, or brought in any other capacity that the Precluded Persons may now or may hereafter have against any or all of the Bank of America Parties and/or Countrywide Parties arising out of or relating to (i) the origination, sale, or delivery of Mortgage Loans to the Covered Trusts, including the representations and warranties in connection with the origination, sale, or delivery of Mortgage Loans to the Covered Trusts or any alleged obligation of any Bank of America Party and/or Countrywide Party to repurchase or otherwise compensate the Covered Trusts for any Mortgage

- 32 -

Loan on the basis of any representations or warranties or otherwise or failure to cure any alleged breaches of representations and warranties, including all claims arising in any way from or under Section 2.03 ("Representations, Warranties and Covenants of the Sellers and Master Servicer") of the Governing Agreements, (ii) the documentation of the Mortgage Loans held by the Covered Trusts (including the documents and instruments covered in Sections 2.01 ("Conveyance of Mortgage Loans") and 2.02 ("Acceptance by the Trustee of the Mortgage Loans") of the Governing Agreements and the Mortgage Files) including with respect to alleged defective, incomplete, or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment, or any other matter relating to legal enforceability of a Mortgage or Mortgage Note, and (iii) the servicing of the Mortgage Loans held by the Covered Trusts (including any claim relating to the timing of collection efforts or foreclosure efforts, loss mitigation, transfers to subservicers, Advances, Servicing Advances, or that servicing includes an obligation to take any action or provide any notice towards, or with respect to, the possible repurchase of Mortgage Loans by the Master Servicer, Seller, or any other Person), in all cases prior to or after the Approval Date (collectively, all such claims being defined as the "Trust Released Claims").

(b) The Trust Released Claims shall also be deemed to have been released as of the Approval Date to the full and same extent by the Master Servicer of the Covered Trusts (including the current Master Servicer, BAC HLS, and any subsequent servicer who may in the future be substituted for the current Master Servicer with respect to one or more of the Covered Trusts or any loans therein) and the Master Servicer shall be deemed to be a Precluded Person.

(c) The release and waiver in Subparagraphs 9(a) and 9(b) is intended to include, and upon its effectiveness shall include, any claims or contentions that Bank of America or any non-Countrywide affiliate, division, or subsidiary of Bank of America, and any of the predecessors or assigns thereof, is liable on any theory of successor liability, vicarious liability, veil piercing, de facto merger, fraudulent conveyance, or other similar claim or theory for the obligations,

---
[1] Which provision is numbered 2.04 in the Sale and Servicing Agreements relating to CWHEQ 2006-A and CWHEQ 2007-G.

- 33 -

164

EXECUTION COPY

exposure, or liability of Countrywide or any of its affiliates, divisions, or subsidiaries, and any of the predecessors or assigns thereof concerning any of the Covered Trusts, with respect to the Trust Released Claims.

**10. Claims Not Released.**

(a) *Administration of the Mortgage Loans.* The release and waiver in Paragraph 9 does not include claims based solely on the action, inaction, or practices of the Master Servicer in its aggregation and remittance of Mortgage Loan payments, accounting for principal and interest, and preparation of taxes and information in connection with the Mortgage Loans and the ministerial operation and administration of the Covered Trusts and of the Mortgage Loans held by the Covered Trusts for which the Master Servicer receives servicing fees unless, as of the Signing Date, the Trustee has or should have knowledge of the actions, inactions, or practices of the Master Servicer in connection with such matters.

(b) *Servicing of the Mortgage Loans.* Except as provided in Subparagraph 10(a), the release and waiver in Paragraph 9 includes: (i) all claims based in whole or in part on any actions, inactions, or practices of the Master Servicer prior to the Approval Date as to the servicing of the Mortgage Loans held by the Covered Trusts; and (ii) as to all actions, inactions, or practices by the Master Servicer after the Approval Date, only (A) actions, inactions, and practices that relate to the aspects of servicing addressed in whole or in part by the provisions of Paragraph 5 (material compliance with which shall satisfy the Master Servicer's obligation to service the Mortgage Loans prudently in accordance with all relevant sections of the Governing Agreements) and (B) actions, inactions, or practices that relate to the aspects of servicing not addressed by the provisions of Paragraph 5 that are consistent with (or improvements over) the Master Servicer's course of conduct prior to the Signing Date. It is further understood and agreed that Investors may pursue such remedies as are available under Section 10.08 ("Limitation on Rights of Certificateholders") of the Governing Agreements with respect to an Event of Default as to any servicing claims not released by this Settlement.

(c) *Certain Individual Investor Claims.* The release and waiver in Paragraph 9 does not include any direct claims held by Investors or their clients that do not seek to enforce any rights under the terms of the Governing Agreements but rather are based on disclosures made (or

- 34 -

EXECUTION COPY

failed to be made) in connection with their decision to purchase, sell, or hold securities issued by any Covered Trust, including claims under the securities or antifraud laws of the United States or of any state; provided, however, that the question of the extent to which any payment made or benefit conferred pursuant to this Settlement Agreement may constitute an offset or credit against, or a reduction in the gross amount of, any such claim shall be determined in the action in which such claim is raised, and the Parties reserve all rights with respect to the position they may take on that question in those actions and acknowledge that all other Persons similarly reserve such rights.

(d) *Financial-Guaranty Provider Rights and Obligations.* To the extent that any third-party guarantor or financial-guaranty provider with respect to any Covered Trust has rights or obligations independent of the rights or obligations of the Investors, the Trustee, or the Covered Trusts, the release and waiver in Paragraph 9 is not intended to and shall not release such rights, or impair or diminish in any respect such obligations or any insurance or indemnity obligations owed by or to such Person.

(e) *Indemnification Rights.* The Parties do not release any rights to indemnification under the Governing Agreements including the Trustee's right to indemnification by the Master Servicer of the Covered Trusts.

(f) *Settlement Agreement Rights.* The Parties do not release any rights or claims against each other to enforce the terms of this Settlement Agreement.

(g) *Excluded Covered Trusts.* The release and waiver in Paragraph 9 does not include claims with respect to any Excluded Covered Trust.

**11. Release of Unknown Claims.** Each of the Parties acknowledges that it has been advised by its attorneys concerning, and is familiar with, California Civil Code Section 1542 and expressly waives any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to the provisions of the California Civil Code Section 1542, including that provision itself, which reads as follows:

- 35 -



"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

The Parties acknowledge that inclusion of the provisions of this Paragraph 11 in this Settlement Agreement was a material and separately bargained for element of this Settlement Agreement.

12. **Concerning the Trustee.** All of the Trustee's privileges, indemnity rights, limitations on liability and other contractual protections under the Governing Agreements shall equally apply to all of the Trustee's duties and obligations under this Settlement Agreement. Without limiting the foregoing:

(a) The duties and obligations of the Trustee under this Settlement Agreement shall be determined solely by the express provisions of this Settlement Agreement. The Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Settlement Agreement, and no implied fiduciary duties shall be read into this Settlement Agreement against the Trustee. Nor, except as expressly set forth herein, shall anything in this Settlement Agreement imply that the Trustee owes any greater duties under the Governing Agreements, fiduciary or otherwise, than it otherwise would owe under those agreements.

(b) In this Settlement Agreement, whenever the Trustee is required to make any report, schedule, or other information available to the Investors:

(i) The Trustee's responsibility for making such information available to the Investors is limited to the availability, timeliness, and accuracy of the information provided to the Trustee; and

(ii) The Trustee's obligation to post such information on the Trustee's Global Corporate Trust Investor Reporting website is subject to the timely provision of such information to the Trustee in form and format satisfactory to the Trustee and (if applicable) to the Trustee's ability to timely break-out such information by the Covered Trust.

- 36 -

13. **Representations and Warranties by Each Party.** Each Party to this Settlement Agreement represents, warrants, and agrees as to itself as follows:

(a) It is duly organized, validly existing, and (to the extent applicable) in good standing under the Law of the jurisdiction in which it is organized. It has the corporate, trust or other power and authority (including contractual and/or regulatory authority to the extent applicable) necessary to execute, deliver, and perform its obligations under this Settlement Agreement, and to complete the transactions contemplated hereby, including with respect to any other entities, accountholders, or accounts for which or on behalf of which it is signing this Settlement Agreement, and the execution, delivery, and performance of this Settlement Agreement and the completion of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate, trust, or other action. Assuming the due authorization, execution, and delivery of this Settlement Agreement by the other Parties, this Settlement Agreement constitutes the legal, valid, and binding obligations of it, enforceable against it in accordance with its terms.

(b) It has not relied upon any statement, representation, or promise of any other Party (or of any representative or attorney of or for any other Party), in executing this Settlement Agreement, or in connection with the Settlement, (i) except for the representations, warranties, covenants, and other obligations set forth in this Settlement Agreement, and (ii) except that Bank of America and Countrywide represent to the Trustee that neither Bank of America nor Countrywide had, as of the date it was provided, or has, as of the date of this Settlement Agreement, actual knowledge that any factual information provided to the Trustee, its counsel and its experts in connection with the negotiation of the Settlement concerning: (A) historic al factual information concerning prior repurchase experience, (B) factual information concerning historical losses and historical delinquencies experienced by the Covered Trusts, (C) the financial statements of CFC and/or CHL, and (D) documents reflecting, or information concerning, corporate transactions involving the exchange of assets between CFC and its subsidiaries and BAC and its non- Countrywide subsidiaries that were taken subsequent to the merger of CFC and a BAC subsidiary, was materially false or materially inaccurate at the time the information or documents were provided (unless subsequently corrected), and acknowledge that the Trustee's experts are relying on such information and documents. In addition, Bank of

- 37 -

1666

EXECUTION COPY

America and Countrywide represent to the Trustee that the information contained on the CD-ROM provided to the Trustee's counsel and experts on June 3, 2011 contains business records of BAC HLS as kept on its computer systems in the ordinary course of its business. It is further acknowledged and understood that the Trustee has made its own independent judgment concerning the reasonableness and advantageousness of the Settlement and its terms.

(c) It is not entering into this Settlement Agreement with the intent of hindering, delaying, or defrauding any of its respective current or future creditors.

(d) It has made such investigation of the facts pertaining to this Settlement and this Settlement Agreement and of all the matters pertaining thereto as it deems necessary.

(e) It has read this Settlement Agreement and understands the contents hereof, has consulted with counsel of its choice with respect to this Settlement Agreement, and has executed this Settlement Agreement voluntarily and without duress or undue influence on the part of or on behalf of any other Party.

(f) It has not heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the claims, demands, or causes of action released or waived by this Settlement Agreement.

**14. Nonsurvival of Representations and Warranties.** None of the representations or warranties set forth in this Settlement Agreement shall survive after the Approval Date or if Final Court Approval becomes legally impossible.

**15. Additional Agreements.**

(a) **Trustee's Agreement Regarding Post-Signing Data Actions.** Absent direction from the Settlement Court in accordance with the next sentence below, between the Signing Date and the Approval Date (or such time as Final Court Approval becomes legally impossible), the Trustee covenants that it will not take any action with respect to any Covered Trust that is intended or reasonably could be expected to be adverse to or inconsistent with the intent, terms, and conditions of the Settlement and this Settlement Agreement, and will not commence or assist in the commencement of any litigation based upon any of the claims subject to the release and

- 38 -

EXECUTION COPY

waiver in Paragraph 9. The Trustee intends to seek an order from the Settlement Court providing that the Trustee may seek direction from the Settlement Court before taking any action in respect of a Covered Trust that is the subject matter of the Article 77 Proceeding, and the Trustee reserves all rights to seek such order or direction.

(b) **Post-Signing Date Repurchases.** If after the Signing Date and before the Settlement Payment is made, any Bank of America Party or Countrywide Party either (i) repurchases any Mortgage Loan(s) from any Covered Trust(s) or (ii) makes any make-whole payment with respect to any such Mortgage Loan(s) to any Covered Trust(s) except as provided in Paragraph 6, the Settlement Payment provided for in this Settlement Agreement shall be reduced dollar-for-dollar by the economic benefit to the Covered Trust(s) of such repurchase or make-whole payment(s) and the Allocable Share(s) for the Covered Trust(s) from which the Mortgage Loan(s) was (or were) repurchased or to which the make-whole payment(s) was (or were) made shall be reduced by that same amount, provided that no amount used to retire Advances or Servicing Advances owed to the Master Servicer shall be considered an economic benefit for purposes of this Subparagraph 15(b). The Parties agree that if the amount of economic benefit received by a Covered Trust as a result of such repurchases or make-whole payments exceeds the amount of that Covered Trust's Allocable Share, then the reduction in the Settlement Payment shall be equal to, but shall not exceed, that Covered Trust's Allocable Share. Under no circumstances shall a repurchase of a Mortgage Loan or payment of a make-whole amount cause any portion of the Settlement Payment to be required to be returned.

(c) **Institutional Investor Agreement.** The Parties acknowledge and agree (and the Institutional Investors have so acknowledged and agreed in the Institutional Investor Agreement) that the Institutional Investors' entry into, and performance of their obligations under, the Institutional Investor Agreement is a material part of the consideration for entry by Bank of America and Countrywide into this Settlement Agreement.

**16. Indemnification.** BAC HLS acknowledges that it has certain obligations under the Governing Agreements to indemnify the Trustee. As of the execution of this Settlement Agreement, BAC HLS has delivered to the Trustee the side-letter attached hereto as Exhibit C and BAC has delivered to the Trustee the guaranty attached thereto with respect to BAC HLS's

- 39 -



EXECUTION COPY

obligations to indemnify the Trustee to the extent specified in the side-letter and in the Governing Agreements.

**17. Confidentiality.** All matters relating to the negotiation of this Settlement Agreement, including confidential information exchanged between any Parties hereto in connection with such negotiation, other than the Settlement Agreement and the Institutional Investor Agreement, shall be and remain confidential (the "Confidential Information") and shall not be disclosed to anyone other than the Parties hereto and their counsel, except that such information may be disclosed (a) in an action by any Party to enforce this Settlement Agreement or the Institutional Investor Agreement, to the extent reasonably required for the purposes of enforcement, (b) in response to a court order, subpoena, or other demand made in accordance with applicable law, rule, or regulation, (c) (i) as required by law, rule, accounting rule, or regulation, including Federal securities law, including any change in law, rule, accounting rule, or regulation, or (ii) in response to a request to a Party made by a Governmental Authority having jurisdiction over such Party, or (iii) as any Bank of America Party may elect in its sole discretion as part of its filings with the Securities and Exchange Commission on Forms 8-K, 10-Q, or 10-K and related disclosures, including disclosures and communications to any Bank of America Party's current or potential shareholders, investors, or other Governmental Authorities, and (d) to such Party's subsidiaries, affiliates, their respective directors, officers, external or internal agents, representatives, professional advisers, attorneys, accountants, auditors, insurers and reinsurers, successors, assigns, and employees, who have a need to know and are under a duty to implement appropriate measures to maintain the confidentiality, security, and integrity of such information. Should any Party receive a request for disclosure with respect to any Confidential Information except as part of this Section 77 Proceeding or pursuant to subsection (c) or (d) of this Paragraph 17, the Party receiving such a request shall promptly, and in no case more than five (5) business days following receipt of such a request (so long as it is legally permitted to provide such notification), notify the other Parties to afford them the opportunity to object or seek a protective order prior to the disclosure of any such information.

**18. Release and Covenants Valid Even if Additional or Different Facts; Effect of Breach.** The Parties acknowledge that they may discover facts that are additional to, inconsistent with, or different from those which they now know or believe to be true regarding

- 40 -

EXECUTION COPY

the Covered Trusts. Nonetheless, except as expressly set forth in this Settlement Agreement, it is intended that this Settlement Agreement shall fully and finally compromise all claims that exist or may exist arising from or relating to the Covered Trusts to the extent set forth herein. Following Final Court Approval, in the event of a material breach of this Settlement Agreement by any Party, the non-breaching Party's sole remedy shall be to seek to enforce the Settlement Agreement; provided, however, that if the Settlement Payment is not made by Bank of America or Countrywide in accordance with Subparagraphs 3(a) and (b) in all material respects or if at any time after the Approval Date the Settlement Payment is voided or rescinded for any reason, including as a preferential or fraudulent transfer (in all such cases, written notice having been given by the Trustee to Bank of America and Countrywide and Bank of America or Countrywide not having cured, made, or restored such payment within sixty (60) days), then the release and waiver contained in Paragraph 9 shall have no further force or effect; provided, however, that the Trustee may instead elect to seek to enforce this Settlement Agreement, in which event the release and waiver contained in Paragraph 9 shall remain in full force and effect. Under no other circumstances shall any breach of the Settlement Agreement by any Party impair or effect in any respect the release and waiver provided in Paragraph 9, or the other injunctive or other provisions to be contained in the Final Order and Judgment.

**19. Attorneys' Fees.** Within thirty (30) days of the Approval Date, Bank of America shall pay the attorneys' fees of the Institutional Investors and their attorneys' costs according to the schedule and terms set forth on Exhibit F (except that those fees and costs described in such Exhibit as being payable on a current basis shall be so paid following the Signing Date, unless and until Final Court Approval shall have become legally impossible, at which time any such payment obligations shall cease).

**20. No Admission.** In no event shall this Settlement, or this Settlement Agreement, the activities performed in contemplation of, in connection with, or in furtherance of this Settlement Agreement or the Article 77 Proceeding (including but not limited to statements in court filings, testimony, arguments, and expert opinions), public statements made by any Party or any of their representatives, concerning or relating to the Settlement, or any communications or negotiations with respect thereto be construed, deemed, used, asserted, or admitted as evidence of an admission or a concession on the part of any Party on any subject whatsoever; provided

- 41 -



EXECUTION COPY

that nothing in this Paragraph 20 shall preclude the use of the Settlement Agreement and the circumstances surrounding its execution to enforce the Settlement Agreement. The Bank of America Parties and the Countrywide Parties have denied and continue to deny any and all wrongdoing of any kind whatsoever, and retain, and do not waive, any and all positions, defenses, and responses that they may have with respect to such matters. The BNY Mellon Parties retain, and do not waive, any positions and responses they may have with respect to such matters other than as set forth explicitly in this Settlement Agreement.

21. **No Amendment of Governing Agreements.** Nothing in this Settlement Agreement is intended to, or does, amend any of the Governing Agreements.

22. **Binding Agreement on Successors and Assigns.** This Settlement Agreement shall be binding upon and inure to the benefit of the Parties' successors and assigns. This Settlement Agreement may not be assigned by any of the Parties without the prior written consent of each of the other Parties hereto and any attempted assignment in violation of this provision shall be null and void.

23. **Governing Law; Waiver of Jury Trial.** This Settlement Agreement and any claim, controversy, or dispute arising under or related to this Settlement Agreement or the Settlement shall be governed by, and construed in accordance with, the laws of the State of New York and the laws of the United States applicable to contracts entered into and completely performed in New York. EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS SETTLEMENT AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

24. **Consent to Jurisdiction.** Each Party consents and irrevocably submits to the continuing exclusive jurisdiction of the Settlement Court and any appellate courts thereof, or, if Final Court Approval becomes legally impossible, to the exclusive jurisdiction of the Supreme Court of the State of New York in the County of New York or the United States District Court for the Southern District of New York, and any appellate courts thereof, in any action, suit, or proceeding arising from or related to this Settlement Agreement. The Parties agree that a final

- 42 -

EXECUTION COPY

unappealable judgment in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Party waives and agrees not to assert by way of motion, as a defense or otherwise in any such suit, action, or proceeding, any claim that it is not personally subject to the jurisdiction of such courts, that the suit, action, or proceeding is brought in an inconvenient forum, that the venue of the suit, action, or proceeding is improper or that the related documents or the subject matter thereof may not be litigated in or by such courts. This consent to jurisdiction shall not be construed, deemed, used, asserted, or admitted as evidence of an admission or a concession of jurisdiction on the part of any Party in any action unrelated to this Settlement Agreement.

25. **Construction.** The terms, provisions, and conditions of this Settlement Agreement represent the results of negotiations among the Parties. The terms, provisions, and conditions of this Settlement Agreement shall be interpreted and construed in accordance with their usual and customary meanings. Each of the Parties expressly, knowingly, and voluntarily waives the application, in connection with the interpretation and construction of this Settlement Agreement, of any rule of law or procedure to the effect that ambiguous or conflicting terms, conditions, or provisions shall be interpreted or construed against the Party whose legal counsel prepared the executed version or any prior drafts of this Settlement Agreement. The headings contained in this Settlement Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Settlement Agreement. Whenever the words "include," "includes," or "including" are used in this Settlement Agreement, they shall be deemed to be followed by the words "without limitation." References to specific numbered sections of the Governing Agreements are intended to refer to those sections and other similar sections of like effect in other Governing Agreements if the numbering differs.

26. **Severability.** If any provision of this Settlement Agreement other than the Settlement Payment contained in Paragraph 3 or the release and waiver contained in Paragraph 9 shall, for any reason or to any extent, be invalidated or ruled to be unenforceable, the remainder of this Settlement Agreement shall be enforced to the fullest extent permitted by law.

27. **No Third-Party Rights or Obligations.** No Person not a Party to this Settlement Agreement shall have any third-party beneficiary or other rights under this Settlement.

- 43 -

169

EXECUTION COPY

Agreement. Under no circumstances shall any Person not a Party hereto have any right to sue under or otherwise directly enforce this Settlement Agreement. For the avoidance of doubt, nothing in this Settlement Agreement confers any right or ability to sue to any present or former Mortgage Loan borrower, nor does this Settlement Agreement create any obligation on the part of any Person to any such borrower.

**28. Multiple Counterparts.** This Settlement Agreement may be executed in a number of identical counterparts, each of which for all purposes is deemed an original, and all of which constitute collectively one agreement. The Parties intend that faxed signatures and electronically-imaged signatures such as PDF files shall constitute original signatures and are binding on all Parties. An executed counterpart signature page delivered by facsimile or by electronic mail shall have the same binding effect as an original signature page. This Settlement Agreement shall not be binding until all Parties have signed and delivered a counterpart of this Settlement Agreement whether by mail, facsimile, or electronic mail.

**29. Modification and Waiver.** This Settlement Agreement may not be amended, altered or modified, and no provision hereof may be waived, except by written instrument executed by the Parties. No waiver shall constitute a waiver of, or estoppel with respect to, any subsequent or other inaccuracy, breach or failure to comply strictly with the provisions of this Settlement Agreement.

**30. Further Assurances.** The Parties agree (a) to use their reasonable best efforts and cooperate in good faith to fully effectuate the intent, terms, and conditions of this Settlement Agreement and the Settlement, including by executing and delivering all additional documents and instruments, doing all acts not specifically referred to herein that are reasonably necessary to fully effectuate the intent, terms, and conditions of this Settlement Agreement, and refraining from taking any action (or assisting others to take any action) contrary to or inconsistent with the intent, terms, and conditions of this Settlement Agreement; provided, however, that, as to the Trustee, seeking to obtain direction from the Settlement Court before or taking any action in respect of a Covered Trust that is the subject matter of the Article 77 Proceeding, pursuant to Subparagraph 2(c) of this Settlement Agreement, shall not be deemed to be contrary to or inconsistent with the intent, terms, and conditions of this Settlement Agreement; (b) that any

- 44 -

EXECUTION COPY

actions taken by the Master Servicer and/or any Subservicer prior to the Approval Date pursuant to or that are consistent with the provisions of Paragraph 5 herein shall be deemed to satisfy the Master Servicer's obligation to service the Mortgage Loans prudently in accordance with all relevant sections of the Governing Agreements; and (c) in the absence of an intentional violation of a representation or warranty contained herein, to perform these obligations even if they discover facts that are additional to, inconsistent with, or different from those which they now know or be know to be true regarding the Covered Trusts.

**31. Entire Agreement.** The Settlement Agreement and the Institutional Investor Agreement constitute the entire agreement of the Parties hereto with respect to the subject matter hereof, except as expressly provided herein, and supersedes all prior agreements and understandings, discussions, negotiations and communications, written and oral, among the Parties with respect to the subject matter hereof. Notwithstanding the preceding sentence, the Confidentiality Undertaking dated January 27, 2011, and agreed to by the Trustee, BAC HLS, and Gibbs & Bruns LLP on behalf of its clients, shall remain in full force and effect, and the Forbearance Agreement shall remain in full force and effect according to its terms and conditions and Paragraph 7 herein.

**32. Notices.** Any notice or other communication required or permitted under this Settlement Agreement shall be in writing and shall be deemed to have been duly given when (a) mailed by United States registered or certified mail, return receipt requested, (b) mailed by overnight express mail or other nationally recognized overnight or same-day delivery service, or (c) delivered in person, to the parties at the following addresses:

If the Trustee, to:

The Bank of New York Mellon
101 Barclay Street, 8 West
New York, New York 10286

Attention:     Loretta A. Lundberg
Managing Director
Corporate Trust Default Services

with a copy to:

- 45 -

170

The Bank of New York Mellon
One Wall Street
New York, New York 10286

Attention:   Jane Sherburne
             General Counsel

If Bank of America, to:

Bank of America Corporation
100 N. Tryon Street
Charlotte, NC 28255-0001

Attention:   Edward P. O'Keefe
             General Counsel
             NC1-007-57-25

with a copy to:

Bank of America Corporation
Consumer Real Estate Services Division, Legacy Asset Servicing Unit
Hearst Tower
214 N. Tryon St.
Charlotte, NC 28255

Attention:   Jana J. Litsey
             Deputy General Counsel
             NC1-027-20-05

If Countywide, to:

Countrywide Home Loans, Inc.
4500 Park Granada
Calabasas, CA 91302

Attention:   Michael Schloessman
             President

- 46 -

with a copy to

Bank of America Corporation
Consumer Real Estate Services Division, Legacy Asset Servicing Unit
Hearst Tower
214 N. Tryon St.
Charlotte, NC 28255

Attention: Jana J. Litsey
           Deputy General Counsel
           NC1-027-20-05

A Party may change the names or addresses where notice is to be given to it by providing notice to the other Parties of such change in accordance with this Paragraph 32.

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement on the day and year so indicated.

- 47 -

/s/ Loretta A. Lundberg

*The Bank of New York Mellon, as trustee or indenture trustee of the Covered Trusts*

Name: Loretta A. Lundberg

Title:   Managing Director

Dated: June 28, 2011

171

/s/ Michael Schloessman

*Countrywide Financial Corporation*

Name : Michael Schloessman

Title :  President and CEO

Dated: June 28, 2011

/s/ Michael Schloessman

*Countrywide Home Loans, Inc.*

Name : Michael Schloessman

Title : President and CEO

Dated: June 28, 2011

/s/ Terrence P. Laughlin

*Bank of America Corporation*

Name : Terrence P. Laughlin

Title : Legacy Asset Servicing Division President

Dated: June 28, 2011

/s/ Terrence P. Laughlin

*BAC Home Loans Servicing, LP*

Name : Terrence P. Laughlin

Title : Legacy Asset Servicing Division President
       Bank of America, N.A.

By:  BAC GP, LLC, its general partner

By:  Bank of America, N.A., its manager

Dated: June 28, 2011

172

## Exhibit A

| | | | |
|---|---|---|---|
| CWALT 2004-10CB | CWALT 2005-17 | CWALT 2005-63 | CWALT 2006-18CB |
| CWALT 2004-12CB | CWALT 2005-18CB | CWALT 2005-64CB | CWALT 2006-19CB |
| CWALT 2004-13CB | CWALT 2005-1CB | CWALT 2005-65CB | CWALT 2006-20CB |
| CWALT 2004-14T2 | CWALT 2005-2 | CWALT 2005-66 | CWALT 2006-21CB |
| CWALT 2004-15 | CWALT 2005-20CB | CWALT 2005-67CB | CWALT 2006-23CB |
| CWALT 2004-16CB | CWALT 2005-21CB | CWALT 2005-69 | CWALT 2006-24CB |
| CWALT 2004-17CB | CWALT 2005-23CB | CWALT 2005-6CB | CWALT 2006-25CB |
| CWALT 2004-18CB | CWALT 2005-24 | CWALT 2005-70CB | CWALT 2006-26CB |
| CWALT 2004-20T1 | CWALT 2005-25T1 | CWALT 2005-71 | CWALT 2006-27CB |
| CWALT 2004-22CB | CWALT 2005-26CB | CWALT 2005-72 | CWALT 2006-28CB |
| CWALT 2004-24CB | CWALT 2005-27 | CWALT 2005-73CB | CWALT 2006-29T1 |
| CWALT 2004-25CB | CWALT 2005-28CB | CWALT 2005-74T1 | CWALT 2006-2CB |
| CWALT 2004-26T1 | CWALT 2005-29CB | CWALT 2005-75CB | CWALT 2006-30T1 |
| CWALT 2004-27CB | CWALT 2005-30CB | CWALT 2005-76 | CWALT 2006-31CB |
| CWALT 2004-28CB | CWALT 2005-31 | CWALT 2005-77T1 | CWALT 2006-32CB |
| CWALT 2004-29CB | CWALT 2005-32T1 | CWALT 2005-79CB | CWALT 2006-33CB |
| CWALT 2004-2CB | CWALT 2005-33CB | CWALT 2005-7CB | CWALT 2006-34 |
| CWALT 2004-30CB | CWALT 2005-34CB | CWALT 2005-80CB | CWALT 2006-35CB |
| CWALT 2004-32CB | CWALT 2005-35CB | CWALT 2005-82 | CWALT 2006-36T2 |
| CWALT 2004-33 | CWALT 2005-36 | CWALT 2005-83CB | CWALT 2006-39CB |
| CWALT 2004-34T1 | CWALT 2005-37T1 | CWALT 2005-84 | CWALT 2006-40T1 |
| CWALT 2004-35T2 | CWALT 2005-38 | CWALT 2005-85CB | CWALT 2006-41CB |
| CWALT 2004-36CB | CWALT 2005-3CB | CWALT 2005-86CB | CWALT 2006-42 |
| CWALT 2004-3T1 | CWALT 2005-4 | CWALT 2005-9CB | CWALT 2006-43CB |
| CWALT 2004-4CB | CWALT 2005-40CB | CWALT 2005-AR1 | CWALT 2006-45T1 |
| CWALT 2004-5CB | CWALT 2005-41 | CWALT 2005-IM1 | CWALT 2006-46 |
| CWALT 2004-6CB | CWALT 2005-42CB | CWALT 2005-J10 | CWALT 2006-4CB |
| CWALT 2004-7T1 | CWALT 2005-43 | CWALT 2005-J11 | CWALT 2006-5T2 |
| CWALT 2004-8CB | CWALT 2005-44 | CWALT 2005-J12 | CWALT 2006-6CB |
| CWALT 2004-9T1 | CWALT 2005-45 | CWALT 2005-J13 | CWALT 2006-7CB |
| CWALT 2004-J10 | CWALT 2005-46CB | CWALT 2005-J14 | CWALT 2006-8T1 |
| CWALT 2004-J11 | CWALT 2005-47CB | CWALT 2005-J3 | CWALT 2006-9T1 |
| CWALT 2004-J12 | CWALT 2005-48T1 | CWALT 2005-J4 | CWALT 2006-HY10 |
| CWALT 2004-J13 | CWALT 2005-49CB | CWALT 2005-J5 | CWALT 2006-HY11 |
| CWALT 2004-J2 | CWALT 2005-50CB | CWALT 2005-J6 | CWALT 2006-HY12 |
| CWALT 2004-J3 | CWALT 2005-51 | CWALT 2005-J7 | CWALT 2006-HY13 |
| CWALT 2004-J5 | CWALT 2005-53T2 | CWALT 2005-J8 | CWALT 2006-HY3 |
| CWALT 2004-J6 | CWALT 2005-54CB | CWALT 2005-J9 | CWALT 2006-J1 |
| CWALT 2004-J7 | CWALT 2005-55CB | CWALT 2006-11CB | CWALT 2006-J2 |
| CWALT 2004-J8 | CWALT 2005-56 | CWALT 2006-12CB | CWALT 2006-J3 |
| CWALT 2004-J9 | CWALT 2005-57CB | CWALT 2006-13T1 | CWALT 2006-J4 |
| CWALT 2005-10CB | CWALT 2005-58 | CWALT 2006-14CB | CWALT 2006-J5 |
| CWALT 2005-11CB | CWALT 2005-59 | CWALT 2006-15CB | CWALT 2006-J6 |
| CWALT 2005-14 | CWALT 2005-60T1 | CWALT 2006-16CB | CWALT 2006-J7 |
| CWALT 2005-16 | CWALT 2005-61 | CWALT 2006-17T1 | CWALT 2006-J8 |

173

CWALT 2006-OA1
CWALT 2006-OA10
CWALT 2006-OA11
CWALT 2006-OA12
CWALT 2006-OA14
CWALT 2006-OA16
CWALT 2006-OA17
CWALT 2006-OA18
CWALT 2006-OA2
CWALT 2006-OA21
CWALT 2006-OA22
CWALT 2006-OA3
CWALT 2006-OA6
CWALT 2006-OA7
CWALT 2006-OA8
CWALT 2006-OA9
CWALT 2006-OC1
CWALT 2006-OC10
CWALT 2006-OC11
CWALT 2006-OC2
CWALT 2006-OC3
CWALT 2006-OC4
CWALT 2006-OC5
CWALT 2006-OC6
CWALT 2006-OC7
CWALT 2006-OC8
CWALT 2006-OC9
CWALT 2007-10CB
CWALT 2007-11T1
CWALT 2007-12T1
CWALT 2007-13
CWALT 2007-14T2
CWALT 2007-16CB
CWALT 2007-17CB
CWALT 2007-18CB
CWALT 2007-19
CWALT 2007-1T1
CWALT 2007-20
CWALT 2007-21CB
CWALT 2007-22
CWALT 2007-23CB
CWALT 2007-24
CWALT 2007-25
CWALT 2007-2CB
CWALT 2007-3T1
CWALT 2007-4CB

CWALT 2007-5CB
CWALT 2007-6
CWALT 2007-7T2
CWALT 2007-8CB
CWALT 2007-9T1
CWALT 2007-AL1
CWALT 2007-HY2
CWALT 2007-HY3
CWALT 2007-HY4
CWALT 2007-HY6
CWALT 2007-HY7C
CWALT 2007-HY8C
CWALT 2007-HY9
CWALT 2007-J2
CWALT 2007-OA11
CWALT 2007-OA2
CWALT 2007-OA3
CWALT 2007-OA4
CWALT 2007-OA6
CWALT 2007-OA7
CWALT 2007-OA8
CWALT 2007-OA9
CWALT 2007-OH1
CWALT 2007-OH2
CWALT 2007-OH3
CWALT 2004-J4
CWALT 2005-13CB
CWALT 2005-19CB
CWALT 2005-22T1
CWALT 2005-52CB
CWALT 2005-62
CWALT 2005-81
CWALT 2005-J1
CWALT 2005-J2
CWALT 2006-OA19
CWALT 2007-15CB
CWALT 2007-J1
CWALT 2007-OA10
CWHEQ 2006-A
CWHEQ 2007-G
CWHL 2004-11
CWHL 2004-12
CWHL 2004-13
CWHL 2004-14
CWHL 2004-15
CWHL 2004-16

CWHL 2004-18
CWHL 2004-19
CWHL 2004-2
CWHL 2004-20
CWHL 2004-21
CWHL 2004-22
CWHL 2004-23
CWHL 2004-24
CWHL 2004-25
CWHL 2004-29
CWHL 2004-3
CWHL 2004-5
CWHL 2004-6
CWHL 2004-7
CWHL 2004-HYB1
CWHL 2004-HYB2
CWHL 2004-HYB3
CWHL 2004-HYB4
CWHL 2004-HYB5
CWHL 2004-HYB6
CWHL 2004-HYB7
CWHL 2004-HYB8
CWHL 2004-HYB9
CWHL 2004-J2
CWHL 2004-J3
CWHL 2004-J4
CWHL 2004-J5
CWHL 2004-J6
CWHL 2004-J7
CWHL 2004-J8
CWHL 2004-J9
CWHL 2005-1
CWHL 2005-10
CWHL 2005-11
CWHL 2005-12
CWHL 2005-13
CWHL 2005-14
CWHL 2005-16
CWHL 2005-17
CWHL 2005-18
CWHL 2005-2
CWHL 2005-20
CWHL 2005-21
CWHL 2005-22
CWHL 2005-23
CWHL 2005-25

CWHL 2005-26
CWHL 2005-27
CWHL 2005-28
CWHL 2005-29
CWHL 2005-3
CWHL 2005-30
CWHL 2005-31
CWHL 2005-7
CWHL 2005-9
CWHL 2005-HYB1
CWHL 2005-HYB2
CWHL 2005-HYB3
CWHL 2005-HYB4
CWHL 2005-HYB5
CWHL 2005-HYB6
CWHL 2005-HYB7
CWHL 2005-HYB8
CWHL 2005-HYB10†
CWHL 2005-J1
CWHL 2005-J2
CWHL 2005-J3
CWHL 2005-J4
CWHL 2006-1
CWHL 2006-10
CWHL 2006-11
CWHL 2006-12
CWHL 2006-13
CWHL 2006-14
CWHL 2006-15
CWHL 2006-16
CWHL 2006-17
CWHL 2006-18
CWHL 2006-19
CWHL 2006-20
CWHL 2006-21
CWHL 2006-3
CWHL 2006-6
CWHL 2006-8
CWHL 2006-9
CWHL 2006-HYB1
CWHL 2006-HYB2
CWHL 2006-HYB3
CWHL 2006-HYB4
CWHL 2006-HYB5

† Appears on Bloomberg as CWHL 2005-HY10

- A-2 -

174

| | | | |
|---|---|---|---|
| CWHL 2006-J1 | CWHL 2005-5 | CWL 2005-SD3 | CWL 2007-SD1 |
| CWHL 2006-J2 | CWHL 2005-6 | CWL 2006-1 | CWL 2007-SEA1 |
| CWHL 2006-J3 | CWL 2004-1 | CWL 2006-10 | CWL 2007-SEA2 |
| CWHL 2006-J4 | CWL 2004-11 | CWL 2006-12 | CWL 2004-10 |
| CWHL 2006-OA4 | CWL 2004-14 | CWL 2006-14 | CWL 2004-12 |
| CWHL 2006-OA5 | CWL 2004-2 | CWL 2006-16 | CWL 2004-13 |
| CWHL 2006-TM1 | CWL 2004-3 | CWL 2006-17 | CWL 2004-15 |
| CWHL 2007-1 | CWL 2004-4 | CWL 2006-18 | CWL 2004-8 |
| CWHL 2007-10 | CWL 2004-5 | CWL 2006-19 | CWL 2004-9 |
| CWHL 2007-11 | CWL 2004-6 | CWL 2006-2 | CWL 2004-AB1 |
| CWHL 2007-12 | CWL 2004-7 | CWL 2006-20 | CWL 2005-1 |
| CWHL 2007-13 | CWL 2004-AB2 | CWL 2006-24 | CWL 2005-11 |
| CWHL 2007-14 | CWL 2004-BC2 | CWL 2006-25 | CWL 2005-12 |
| CWHL 2007-15 | CWL 2004-BC3 | CWL 2006-3 | CWL 2005-13 |
| CWHL 2007-16 | CWL 2004-BC4 | CWL 2006-4 | CWL 2005-14 |
| CWHL 2007-17 | CWL 2004-BC5 | CWL 2006-5 | CWL 2005-15 |
| CWHL 2007-18 | CWL 2004-ECC1 | CWL 2006-6 | CWL 2005-16 |
| CWHL 2007-19 | CWL 2004-ECC2 | CWL 2006-7 | CWL 2005-17 |
| CWHL 2007-2 | CWL 2004-S1 | CWL 2006-8 | CWL 2005-3 |
| CWHL 2007-20 | CWL 2004-SD2 | CWL 2006-9 | CWL 2005-4 |
| CWHL 2007-21 | CWL 2004-SD3 | CWL 2006-ABC1 | CWL 2005-7 |
| CWHL 2007-3 | CWL 2004-SD4 | CWL 2006-BC1 | CWL 2006-11 |
| CWHL 2007-4 | CWL 2005-10 | CWL 2006-BC2 | CWL 2006-13 |
| CWHL 2007-5 | CWL 2005-2 | CWL 2006-BC3 | CWL 2006-15 |
| CWHL 2007-6 | CWL 2005-5 | CWL 2006-BC4 | CWL 2006-21 |
| CWHL 2007-7 | CWL 2005-6 | CWL 2006-BC5 | CWL 2006-22 |
| CWHL 2007-8 | CWL 2005-8 | CWL 2006-IM1 | CWL 2006-23 |
| CWHL 2007-9 | CWL 2005-9 | CWL 2006-QH1 | CWL 2006-26 |
| CWHL 2007-HY1 | CWL 2005-AB1 | CWL 2006-SD1 | CWL 2007-1 |
| CWHL 2007-HY3 | CWL 2005-AB2 | CWL 2006-SD2 | CWL 2007-13 |
| CWHL 2007-HY4 | CWL 2005-AB3 | CWL 2006-SD3 | CWL 2007-2 |
| CWHL 2007-HY5 | CWL 2005-AB4 | CWL 2006-SD4 | CWL 2007-4 |
| CWHL 2007-HY6 | CWL 2005-AB5 | CWL 2006-SPS1 | |
| CWHL 2007-HY7 | CWL 2005-BC1 | CWL 2006-SPS2 | |
| CWHL 2007-HYB1 | CWL 2005-BC2 | CWL 2007-10 | |
| CWHL 2007-HYB2 | CWL 2005-BC3 | CWL 2007-11 | |
| CWHL 2007-J1 | CWL 2005-BC4 | CWL 2007-12 | |
| CWHL 2007-J2 | CWL 2005-BC5 | CWL 2007-3 | |
| CWHL 2007-J3 | CWL 2005-HYB9* | CWL 2007-5 | |
| CWHL 2008-1 | CWL 2005-IM1 | CWL 2007-6 | |
| CWHL 2004-10 | CWL 2005-IM2 | CWL 2007-7 | |
| CWHL 2004-4 | CWL 2005-IM3 | CWL 2007-8 | |
| CWHL 2004-8 | CWL 2005-SD1 | CWL 2007-9 | |
| CWHL 2004-9 | CWL 2005-SD2 | CWL 2007-BC1 | |
| CWHL 2005-15 | | CWL 2007-BC2 | |
| CWHL 2005-24 | | CWL 2007-BC3 | |

---

*    Appears on Bloomberg as CWHL 2005-HYB9

175

**EXHIBIT B**

**Form of Order**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------------x
                                                                     :
In the matter of the application of                                  :
                                                                     :
THE BANK OF NEW YORK MELLON,                                         :
(as Trustee under various Pooling and Servicing Agreements and        :    Index No.
Indenture Trustee under various Indentures),                         :
                                                                     :    [PROPOSED]
                                              Petitioner,             :    FINAL ORDER AND
                                                                     :    JUDGMENT
for an order, pursuant to CPLR § 7701, seeking judicial              :
instructions and approval of a proposed settlement.                  :
                                                                     :
---------------------------------------------------------------------x

Petitioner, The Bank of New York Mellon, solely in its capacity as trustee or indenture trustee under 530 mortgage-securitization trusts identified in Exhibit A to the Verified Petition (the "Petitioner" or the "Trustee"), evidenced by 530 separate Pooling and Servicing Agreements ("PSAs") or Indentures and related Sales and Servicing Agreements ("SSAs," and together with the PSAs and Indentures, the "Governing Agreements"), having applied to this Court for an order pursuant to CPLR § 7701 for judicial instructions and approval of a settlement entered into by and among the Trustee, Bank of America Corporation, BAC Home Loans Servicing, LP, Countrywide Financial Corporation, and Countrywide Home Loans, Inc. (the "Settlement"), such Settlement being embodied in the settlement agreement, dated June 28, 2011 (the "Settlement Agreement") attached to the Verified Petition herein and attached hereto as Exhibit A; and

- B-1 -

UPON reading and filing the Verified Petition and the exhibits thereto; the Affirmation of Matthew D. Ingber, counsel to the Trustee, in support of the Verified Petition, dated June 28, 2011 (the "Ingber Affirmation"); The Bank of New York Mellon's Memorandum of Law In Support of its Verified Petition Seeking Judicial Instructions and Approval of a Proposed Settlement, dated June 28, 2011; all answers, objections, or other responses filed in response to the Verified Petition; all papers filed in response to those answers, objections, or responses; and upon all prior proceedings and pleadings heretofore had; and

UPON this Court having rendered its decision (the "Decision") on _____, 2011, which Decision is attached hereto as Exhibit B; and

UPON the Decision with notice of entry (attached hereto as Exhibit C) having been served upon all parties on _____, 2011;

NOW, it is hereby ORDERED, ADJUDGED, and DECREED that:

a)   For purposes of this Final Order and Judgment, the Court adopts all defined terms set forth in the Settlement Agreement. Capitalized terms used herein, unless otherwise defined, shall have the meanings set forth in the Settlement Agreement.

b)   The Court has jurisdiction over the subject matter of this Article 77 Proceeding. The Court has jurisdiction over the Petitioner, the Covered Trusts, and all certificateholders and noteholders of the Covered Trusts (the "Trust Beneficiaries") with respect to the matters determined herein. (As used herein, "Trust Beneficiaries" shall have the same meaning as "Investors" under the Settlement Agreement.)

- B-2 -

176

c)   The form and the method of dissemination of notice (the "Notice"), as described in and as previously approved by the Court's Order dated _____, 2011 (the "Preliminary Order"), provided the best notice practicable under the circumstances and was reasonably calculated to put interested parties on notice of this action. The Preliminary Order provided, inter alia, for the Notice to be provided by a combination of individual notice, notice by publication in specified publications, notice through the Depository Trust Company, advertising on the internet, and notice through a website created and maintained by the Trustee for the Article 77 Proceeding. The Petitioner has submitted evidence establishing its compliance with reasonable diligence with the Preliminary Order. The Court finds that the Notice was provided in accordance with the provisions of the Preliminary Order.

d)   The Notice provided due and adequate notice of these proceedings and the matters set forth herein, including the Settlement and the Court's consideration of the actions of the Trustee in entering into the Settlement Agreement, to all persons entitled to such notice, including the Potentially Interested Persons identified in paragraph 6 of the Ingber Affirmation, including the Trust Beneficiaries, and the Notice fully satisfied the requirements of New York law, federal and state due process requirements and the requirements of other applicable law.

e)   A full and fair opportunity has been offered to all Potentially Interested Persons, including the Trust Beneficiaries, to make their views known to the Court, to object to the Settlement and to the approval of the actions of the

- B-3 -

Trustee in entering into the Settlement Agreement, and to participate in the hearing thereon. Accordingly, the Covered Trusts, all Trust Beneficiaries, and their successors-in-interest and assigns, and any Persons claiming by, through, or on behalf of any of the Trustee, the Trust Beneficiaries, or the Covered Trusts or under the Governing Agreements are bound by this Final Order and Judgment.

f)   The Trustee has the authority, pursuant to the Governing Agreements and applicable law: (i) to assert, abandon, or compromise the Trust Released Claims, and (ii) to enter into the Settlement Agreement on behalf of all Trust Beneficiaries, the Covered Trusts, and any Persons claiming by, through, or on behalf of any of the Trustee, the Trust Beneficiaries, or the Covered Trusts or under the Governing Agreements.

g)   Pursuant to the Governing Agreements and applicable law, the decision whether to enter into the Settlement Agreement on behalf of all Trust Beneficiaries, the Covered Trusts, and any Persons claiming by, through, or on behalf of any of the Trustee, the Trust Beneficiaries, or the Covered Trusts or under the Governing Agreements is a matter within the Trustee's discretion.

h)   The Settlement Agreement is the result of factual and legal investigation by the Trustee, and is supported by the Institutional Investors.

i)   The Trustee appropriately evaluated the terms, benefits, and consequences of the Settlement and the strengths and weaknesses of the claims being settled. In that regard, the Trustee appropriately considered the claims made and

- B-4 -

positions presented by the Institutional Investors, Bank of America, and Countrywide relating to the Trust Released Claims in considering whether to enter into the Settlement Agreement.

j)   The arm's-length negotiations that led to the Settlement Agreement and the Trustee's deliberations appropriately focused on the strengths and weaknesses of the Trust Released Claims, the alternatives available or potentially available to pursue remedies for the benefit of the Trust Beneficiaries, and the terms of the Settlement.

k)   The Trustee acted in good faith, within its discretion, and within the bounds of reasonableness in determining that the Settlement Agreement was in the best interests of the Covered Trusts.

l)   Pursuant to CPLR § 7701, the Court hereby approves the actions of the Trustee in entering into the Settlement Agreement in all respects.

m)   The Parties are directed to consummate the Settlement in accordance with its terms and conditions, and the Settlement is hereby approved by the Court in all respects.

n)   The Settlement Agreement is hereby approved in all respects, and is fully enforceable in all respects. The release in the Settlement Agreement provides as follows:

9.   **Release.**

(a) Effective as of the Approval Date, except as set forth in Paragraph 10 [of the Settlement Agreement], the Trustee on behalf of itself and all Investors, the Covered Trusts, and/or any Persons claiming by, through, or on behalf of any of the Trustee, the Investors, or the Covered Trusts or under the Governing Agreements (collectively, the Trustee, Investors, Covered Trusts, and such Persons being defined together as the "Precluded Persons"),

- B-5 -

177

irrevocably and unconditionally grants a full, final, and complete release, waiver, and discharge of all alleged or actual claims, counterclaims, defenses, rights of setoff, rights of rescission, liens, disputes, liabilities, Losses, debts, costs, expenses, obligations, demands, claims for accountings or audits, alleged Events of Default, damages, rights, and causes of action of any kind or nature whatsoever, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, in contract, tort, or otherwise, secured or unsecured, accrued or unaccrued, whether direct, derivative, or brought in any other capacity that the Precluded Persons may now or may hereafter have against any or all of the Bank of America Parties and/or Countrywide Parties arising out of or relating to (i) the origination, sale, or delivery of Mortgage Loans to the Covered Trusts, including the representations and warranties in connection with the origination, sale, or delivery of Mortgage Loans to the Covered Trusts or any alleged obligation of any Bank of America Party and/or Countrywide Party to repurchase or otherwise compensate the Covered Trusts for any Mortgage Loan on the basis of any representations or warranties or otherwise or failure to cure any alleged breaches of representations and warranties, including all claims arising in any way from or under Section 2.03 ("Representations, Warranties and Covenants of the Sellers and Master Servicer") of the Governing Agreements, (ii) the documentation of the Mortgage Loans held by the Covered Trusts (including the documents and instruments covered in Sections 2.01 ("Conveyance of Mortgage Loans") and 2.02 ("Acceptance by the Trustee of the Mortgage Loans") of the Governing Agreements and the Mortgage File) including with respect to alleged defective, incomplete or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment, or any other matter relating to legal enforceability of a Mortgage or Mortgage Note, and (iii) the servicing of the Mortgage Loans held by the Covered Trusts (including any claim relating to the timing of collection efforts or foreclosure efforts, loss mitigation, transfers to subservicers, Advances, Servicing Advances, or that servicing includes an obligation to take any action or provide any notice towards, or with respect to, the possible repurchase of Mortgage Loans by the Master Servicer, Seller, or any other Person), in all cases prior to or after the Approval Date (collectively, all such claims being defined as the "Trust Released Claims").

(b) The Trust Released Claims shall also be deemed to have been released as of the Approval Date to the full and same extent by the Master Servicer of the Covered Trusts (including the current Master Servicer, BAC HLS, and any subsequent servicer who may in the future be substituted for the current Master Servicer with respect to one or more of the Covered Trusts or any loans therein) and the Master Servicer shall be deemed to be a Precluded Person.

---

¹  Which provision is numbered 2.04 in the Sale and Servicing Agreements relating to CWHEQ 2006-A and CWHEQ 2007-G.

---

(c) The release and waiver in Subparagraphs 9(a) and 9(b) [of the Settlement Agreement] is intended to include, and upon its effectiveness shall include, any claims or contentions that Bank of America or any non-Countrywide affiliate, division, or subsidiary of Bank of America, and any of the predecessors or assigns thereof, is liable on any theory of successor liability, vicarious liability, veil piercing, de facto merger, fraudulent conveyance, or other similar claim or theory for the obligations, exposure, or liability of Countrywide or any of its affiliates, divisions, or subsidiaries, and any of the predecessors or assigns thereof concerning any of the Covered Trusts, with respect to the Trust Released Claims.

**10.    Claims Not Released.**

(a) **Administration of the Mortgage Loans.** The release and waiver in Paragraph 9 [of the Settlement Agreement] does not include claims based solely on the action, inaction, or practices of the Master Servicer in its aggregation and remittance of Mortgage Loan payments, accounting for principal and interest, and preparation of tax-related information in connection with the Mortgage Loans and the ministerial operation and administration of the Covered Trusts and of the Mortgage Loans held by the Covered Trusts for which the Master Servicer receives servicing fees unless, as of the Signing Date, the Trustee has or should have knowledge of the actions, inactions or practices of the Master Servicer in connection with such matters.

(b) **Servicing of the Mortgage Loans.** Except as provided in Subparagraph 10(a) [of the Settlement Agreement], the release and waiver in Paragraph 9 [of the Settlement Agreement] includes: (i) all claims based in whole or in part on any actions, inactions, or practices of the Master Servicer prior to the Approval Date as to the servicing of the Mortgage Loans held by the Covered Trusts; and (ii) as to all actions, inactions, or practices by the Master Servicer after the Approval Date, only (A) actions, inactions, and practices that relate to the aspects of servicing addressed in whole or in part by the provisions of Paragraph 5 [of the Settlement Agreement] (material compliance with which shall satisfy the Master Servicer's obligation to service the Mortgage Loans prudently in accordance with all relevant sections of the Governing Agreements) and (B) actions, inactions, or practices that relate to the aspects of servicing not addressed by the provisions of Paragraph 5 [of the Settlement Agreement] that are consistent with (or improvements over) the Master Servicer's course of conduct prior to the Signing Date. It is further understood and agreed that Investors may pursue such remedies as are available under Section 10.08 ("Limitation on Rights of Certificateholders") of the Governing Agreements with respect to an Event of Default as to any servicing claims not released by this Settlement.

178

(c) **Certain Individual Investor Claims**. The release and waiver in Paragraph 9 [of the Settlement Agreement] does not include any direct claims held by Investors or their clients that do not seek to enforce any rights under the terms of the Governing Agreements but rather are based on disclosures made (or failed to be made) in connection with their decision to purchase, sell, or hold securities issued by any Covered Trust, including claims under the securities or antifraud laws of the United States or of any state; provided, however, that the question of the extent to which any payment made or benefit conferred pursuant to this Settlement Agreement may constitute an offset or credit against, or a reduction in the gross amount of, any such claim shall be determined in the action in which such claim is raised, and the Parties reserve all rights with respect to the position they may take on that question in those actions and acknowledge that all other Persons similarly reserve such rights.

(d) **Financial Guaranty Provider Rights and Obligations**. To the extent that any third-party guarantor or financial-guaranty provider with respect to any Covered Trust has rights or obligations independent of the rights or obligations of the Investors, the Trustee, or the Covered Trusts, the release and waiver in Paragraph 9 [of the Settlement Agreement] is not intended to and shall not release such rights, or impair or diminish in any respect such obligations or any insurance or indemnity obligations owed by or to such Person.

(e) **Indemnification Rights**. The Parties do not release any rights to indemnification under the Governing Agreements including the Trustee's right to indemnification by the Master Servicer of the Covered Trusts.

(f) **Settlement Agreement Rights**. The Parties do not release any rights or claims against each other to enforce the terms of this Settlement Agreement.

(g) **Excluded Covered Trusts**. The release and waiver in Paragraph 9 [of the Settlement Agreement] does not include claims with respect to any Excluded Covered Trust.

o)  The Trustee, all Trust Beneficiaries, the Covered Trusts, and any Persons claiming by, through, or on behalf of any of the Trustee, the Trust Beneficiaries, or the Covered Trusts or under the Governing Agreements, and each of their heirs, executors, administrators, successors-in-interest, and assigns, are hereby: (i) permanently barred and enjoined from instituting, commencing, or prosecuting, either directly, derivatively, or in any other

- B-8 -

capacity, any suit, proceeding, or other action asserting any of the Trust Released Claims, against any or all of the Bank of America Parties and/or the Countrywide Parties; (ii) conclusively determined to have fully, finally, and forever compromised, settled, released, relinquished, discharged, and dismissed with prejudice and on the merits the Trust Released Claims; and (iii) permanently barred and enjoined from knowingly assisting in any way any third party in instituting, commencing, or prosecuting any suit against any or all of the Bank of America Parties and/or the Countrywide Parties asserting any of the Trust Released Claims. These provisions shall also be deemed to apply to the full and same extent to the Master Servicer of the Covered Trusts (including the current Master Servicer, BAC HLS, and any subsequent servicer who may in the future be substituted for the current Master Servicer with respect to one or more of the Covered Trusts or any loans therein).

p)  All Trust Beneficiaries and each of their heirs, executors, administrators, successors-in-interest, and assigns, and the Bank of America Parties and the Countrywide Parties and each of their respective heirs, executors, administrators, successors-in-interest, and assigns, are hereby permanently barred and enjoined from instituting, commencing, or prosecuting, either directly, derivatively, or in any other capacity, any suit, proceeding, or other action asserting the Trustee any claims arising from or in connection with the Trustee's entry into the Settlement, including but not limited to the Trustee's participation in negotiations regarding the Settlement, the Trustee's analysis of the Settlement, the filing by the Trustee of any petition in

- B-9 -

179

connection with the Settlement, the provision of notices concerning the Settlement to Potentially Interested Persons, and any further actions by the Trustee in support of the Settlement, including the response by the Trustee to any objections to the Settlement and any implementation of the Settlement by the Trustee; provided, however, that nothing herein precludes any Party from asserting any claims arising out of a breach of the Settlement Agreement.

q) With the exception of prosecuting any appeals directly from this Final Order and Judgment, all Trust Beneficiaries, the Covered Trusts, and any Persons claiming by, through, or on behalf of any of the Trustee, the Trust Beneficiaries, or the Covered Trusts or under the Governing Agreements, and each of their heirs, executors, administrators, successors-in-interest, and assigns, are hereby permanently barred and enjoined from instituting, commencing, asserting, or prosecuting, either directly, derivatively, or in any other capacity, any claim or objection challenging this Final Order and Judgment, the actions of the Trustee in entering into the Settlement Agreement or this Article 77 Proceeding.

r) The Trustee will not, by virtue of actions taken in seeking, or pursuant to, any orders in this proceeding or this Final Order and Judgment, impair the rights it has under the applicable Governing Agreements to be compensated for the fees and expenses it incurs in discharging its duties as Trustee.

s) None of the Bank of America Parties, the Countrywide Parties, the Institutional Investors, or the Trustee shall have any liability (including under any indemnification obligation provided for in any Governing Agreement,

- B-10 -

including as clarified by the side-letter that is Exhibit C to the Settlement Agreement) to each other, the Trust Beneficiaries, the Covered Trusts, or any other Person arising out of the determination, administration, or distribution (including distribution within each Covered Trust) of the Allocable Shares pursuant to the Settlement or incurred by reason of any tax consequences of the Settlement.

t) All objections to the Settlement have been considered and are overruled and denied in all respects.

u) Without affecting the finality of this Final Order and Judgment in any respect, the Court hereby retains exclusive jurisdiction over the Petitioner, the Covered Trusts, and all Trust Beneficiaries (whether past, present, or future) for all matters relating to the Settlement and this Article 77 Proceeding, including the administration, interpretation, effectuation, or enforcement of the Settlement Agreement and this Final Order and Judgment.

v) There is no just reason for delay in the entry of this Final Order and Judgment and immediate entry by the Clerk of the Court is expressly directed.

Judgment entered on this ___ day of ___, 2011.

ENTER

_____

JSC

_____

CLERK OF THE COURT

- B-11 -



EXECUTION COPY

BAC Home Loans Servicing, LP
6400 Legacy Drive
Plano, TX 75024

June 28, 2011

The Bank of New York Mellon, as Trustee or Indenture Trustee
101 Barclay Street
New York, New York 10286
Attn: Mortgage-Backed Securities Group

Ladies and Gentlemen:

Re: Pooling and Servicing Agreements and Sale and Servicing Agreements

We refer to the Pooling and Servicing Agreements (the "PSAs") and Sale and Servicing Agreements (the "SSAs" and together with the PSAs, the "Sale Agreements"), as applicable, for the transactions identified on Exhibit 1 hereto, each, in PSAs, among the Depositor thereunder, the Sellers thereunder, BAC Home Loans Servicing, LP (f/k/a Countrywide Home Loans Servicing, LP), as Master Servicer (the "Master Servicer") and The Bank of New York Mellon (f/k/a The Bank of New York), as trustee (or, in the case of SSAs, the Indenture trustee, together the "Trustee") and each, in SSAs, among the Depositor thereunder, BAC Home Loans Servicing, LP (f/k/a Countrywide Home Loans Servicing, LP), as Sponsor and Master Servicer, the Trust thereunder and the Trustee. We also refer to the Guaranty of Bank of America Corporation, dated as of June 28, 2011, attached hereto as Exhibit 2 (the "Guaranty"). Capitalized terms used but not defined in this letter have the meanings specified in the Sale Agreements.

Section 8.05 (Trustee's Fees and Expenses) of each PSA and Section 7.03 (Master Servicer to pay Indenture Trustee's and Owner Trustee's Fees and Expenses) of each SSA (together, the "Indemnity") each provide, in part, that "The Trustee and any director, officer, employee or agent of the Trustee shall be indemnified by the Master Servicer and held harmless against any loss, liability or expense (including reasonable attorneys fees) (i) incurred in connection with any claim or legal action relating to (a) [the Sale Agreement], (b) the [applicable securities] or (c) in connection with the performance of any of the Trustee's duties [under the Sale Agreement], other than any loss, liability or expense incurred by reason of willful malfeasance, bad faith or negligence in the performance of any of the Trustee's duties hereunder . . . ." Certain Sale Agreements also exclude from the scope of the Indemnity "any loss, liability or expense incurred . . . by reason of any action of the Trustee taken at the direction of the [investors]."

---

[1]   We note that the language referenced in this letter may vary in certain ways in the Sale Agreements. Notwithstanding such variances, we intend this letter to apply, with same effect, to all the Sale Agreements for the transactions identified on Exhibit 1 hereto, except if such variances are material, in which case the parties hereto will consider in good faith how to implement the intent of this letter to such variances if the need arises.

181

EXECUTION COPY

We confirm that we view any actions taken by the Trustee in connection with its entry into the settlement in respect of Mortgage Loan repurchase and other alleged claims against the Sellers and Master Servicer relating to the transactions identified on Exhibit 1 hereto (the "Settlement"), including but not limited to the Trustee's participation in settlement negotiations, the Trustee's analysis of the Settlement, the filing by the Trustee of any petition in connection with the Settlement, the provision of notices concerning the Settlement to interested parties (including investors), and any further actions by the Trustee in support of the Settlement, including the response by the Trustee to any objections to the Settlement and any implementation of the Settlement by the Trustee (such actions together being the "Trustee Settlement Activities") as being actions that, for purposes of the Indemnity, relate to the Sale Agreements, the applicable securities, or the performance of the Trustee's duties under the Sale Agreements. We also confirm that the manner of entering into the Settlement or undertaking the activities to prepare therefor or contemplated thereby will not serve to disqualify the Trustee from receiving the benefits of the Indemnity or the Guaranty.

We also confirm that we view the Institutional Investor Agreement and any letter or other correspondence from the investors or their counsel which requests that the Trustee take the Trustee Settlement Activities, or any portion thereof, as not being the equivalent of a direction from the investors for purposes of the Indemnity. We further confirm that neither the receipt by the Trustee of any such letter or other correspondence nor the entry by the Trustee into the Institutional Investor Agreement will disqualify the Trustee from receiving the benefit of either the Indemnity or the Guaranty.

Finally, we note that the Indemnity also provides, with certain exceptions expressly provided for, that "the Master Servicer covenants and agrees . . . to pay or reimburse the Trustee for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any of the provisions of [the Sale Agreements] with respect to (A) the reasonable compensation and the expenses and disbursements of its counsel not associated with the closing of the issuance of the [applicable securities], (B) the reasonable compensation, expenses and disbursements of any accountant, engineer or appraiser that is not regularly employed by the Trustee, to the extent that the Trustee must engage such persons to perform acts or services [under the Sale Agreement] and (C) printing and engraving expenses in connection with preparing any Definitive [securities]."[1] We confirm that we view reasonable expenses, disbursements and advances otherwise within the Indemnity, if incurred or made by the Trustee in connection with the Trustee Settlement Activities, as being reimbursable by the Master Servicer under the Indemnity.

Without limiting any of the foregoing, we confirm that following the entry by the Trustee into the Settlement, Bank of America Corporation, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and/or Countrywide Home Loans, Inc. shall pay the reasonable fees and expenses of the Trustee for Trustee Settlement Activities (including its reasonable attorneys' fees and expenses) on a current and ongoing basis (including all accrued

---

[1]   We note that the language referenced in this letter may vary in certain ways in the Sale Agreements.  Notwithstanding such variances, we intend this letter to apply, with same effect, to all the Sale Agreements for the transactions identified on Exhibit 1 hereto, except if such variances are material, in which case the parties hereto will consider in good faith how to implement the intent of this letter to such variances if the need arises.

2

---

EXECUTION COPY

and unpaid fees and expenses as of the date hereof, which shall be paid in full no later than 15 days from the execution of the Settlement).

Except as noted above, nothing herein is intended to limit, modify, supersede, or in any way affect any exceptions to the liability of the Master Servicer under the Indemnity that are based on the conduct of the Trustee. It is understood and agreed that the Indemnity does not cover any loss or liability incurred by reason of any tax consequences of the Settlement or arising out of the determination, administration or distribution (including distribution within each Covered Trust) of the Allocable Shares pursuant to the Settlement, which the Final Order and Judgment to be entered with respect to the Settlement shall provide shall not give rise to liability on the part of the BNYM Parties, the Bank of America Parties or the Countrywide Parties (all as defined in the Settlement Agreement). Nothing herein is intended to limit, modify, or in any way affect the limitations on the liability of the Master Servicer under Section 6.03 (*Limitation on Liability of the Depositor, the Sellers, the Master Servicer and Others*) of each PSA and Section 5.03 (*Limitation on Liability of the Seller, the Master Servicer and Others*) of each SSA.

Please acknowledge your agreement by countersigning this letter in the space provided below and returning a copy to us.

3

182

Sincerely,

BAC HOME LOANS SERVICING, L.P.

By: _____
Name: _____
Title: _____

4

Accepted and Agreed:

BANK OF AMERICA CORPORATION

By: _____
Name: _____
Title: _____

THE BANK OF NEW YORK MELLON

By: _____
Name: _____
Title: _____

183

Exhibit 1

| | | |
|---|---|---|
| CWALT 2004-10CB | CWALT 2005-17 | CWALT 2005-63 |
| CWALT 2004-12CB | CWALT 2005-18CB | CWALT 2005-64CB |
| CWALT 2004-13CB | CWALT 2005-1CB | CWALT 2005-65CB |
| CWALT 2004-14T2 | CWALT 2005-2 | CWALT 2005-66 |
| CWALT 2004-15 | CWALT 2005-20CB | CWALT 2005-67CB |
| CWALT 2004-16CB | CWALT 2005-21CB | CWALT 2005-69 |
| CWALT 2004-17CB | CWALT 2005-23CB | CWALT 2005-6CB |
| CWALT 2004-18CB | CWALT 2005-24 | CWALT 2005-70CB |
| CWALT 2004-20T1 | CWALT 2005-25T1 | CWALT 2005-71 |
| CWALT 2004-22CB | CWALT 2005-26CB | CWALT 2005-72 |
| CWALT 2004-24CB | CWALT 2005-27 | CWALT 2005-73CB |
| CWALT 2004-25CB | CWALT 2005-28CB | CWALT 2005-74T1 |
| CWALT 2004-26T1 | CWALT 2005-29CB | CWALT 2005-75CB |
| CWALT 2004-27CB | CWALT 2005-30CB | CWALT 2005-76 |
| CWALT 2004-28CB | CWALT 2005-31 | CWALT 2005-77T1 |
| CWALT 2004-29CB | CWALT 2005-32T1 | CWALT 2005-79CB |
| CWALT 2004-2CB | CWALT 2005-33CB | CWALT 2005-7CB |
| CWALT 2004-30CB | CWALT 2005-34CB | CWALT 2005-80CB |
| CWALT 2004-32CB | CWALT 2005-35CB | CWALT 2005-82 |
| CWALT 2004-33 | CWALT 2005-36 | CWALT 2005-83CB |
| CWALT 2004-34T1 | CWALT 2005-37T1 | CWALT 2005-84 |
| CWALT 2004-35T2 | CWALT 2005-38 | CWALT 2005-85CB |
| CWALT 2004-36CB | CWALT 2005-3CB | CWALT 2005-86CB |
| CWALT 2004-3T1 | CWALT 2005-4 | CWALT 2005-9CB |
| CWALT 2004-4CB | CWALT 2005-40CB | CWALT 2005-AR1 |
| CWALT 2004-5CB | CWALT 2005-41 | CWALT 2005-IM1 |
| CWALT 2004-6CB | CWALT 2005-42CB | CWALT 2005-J10 |
| CWALT 2004-7T1 | CWALT 2005-43 | CWALT 2005-J11 |
| CWALT 2004-8CB | CWALT 2005-44 | CWALT 2005-J12 |
| CWALT 2004-9T1 | CWALT 2005-45 | CWALT 2005-J13 |
| CWALT 2004-J10 | CWALT 2005-46CB | CWALT 2005-J14 |
| CWALT 2004-J11 | CWALT 2005-47CB | CWALT 2005-J3 |
| CWALT 2004-J12 | CWALT 2005-48T1 | CWALT 2005-J4 |
| CWALT 2004-J13 | CWALT 2005-49CB | CWALT 2005-J5 |
| CWALT 2004-J2 | CWALT 2005-50CB | CWALT 2005-J6 |
| CWALT 2004-J3 | CWALT 2005-51 | CWALT 2005-J7 |
| CWALT 2004-J5 | CWALT 2005-53T2 | CWALT 2005-J8 |
| CWALT 2004-J6 | CWALT 2005-54CB | CWALT 2005-J9 |
| CWALT 2004-J7 | CWALT 2005-55CB | CWALT 2006-11CB |
| CWALT 2004-J8 | CWALT 2005-56 | CWALT 2006-12CB |
| CWALT 2004-J9 | CWALT 2005-57CB | CWALT 2006-13T1 |
| CWALT 2005-10CB | CWALT 2005-58 | CWALT 2006-14CB |
| CWALT 2005-11CB | CWALT 2005-59 | CWALT 2006-15CB |
| CWALT 2005-14 | CWALT 2005-60T1 | CWALT 2006-16CB |
| CWALT 2005-16 | CWALT 2005-61 | CWALT 2006-17T1 |

CWALT 2006-18CB
CWALT 2006-19CB
CWALT 2006-20CB
CWALT 2006-21CB
CWALT 2006-23CB
CWALT 2006-24CB
CWALT 2006-25CB
CWALT 2006-26CB
CWALT 2006-27CB
CWALT 2006-28CB
CWALT 2006-29T1

184

CWALT 2006-2CB
CWALT 2006-30T1
CWALT 2006-31CB
CWALT 2006-32CB
CWALT 2006-33CB
CWALT 2006-34
CWALT 2006-35CB
CWALT 2006-36T2
CWALT 2006-39CB
CWALT 2006-40T1
CWALT 2006-41CB
CWALT 2006-42
CWALT 2006-43CB
CWALT 2006-45T1
CWALT 2006-46
CWALT 2006-4CB
CWALT 2006-5T2
CWALT 2006-6CB
CWALT 2006-7CB
CWALT 2006-8T1
CWALT 2006-9T1
CWALT 2006-HY10
CWALT 2006-HY11
CWALT 2006-HY12
CWALT 2006-HY13
CWALT 2006-HY3
CWALT 2006-J1
CWALT 2006-J2
CWALT 2006-J3
CWALT 2006-J4
CWALT 2006-J5
CWALT 2006-J6
CWALT 2006-J7
CWALT 2006-J8

- 1-1 -

185

CWALT 2006-0A1
CWALT 2006-0A10
CWALT 2006-0A11
CWALT 2006-0A12
CWALT 2006-0A14
CWALT 2006-0A16
CWALT 2006-0A17
CWALT 2006-0A18
CWALT 2006-0A2
CWALT 2006-0A21
CWALT 2006-0A22
CWALT 2006-0A3
CWALT 2006-0A6
CWALT 2006-0A7
CWALT 2006-0A8
CWALT 2006-0A9
CWALT 2006-0C1
CWALT 2006-0C10
CWALT 2006-0C11
CWALT 2006-0C2
CWALT 2006-0C3
CWALT 2006-0C4
CWALT 2006-0C5
CWALT 2006-0C6
CWALT 2006-0C7
CWALT 2006-0C8
CWALT 2006-0C9
CWALT 2007-10CB
CWALT 2007-11T1
CWALT 2007-12T1
CWALT 2007-13
CWALT 2007-14T2
CWALT 2007-16CB
CWALT 2007-17CB
CWALT 2007-18CB
CWALT 2007-19
CWALT 2007-1T1
CWALT 2007-20
CWALT 2007-21CB
CWALT 2007-22
CWALT 2007-23CB
CWALT 2007-24
CWALT 2007-25
CWALT 2007-2CB
CWALT 2007-3T1
CWALT 2007-4CB

CWALT 2007-5CB
CWALT 2007-6
CWALT 2007-7T2
CWALT 2007-8CB
CWALT 2007-9T1
CWALT 2007-AL1
CWALT 2007-HY2
CWALT 2007-HY3
CWALT 2007-HY4
CWALT 2007-HY6
CWALT 2007-HY7C
CWALT 2007-HY8C
CWALT 2007-HY9
CWALT 2007-J2
CWALT 2004-0A11
CWALT 2007-0A2
CWALT 2007-0A3
CWALT 2007-0A4
CWALT 2007-0A6
CWALT 2007-0A7
CWALT 2007-0A8
CWALT 2007-0A9
CWALT 2007-0H1
CWALT 2007-0H2
CWALT 2007-0H3
CWALT 2004-J4
CWALT 2005-13CB
CWALT 2005-19CB
CWALT 2005-22T1
CWALT 2005-52CB
CWALT 2005-62
CWALT 2005-81
CWALT 2005-J1
CWALT 2005-J2
CWALT 2006-0A19
CWALT 2007-15CB
CWALT 2007-J1
CWALT 2007-0A10
CWHEQ 2006-A
CWHEQ 2007-G
CWHL 2004-11
CWHL 2004-12
CWHL 2004-13
CWHL 2004-14
CWHL 2004-15
CWHL 2004-16

CWHL 2004-18
CWHL 2004-19
CWHL 2004-2
CWHL 2004-20
CWHL 2004-21
CWHL 2004-22
CWHL 2004-23
CWHL 2004-24
CWHL 2004-25
CWHL 2004-29
CWHL 2004-3
CWHL 2004-5
CWHL 2004-6
CWHL 2004-7
CWHL 2004-HYB1
CWHL 2004-HYB2
CWHL 2004-HYB3
CWHL 2004-HYB4
CWHL 2004-HYB5
CWHL 2004-HYB6
CWHL 2004-HYB7
CWHL 2004-HYB8
CWHL 2004-HYB9
CWHL 2004-J2
CWHL 2004-J3
CWHL 2004-J4
CWHL 2004-J5
CWHL 2004-J6
CWHL 2004-J7
CWHL 2004-J8
CWHL 2004-J9
CWHL 2005-1
CWHL 2005-10
CWHL 2005-11
CWHL 2005-12
CWHL 2005-13
CWHL 2005-14
CWHL 2005-16
CWHL 2005-17
CWHL 2005-18
CWHL 2005-2
CWHL 2005-20
CWHL 2005-21
CWHL 2005-22
CWHL 2005-23
CWHL 2005-25

CWHL 2005-26
CWHL 2005-27
CWHL 2005-28
CWHL 2005-29
CWHL 2005-3
CWHL 2005-30
CWHL 2005-31
CWHL 2005-7
CWHL 2005-9
CWHL 2005-HYB1
CWHL 2005-HYB2
CWHL 2005-HYB3


186

CWHL 2005-HYB4
CWHL 2005-HYB5
CWHL 2005-HYB6
CWHL 2005-HYB7
CWHL 2005-HYB9
CWHL 2005-HYB10 [1]
CWHL 2005-J1
CWHL 2005-J2
CWHL 2005-J3
CWHL 2005-J4
CWHL 2006-1
CWHL 2006-10
CWHL 2006-11
CWHL 2006-12
CWHL 2006-13
CWHL 2006-14
CWHL 2006-15
CWHL 2006-16
CWHL 2006-17
CWHL 2006-18
CWHL 2006-19
CWHL 2006-20
CWHL 2006-21
CWHL 2006-3
CWHL 2006-6
CWHL 2006-8
CWHL 2006-9
CWHL 2006-HYB1
CWHL 2006-HYB2
CWHL 2006-HYB3
CWHL 2006-HYB4
CWHL 2006-HYB5

---

[1]    Appears on Bloomberg as CWHL 2005-HY10

187

| | | |
|---|---|---|
| CWHL 2006-J1 | CWHL 2005-5 | CWL 2005-SD3 |
| CWHL 2006-J2 | CWHL 2005-6 | CWL 2006-1 |
| CWHL 2006-J3 | CWL 2004-1 | CWL 2006-10 |
| CWHL 2006-J4 | CWL 2004-11 | CWL 2006-12 |
| CWHL 2006-OA4 | CWL 2004-14 | CWL 2006-14 |
| CWHL 2006-OA5 | CWL 2004-2 | CWL 2006-16 |
| CWHL 2006-TM1 | CWL 2004-3 | CWL 2006-17 |
| CWHL 2007-1 | CWL 2004-4 | CWL 2006-18 |
| CWHL 2007-10 | CWL 2004-5 | CWL 2006-19 |
| CWHL 2007-11 | CWL 2004-6 | CWL 2006-2 |
| CWHL 2007-12 | CWL 2004-7 | CWL 2006-20 |
| CWHL 2007-13 | CWL 2004-AB2 | CWL 2006-24 |
| CWHL 2007-14 | CWL 2004-BC2 | CWL 2006-25 |
| CWHL 2007-15 | CWL 2004-BC3 | CWL 2006-3 |
| CWHL 2007-16 | CWL 2004-BC4 | CWL 2006-4 |
| CWHL 2007-17 | CWL 2004-BC5 | CWL 2006-5 |
| CWHL 2007-18 | CWL 2004-ECC1 | CWL 2006-6 |
| CWHL 2007-19 | CWL 2004-ECC2 | CWL 2006-7 |
| CWHL 2007-2 | CWL 2004-S1 | CWL 2006-8 |
| CWHL 2007-20 | CWL 2004-SD2 | CWL 2006-9 |
| CWHL 2007-21 | CWL 2004-SD3 | CWL 2006-ABC1 |
| CWHL 2007-3 | CWL 2004-SD4 | CWL 2006-BC1 |
| CWHL 2007-4 | CWL 2005-10 | CWL 2006-BC2 |
| CWHL 2007-5 | CWL 2005-2 | CWL 2006-BC3 |
| CWHL 2007-6 | CWL 2005-5 | CWL 2006-BC4 |
| CWHL 2007-7 | CWL 2005-6 | CWL 2006-BC5 |
| CWHL 2007-8 | CWL 2005-8 | CWL 2006-IM1 |
| CWHL 2007-9 | CWL 2005-9 | CWL 2006-QH1 |
| CWHL 2007-HY1 | CWL 2005-AB1 | CWL 2006-SD1 |
| CWHL 2007-HY3 | CWL 2005-AB2 | CWL 2006-SD2 |
| CWHL 2007-HY4 | CWL 2005-AB3 | CWL 2006-SD3 |
| CWHL 2007-HY5 | CWL 2005-AB4 | CWL 2006-SD4 |
| CWHL 2007-HY6 | CWL 2005-AB5 | CWL 2006-SPS1 |
| CWHL 2007-HY7 | CWL 2005-BC1 | CWL 2006-SPS2 |
| CWHL 2007-HYB1 | CWL 2005-BC2 | CWL 2007-10 |
| CWHL 2007-HYB2 | CWL 2005-BC3 | CWL 2007-11 |
| CWHL 2007-J1 | CWL 2005-BC4 | CWL 2007-12 |
| CWHL 2007-J2 | CWL 2005-BC5 | CWL 2007-3 |
| CWHL 2007-J3 | CWL 2005-HYB9 | CWL 2007-5 |
| CWHL 2008-1 | CWL 2005-IM1 | CWL 2007-6 |
| CWHL 2004-10 | CWL 2005-IM2 | CWL 2007-7 |
| CWHL 2004-4 | CWL 2005-IM3 | CWL 2007-8 |
| CWHL 2004-8 | CWL 2005-SD1 | CWL 2007-9 |
| CWHL 2004-9 | CWL 2005-SD2 | CWL 2007-BC1 |
| CWHL 2005-15 | | CWL 2007-BC2 |
| CWHL 2005-24 | | CWL 2007-BC3 |

CWL 2007-SD1
CWL 2007-SEA1
CWL 2007-SEA2
CWL 2004-10
CWL 2004-12
CWL 2004-13
CWL 2004-15
CWL 2004-8
CWL 2004-9
CWL 2004-AB1
CWL 2005-1
CWL 2005-11

188

CWL 2005-12
CWL 2005-13
CWL 2005-14
CWL 2005-15
CWL 2005-16
CWL 2005-17
CWL 2005-3
CWL 2005-4
CWL 2005-7
CWL 2006-11
CWL 2006-13
CWL 2006-15
CWL 2006-21
CWL 2006-22
CWL 2006-23
CWL 2006-26
CWL 2007-1
CWL 2007-13
CWL 2007-2
CWL 2007-4

---

[1]   Appears on Bloomberg as CWHL 2005-HYB9

- 1-3 -

---

**EXECUTION COPY**

## GUARANTY

This GUARANTY (as amended, supplemented, amended and restated or otherwise modified from time to time, this "**Guaranty**"), dated as of June 29, 2011, is made by BANK OF AMERICA CORPORATION (the "**Guarantor**"), in favor of THE BANK OF NEW YORK MELLON (f/k/a THE BANK OF NEW YORK) (the "**Guaranteed Party**").

### WITNESSETH:

WHEREAS, pursuant to the Pooling and Servicing Agreements and Sale and Servicing Agreements for the transactions identified on Exhibit 1 hereto (together the "**Sale Agreements**," and each a "**Sale Agreement**"), each, in Pooling and Servicing Agreements, among the Depositor thereunder, the Sellers thereunder, BAC Home Loans Servicing, L.P. (f/k/a Countrywide Home Loans Servicing, L.P.), as Master Servicer (the "**Master Servicer**") and the Guaranteed Party, as Trustee, and each, in Sale and Servicing Agreements, among the Depositor thereunder, BAC Home Loans Servicing, L.P. (f/k/a Countrywide Home Loans Servicing, L.P.), as Sponsor and Master Servicer, the Trust thereunder and the Guaranteed Party, as Indenture Trustee, the Master Servicer agreed to indemnify the Guaranteed Party in respect of certain losses, liabilities and expenses that might be incurred by the Guaranteed Party thereunder; and

WHEREAS, in connection with the activities of the Guaranteed Party that relate to the settlement of Mortgage Loan repurchase and other claims now or hereafter arising against the Sellers and/or the Master Servicer relating to the transactions identified on Exhibit 1 hereto (the "**Settlement**"), the Guarantor has agreed to execute and deliver this Guaranty.

NOW THEREFORE, for good and valuable consideration the receipt of which is hereby acknowledged, the Guarantor agrees, for the benefit of the Guaranteed Party, as follows:

### ARTICLE I
### DEFINITIONS

SECTION 1.1. Certain Terms. The following terms (whether or not underscored) when used in this Guaranty, including its preamble and recitals, shall have the following meanings (such definitions to be equally applicable to the singular and plural forms thereof):

"**Guaranteed Party**" is defined in the preamble.

"**Guarantor**" is defined in the preamble.

"**Guaranty**" is defined in the preamble.

"**Master Servicer**" is defined in the first recital.

"**Material Adverse Effect**" means a material adverse effect on (i) the business, assets, operations, prospects or condition, financial or otherwise, of the Guarantor or (ii) the ability of the Guarantor to perform any of its obligations under this Guaranty.

189

"Obligations" means the payment obligations of the Master Servicer, whether now or hereafter arising, direct or indirect, absolute or contingent, under any Sale Agreement, in accordance with the terms and conditions thereof, to indemnify, hold harmless or otherwise reimburse the Guaranteed Party against certain losses, liabilities or expenses that may arise in connection with the Settlement.

"Parties" means the Guarantor and the Guaranteed Party.

"Sale Agreement" is defined in the first recital.

"Settlement" is defined in the second recital.

SECTION 1.2. Sale Agreement Definitions. Unless otherwise defined herein or the context otherwise requires, terms used in this Guaranty, including its preamble and recitals, have the meanings provided in each applicable Sale Agreement solely with regard to that Sale Agreement (and not the other Sale Agreements).

## ARTICLE II
## GUARANTY PROVISIONS

SECTION 2.1. Guaranty. The Guarantor hereby absolutely, unconditionally and irrevocably guarantees the full and punctual payment when due of all existing and future Obligations and indemnifies and holds harmless the Guaranteed Party for any and all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Guaranteed Party in enforcing any rights under this Guaranty. This Guaranty constitutes a guaranty of payment when due and not of collection, and the Guarantor specifically agrees that it shall not be necessary or required that the Guaranteed Party exercise any right, assert any claim or demand or enforce any remedy whatsoever against the Master Servicer or any other Person before or as a condition to the obligations of the Guarantor hereunder.

SECTION 2.2. Reinstatement, etc. The Guarantor hereby agrees that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment (in whole or in part) of any of the Obligations is invalidated, declared to be fraudulent or preferential, set aside, rescinded or must otherwise be restored by the Guaranteed Party as though such payment had not been made.

SECTION 2.3. Guaranty Absolute, etc. This Guaranty shall in all respects be a continuing, absolute, unconditional and irrevocable guaranty of payment, and shall remain in full force and effect until the Obligations shall have been paid in full in cash and the Master Servicer shall have no further obligation under any Sale Agreement to indemnify, hold harmless or otherwise reimburse the Guaranteed Party. The Guarantor guarantees that the Obligations of the Master Servicer will be paid strictly in accordance with the terms of each Sale Agreement under which they arise. The liability of the Guarantor under this Guaranty shall be absolute, unconditional and irrevocable irrespective of:

(a) any lack of validity, legality or enforceability of the Obligations;

2

*190*

(b) whether or not the Settlement is ever finally approved or consummated;

(c) the failure of the Guaranteed Party (i) to assert any claim or demand or to enforce any right or remedy against the Master Servicer or any other Person under the provisions of any Sale Agreement or otherwise, or (ii) to exercise any right or remedy against any other guarantor of, or collateral securing, any Obligations;

(d) any amendment to, rescission, waiver or other modification of, or any consent to or departure from, any of the terms of any Sale Agreement; or

(e) any other circumstance (other than payment of the Obligations in full in cash) which might otherwise constitute a legal or equitable discharge of any surety or any guarantor.

SECTION 2.4. Waiver, etc. The Guarantor hereby waives promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty and any requirement that the Guaranteed Party exhaust any right or take any action against the Master Servicer or any other Person (including any other guarantor) or entity or any collateral securing the Obligations, as the case may be.

SECTION 2.5. Postponement of Subrogation, etc. The Guarantor agrees that it will not exercise any rights which it may acquire by way of rights of subrogation until all of the Obligations shall have been paid in full in cash and the Master Servicer shall have no further obligation under any Sale Agreement to indemnify, hold harmless or otherwise reimburse the Guaranteed Party in respect of the Obligations. Any amount paid to the Guarantor on account of any such subrogation right in violation of the foregoing limitation shall be held in trust for the benefit of the Guaranteed Party and shall immediately be paid and turned-over to the Guaranteed Party in the exact form received by the Guarantor (duly endorsed in favor of the Guaranteed Party, if required) to be credited and applied against the Obligations.

SECTION 2.6. Payments. The Guarantor hereby agrees with the Guaranteed Party that all payments made by the Guarantor hereunder will be made in lawful currency of the United States to the Guaranteed Party, without set-off, counterclaim or other defense (other than that payment is not due) and without withholding or deduction for or on account of any present or future taxes, duties or other charges, unless the withholding or deduction of such taxes or duties is required by law.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

SECTION 3.1. Representations. The Guarantor hereby represents and warrants to the Guaranteed Party as set forth below.

(a) The Guarantor is a corporation incorporated under the laws of the State of Delaware, duly organized or formed, validly existing and in good standing and is duly qualified to do business, and is in good standing in, every jurisdiction in which the nature

3

191

of its business requires it to be so qualified, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect. This Guaranty has been duly authorized, executed and delivered by the Guarantor;

(b) the execution, delivery and performance of this Guaranty have been and remain duly authorized by all necessary organizational action and do not contravene any provision of (i) the Guarantor's organizational documents, (ii) any law, rule or regulation, (iii) any contractual restriction binding on Guarantor or its property or (iv) any order, writ, judgment, award, injunction or decree binding on or affecting the Guarantor or its property, except in the case of the foregoing clauses (ii) through (iv), where such contravention would not reasonably be expected to have a Material Adverse Effect and would not reasonably be expected to impose any liability on the Guaranteed Party;

(c) all consents, licenses, clearances, authorizations and approvals of, and registrations and declarations with, any governmental authority or regulatory body necessary for the due execution, delivery and performance of this Guaranty have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, except where the failure to so obtain such consents, licenses, clearances, authorizations and approvals, registration or declarations or to satisfy the conditions thereof would not reasonably be expected to have a Material Adverse Effect, and no other action by, and, except as contemplated herein, no notice to or filing with any governmental authority or regulatory body is required in connection with the execution, delivery or performance of this Guaranty; and

(d) this Guaranty constitutes the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, subject to general principles of equity and applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally.

## ARTICLE IV
## MISCELLANEOUS PROVISIONS

SECTION 4.1. Binding on Successors, Transferees and Assigns; Assignment. This Guaranty shall be binding upon the Guarantor and its successors, transferees and assigns and shall inure to the benefit of and be enforceable by the Guaranteed Party and its successors, transferees and assigns.

SECTION 4.2. Amendments, etc. No amendment to or waiver of any provision of this Guaranty, nor consent to any departure by the Guarantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Guaranteed Party and the Guarantor and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 4.3. Notices. All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, telecopied or delivered to the Guarantor, attention Edward P. O'Keefe, General Counsel, Bank of America Corporation, at

4

192

100 N. Tryon Street, Charlotte, North Carolina 28255-0001, or, if such notice or communication is to the Guaranteed Party, attention Ann Sherburne, General Counsel, The Bank of New York Mellon, at One Wall Street, New York, New York 10286. All such notices and other communications, when mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any such notice or communication, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter.

SECTION 4.4. No Waiver; Remedies. In addition to, and not in limitation of, Section 2.3 and Section 2.4, no failure on the part of the Guaranteed Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 4.5. Captions. Section captions used in this Guaranty are for convenience of reference only, and shall not affect the construction of this Guaranty.

SECTION 4.6. Severability. Wherever possible each provision of this Guaranty shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

SECTION 4.7. Governing Law; Entire Agreement, etc. THIS GUARANTY SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK). THIS GUARANTY CONSTITUTES THE ENTIRE UNDERSTANDING AMONG THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY PRIOR AGREEMENTS, WRITTEN OR ORAL, WITH RESPECT THERETO.

SECTION 4.8. Forum Selection and Consent to Jurisdiction. ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS GUARANTY, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE GUARANTEED PARTY OR THE GUARANTOR SHALL BE BROUGHT AND MAINTAINED IN THE COURTS OF THE STATE OF NEW YORK, NEW YORK COUNTY OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. EACH PARTY HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN

OR WITHOUT THE STATE OF NEW YORK TO THE INDIVIDUAL DESIGNATED TO RECEIVE NOTICES UNDER SECTION 4.3. EACH PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, SUCH PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS GUARANTY.

SECTION 4.9. Counterpart, etc. This Guaranty may be executed by the Parties hereto in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement. A copy of this Guaranty executed and delivered by facsimile or in electronic form, including as a PDF file, shall be effective as delivery of an originally executed counterpart of this Guaranty.

SECTION 4.10. Counsel Representation. EACH PARTY ACKNOWLEDGES AND AGREES THAT IT HAS BEEN REPRESENTED BY COMPETENT COUNSEL IN THE NEGOTIATION OF THIS GUARANTY, AND THAT ANY RULE OR CONSTRUCTION OF LAW ENABLING ANY PARTY TO ASSERT THAT ANY AMBIGUITIES OR INCONSISTENCIES IN THE DRAFTING OR PREPARATION OF THE TERMS OF THIS GUARANTY SHOULD DIMINISH ANY RIGHTS OR REMEDIES OF THE OTHER PARTY ARE HEREBY WAIVED.

SECTION 4.11. Waiver of Jury Trial. EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS GUARANTY OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE OTHER PARTY. EACH PARTY ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION.

193

IN WITNESS WHEREOF, this Guaranty has been duly executed and delivered by the Guarantor to the Guaranteed Party as of the date first above written.

BANK OF AMERICA CORPORATION

By: _____
    Title:

ACCEPTED AND AGREED:

THE BANK OF NEW YORK MELLON

By: _____
    Title:

7

194

THIS PAGE LEFT BLANK INTENTIONALLY

195

THIS PAGE LEFT BLANK INTENTIONALLY

196

THIS PAGE LEFT BLANK INTENTIONALLY

197

THIS PAGE LEFT BLANK INTENTIONALLY

*198*

THIS PAGE LEFT BLANK INTENTIONALLY

*199*

**Exhibit 1**

| | | |
|---|---|---|
| CWALT 2004-10CB | CWALT 2005-17 | CWALT 2005-63 |
| CWALT 2004-12CB | CWALT 2005-18CB | CWALT 2005-64CB |
| CWALT 2004-13CB | CWALT 2005-1CB | CWALT 2005-65CB |
| CWALT 2004-14T2 | CWALT 2005-2 | CWALT 2005-66 |
| CWALT 2004-15 | CWALT 2005-20CB | CWALT 2005-67CB |
| CWALT 2004-16CB | CWALT 2005-21CB | CWALT 2005-69 |
| CWALT 2004-17CB | CWALT 2005-23CB | CWALT 2005-6CB |
| CWALT 2004-18CB | CWALT 2005-24 | CWALT 2005-70CB |
| CWALT 2004-20T1 | CWALT 2005-25T1 | CWALT 2005-71 |
| CWALT 2004-22CB | CWALT 2005-26CB | CWALT 2005-72 |
| CWALT 2004-24CB | CWALT 2005-27 | CWALT 2005-73CB |
| CWALT 2004-25CB | CWALT 2005-28CB | CWALT 2005-74T1 |
| CWALT 2004-26T1 | CWALT 2005-29CB | CWALT 2005-75CB |
| CWALT 2004-27CB | CWALT 2005-30CB | CWALT 2005-76 |
| CWALT 2004-28CB | CWALT 2005-31 | CWALT 2005-77T1 |
| CWALT 2004-29CB | CWALT 2005-32T1 | CWALT 2005-79CB |
| CWALT 2004-2CB | CWALT 2005-33CB | CWALT 2005-7CB |
| CWALT 2004-30CB | CWALT 2005-34CB | CWALT 2005-80CB |
| CWALT 2004-32CB | CWALT 2005-35CB | CWALT 2005-82 |
| CWALT 2004-33 | CWALT 2005-36 | CWALT 2005-83CB |
| CWALT 2004-34T1 | CWALT 2005-37T1 | CWALT 2005-84 |
| CWALT 2004-35T2 | CWALT 2005-38 | CWALT 2005-85CB |
| CWALT 2004-36CB | CWALT 2005-3CB | CWALT 2005-86CB |
| CWALT 2004-3T1 | CWALT 2005-4 | CWALT 2005-9CB |
| CWALT 2004-4CB | CWALT 2005-40CB | CWALT 2005-AR1 |
| CWALT 2004-5CB | CWALT 2005-41 | CWALT 2005-IM1 |
| CWALT 2004-6CB | CWALT 2005-42CB | CWALT 2005-J10 |
| CWALT 2004-7T1 | CWALT 2005-43 | CWALT 2005-J11 |
| CWALT 2004-8CB | CWALT 2005-44 | CWALT 2005-J12 |
| CWALT 2004-9T1 | CWALT 2005-45 | CWALT 2005-J13 |
| CWALT 2004-J10 | CWALT 2005-46CB | CWALT 2005-J14 |
| CWALT 2004-J11 | CWALT 2005-47CB | CWALT 2005-J3 |
| CWALT 2004-J12 | CWALT 2005-48T1 | CWALT 2005-J4 |
| CWALT 2004-J13 | CWALT 2005-49CB | CWALT 2005-J5 |
| CWALT 2004-J2 | CWALT 2005-50CB | CWALT 2005-J6 |
| CWALT 2004-J3 | CWALT 2005-51 | CWALT 2005-J7 |
| CWALT 2004-J5 | CWALT 2005-53T2 | CWALT 2005-J8 |
| CWALT 2004-J6 | CWALT 2005-54CB | CWALT 2005-J9 |
| CWALT 2004-J7 | CWALT 2005-55CB | CWALT 2006-11CB |
| CWALT 2004-J8 | CWALT 2005-56 | CWALT 2006-12CB |
| CWALT 2004-J9 | CWALT 2005-57CB | CWALT 2006-13T1 |
| CWALT 2005-10CB | CWALT 2005-58 | CWALT 2006-14CB |
| CWALT 2005-11CB | CWALT 2005-59 | CWALT 2006-15CB |
| CWALT 2005-14 | CWALT 2005-60T1 | CWALT 2006-16CB |
| CWALT 2005-16 | CWALT 2005-61 | CWALT 2006-17T1 |

| |
|---|
| CWALT 2006-18CB |
| CWALT 2006-19CB |
| CWALT 2006-20CB |
| CWALT 2006-21CB |
| CWALT 2006-23CB |
| CWALT 2006-24CB |
| CWALT 2006-25CB |
| CWALT 2006-26CB |
| CWALT 2006-27CB |
| CWALT 2006-28CB |
| CWALT 2006-29T1 |



CWALT 2006-2CB
CWALT 2006-30T1
CWALT 2006-31CB
CWALT 2006-32CB
CWALT 2006-33CB
CWALT 2006-34
CWALT 2006-35CB
CWALT 2006-36T2
CWALT 2006-39CB
CWALT 2006-40T1
CWALT 2006-41CB
CWALT 2006-42
CWALT 2006-43CB
CWALT 2006-45T1
CWALT 2006-46
CWALT 2006-4CB
CWALT 2006-5T2
CWALT 2006-6CB
CWALT 2006-7CB
CWALT 2006-8T1
CWALT 2006-9T1
CWALT 2006-HY10
CWALT 2006-HY11
CWALT 2006-HY12
CWALT 2006-HY13
CWALT 2006-HY3
CWALT 2006-J1
CWALT 2006-J2
CWALT 2006-J3
CWALT 2006-J4
CWALT 2006-J5
CWALT 2006-J6
CWALT 2006-J7
CWALT 2006-J8

- 1-1 -

CWALT 2006-0A1
CWALT 2006-0A10
CWALT 2006-0A11
CWALT 2006-0A12
CWALT 2006-0A14
CWALT 2006-0A16
CWALT 2006-0A17
CWALT 2006-0A18
CWALT 2006-0A2
CWALT 2006-0A21
CWALT 2006-0A22
CWALT 2006-0A3
CWALT 2006-0A6
CWALT 2006-0A7
CWALT 2006-0A8
CWALT 2006-0A9
CWALT 2006-0C1
CWALT 2006-0C10
CWALT 2006-0C11
CWALT 2006-0C2
CWALT 2006-0C3
CWALT 2006-0C4
CWALT 2006-0C5
CWALT 2006-0C6
CWALT 2006-0C7
CWALT 2006-0C8
CWALT 2006-0C9
CWALT 2007-10CB
CWALT 2007-11T1
CWALT 2007-12T1
CWALT 2007-13
CWALT 2007-14T2
CWALT 2007-16CB
CWALT 2007-17CB
CWALT 2007-18CB
CWALT 2007-19
CWALT 2007-1T1
CWALT 2007-20
CWALT 2007-21CB
CWALT 2007-22
CWALT 2007-23CB
CWALT 2007-24
CWALT 2007-25
CWALT 2007-2CB
CWALT 2007-3T1
CWALT 2007-4CB

CWALT 2007-5CB
CWALT 2007-6
CWALT 2007-7T2
CWALT 2007-8CB
CWALT 2007-9T1
CWALT 2007-AL1
CWALT 2007-HY2
CWALT 2007-HY3
CWALT 2007-HY4
CWALT 2007-HY6
CWALT 2007-HY7C
CWALT 2007-HY8C
CWALT 2007-HY9
CWALT 2007-J2
CWALT 2007-0A11
CWALT 2007-0A2
CWALT 2007-0A3
CWALT 2007-0A4
CWALT 2007-0A6
CWALT 2007-0A7
CWALT 2007-0A8
CWALT 2007-0A9
CWALT 2007-0H1
CWALT 2007-0H2
CWALT 2007-0H3
CWALT 2004-J4
CWALT 2005-13CB
CWALT 2005-19CB
CWALT 2005-22T1
CWALT 2005-52CB
CWALT 2005-62
CWALT 2005-81
CWALT 2005-J1
CWALT 2005-J2
CWALT 2006-0A19
CWALT 2007-15CB
CWALT 2007-J1
CWALT 2007-0A10
CWHEQ 2006-A
CWHEQ 2007-G
CWHL 2004-11
CWHL 2004-12
CWHL 2004-13
CWHL 2004-14
CWHL 2004-15
CWHL 2004-16

CWHL 2004-18
CWHL 2004-19
CWHL 2004-2
CWHL 2004-20
CWHL 2004-21
CWHL 2004-22
CWHL 2004-23
CWHL 2004-24
CWHL 2004-25
CWHL 2004-29
CWHL 2004-3
CWHL 2004-5
CWHL 2004-6
CWHL 2004-7
CWHL 2004-HYB1
CWHL 2004-HYB2
CWHL 2004-HYB3
CWHL 2004-HYB4
CWHL 2004-HYB5
CWHL 2004-HYB6
CWHL 2004-HYB7
CWHL 2004-HYB8
CWHL 2004-HYB9
CWHL 2004-J2
CWHL 2004-J3
CWHL 2004-J4
CWHL 2004-J5
CWHL 2004-J6
CWHL 2004-J7
CWHL 2004-J8
CWHL 2004-J9
CWHL 2005-1
CWHL 2005-10
CWHL 2005-11
CWHL 2005-12
CWHL 2005-13
CWHL 2005-14
CWHL 2005-16
CWHL 2005-17
CWHL 2005-18
CWHL 2005-2
CWHL 2005-20
CWHL 2005-21
CWHL 2005-22
CWHL 2005-23
CWHL 2005-25

CWHL 2005-26
CWHL 2005-27
CWHL 2005-28
CWHL 2005-29
CWHL 2005-3
CWHL 2005-30
CWHL 2005-31
CWHL 2005-7
CWHL 2005-9
CWHL 2005-HYB1
CWHL 2005-HYB2
CWHL 2005-HYB3

CWHL 2005-HYB4
CWHL 2005-HYB5
CWHL 2005-HYB6
CWHL 2005-HYB7
CWHL 2005-HYB8
CWHL 2005-HYB10¹
CWHL 2005-J1
CWHL 2005-J2
CWHL 2005-J3
CWHL 2005-J4
CWHL 2006-1
CWHL 2006-10
CWHL 2006-11
CWHL 2006-12
CWHL 2006-13
CWHL 2006-14
CWHL 2006-15
CWHL 2006-16
CWHL 2006-17
CWHL 2006-18
CWHL 2006-19
CWHL 2006-20
CWHL 2006-21
CWHL 2006-3
CWHL 2006-6
CWHL 2006-8
CWHL 2006-9
CWHL 2006-HYB1
CWHL 2006-HYB2
CWHL 2006-HYB3
CWHL 2006-HYB5

¹    Appears on Bloomberg as CWHL 2005-HY10

- 1-2 -

203

| | | |
|---|---|---|
| CWHL 2006-J1 | CWHL 2005-5 | CWL 2005-SD3 |
| CWHL 2006-J2 | CWHL 2005-6 | CWL 2006-1 |
| CWHL 2006-J3 | CWL 2004-1 | CWL 2006-10 |
| CWHL 2006-J4 | CWL 2004-11 | CWL 2006-12 |
| CWHL 2006-OA4 | CWL 2004-14 | CWL 2006-14 |
| CWHL 2006-OA5 | CWL 2004-2 | CWL 2006-16 |
| CWHL 2006-TM1 | CWL 2004-3 | CWL 2006-17 |
| CWHL 2007-1 | CWL 2004-4 | CWL 2006-18 |
| CWHL 2007-10 | CWL 2004-5 | CWL 2006-19 |
| CWHL 2007-11 | CWL 2004-6 | CWL 2006-2 |
| CWHL 2007-12 | CWL 2004-7 | CWL 2006-20 |
| CWHL 2007-13 | CWL 2004-AB2 | CWL 2006-24 |
| CWHL 2007-14 | CWL 2004-BC2 | CWL 2006-25 |
| CWHL 2007-15 | CWL 2004-BC3 | CWL 2006-3 |
| CWHL 2007-16 | CWL 2004-BC4 | CWL 2006-4 |
| CWHL 2007-17 | CWL 2004-BC5 | CWL 2006-5 |
| CWHL 2007-18 | CWL 2004-ECC1 | CWL 2006-6 |
| CWHL 2007-19 | CWL 2004-ECC2 | CWL 2006-7 |
| CWHL 2007-2 | CWL 2004-S1 | CWL 2006-8 |
| CWHL 2007-20 | CWL 2004-SD2 | CWL 2006-9 |
| CWHL 2007-21 | CWL 2004-SD3 | CWL 2006-ABC1 |
| CWHL 2007-3 | CWL 2004-SD4 | CWL 2006-BC1 |
| CWHL 2007-4 | CWL 2005-10 | CWL 2006-BC2 |
| CWHL 2007-5 | CWL 2005-2 | CWL 2006-BC3 |
| CWHL 2007-6 | CWL 2005-5 | CWL 2006-BC4 |
| CWHL 2007-7 | CWL 2005-6 | CWL 2006-BC5 |
| CWHL 2007-8 | CWL 2005-8 | CWL 2006-IM1 |
| CWHL 2007-9 | CWL 2005-9 | CWL 2006-QH1 |
| CWHL 2007-HY1 | CWL 2005-AB1 | CWL 2006-SD1 |
| CWHL 2007-HY3 | CWL 2005-AB2 | CWL 2006-SD2 |
| CWHL 2007-HY4 | CWL 2005-AB3 | CWL 2006-SD3 |
| CWHL 2007-HY5 | CWL 2005-AB4 | CWL 2006-SD4 |
| CWHL 2007-HY6 | CWL 2005-AB5 | CWL 2006-SPS1 |
| CWHL 2007-HY7 | CWL 2005-BC1 | CWL 2006-SPS2 |
| CWHL 2007-HYB1 | CWL 2005-BC2 | CWL 2007-10 |
| CWHL 2007-HYB2 | CWL 2005-BC3 | CWL 2007-11 |
| CWHL 2007-J1 | CWL 2005-BC4 | CWL 2007-12 |
| CWHL 2007-J2 | CWL 2005-BC5 | CWL 2007-3 |
| CWHL 2007-J3 | CWL 2005-HYB9 | CWL 2007-5 |
| CWHL 2008-1 | CWL 2005-IM1 | CWL 2007-6 |
| CWHL 2004-10 | CWL 2005-IM2 | CWL 2007-7 |
| CWHL 2004-4 | CWL 2005-IM3 | CWL 2007-8 |
| CWHL 2004-8 | CWL 2005-SD1 | CWL 2007-9 |
| CWHL 2004-9 | CWL 2005-SD2 | CWL 2007-BC1 |
| CWHL 2005-15 | | CWL 2007-BC2 |
| CWHL 2005-24 | | CWL 2007-BC3 |

CWL 2007-SD1
CWL 2007-SEA1
CWL 2007-SEA2
CWL 2004-10
CWL 2004-12
CWL 2004-13
CWL 2004-15
CWL 2004-8
CWL 2004-9
CWL 2004-AB1
CWL 2005-1
CWL 2005-11

204

CWL 2005-12
CWL 2005-13
CWL 2005-14
CWL 2005-15
CWL 2005-16
CWL 2005-17
CWL 2005-3
CWL 2005-4
CWL 2005-7
CWL 2006-11
CWL 2006-13
CWL 2006-15
CWL 2006-21
CWL 2006-22
CWL 2006-23
CWL 2006-26
CWL 2007-1
CWL 2007-13
CWL 2007-2
CWL 2007-4

---

[1]   Appears on Bloomberg as CWHL 2005-HYB9

- 1-3 -

---

## Exhibit B

### Grounds for Trustee's Objection to Slated Subservicer

- Is not approved as a servicer by one or more of FNMA, FHLMC, or GNMA (for the avoidance of doubt, there can be no objection on this ground if a subservicer is approved as a servicer by any one of FNMA, FHLMC, or GNMA);

- Does not have appropriate and adequate core infrastructure (staff, facilities and technology) to accommodate incremental volume;

- Does not have a demonstrated ability to scale out effectively loan volumes in the magnitude of loans transfer being contemplated;

- Does not have a credible plan to support loan volume additions for the relevant product types;

- Is currently experiencing or has recently experienced excessive staff turnover;

- At least 90% of call center staff must be primarily resident in the United States and all call center staff must have experience relating to servicing in various geographic regions of the country;

- Inadequate levels of workload ratios per staff member;

- Excessive or unusual outstanding customer disputes and complaints;

- Internal and external audit /regulatory report ratings, underlying issues identified and corrective actions taken to correct any deficiencies noted;

- Cannot have weighted average age of REO inventory for its non-Agency RMBS portfolio greater than 270 days;

- Whether the selected subservicer is an affiliate of an operational Subservicer and whether transfer to the selected subservicer would violate the requirement that only one Bank of America entity or affiliate serve as a subservicer; and

- Valid licensing exists for all states relevant to the servicing of the particular pool for which servicing will be transferred.

- D-1 -



## Exhibit E

### Reconventation Subservicer Compensation

**Boarding Fees**:

Manual Boarding:     $25 per Mortgage Loan
Electronic Boarding:  $15 per Mortgage Loan

**De-Boarding Fee**:

$15 per Mortgage Loan (fee will be increased to $50 if Mortgage Loan is transferred within 6 months of boarding)

**Base Fee**:

For each Mortgage Loan, a monthly fee pursuant to the chart below

| End of Month Status Volume: | | Less than 1,000 | 1,000+ |
|---|---|---|---|
| 0-29 Days Past Due | $ | 30 | $ 25 |
| 30-89 Days Past Due | $ | 60 | $ 55 |
| 90+ Days Past Due | $ | 125 | $ 100 |
| Foreclosure | $ | 125 | $ 100 |
| Bankruptcy | $ | 100 | $ 90 |
| REO Property | $ | 75 | $ 65 |

### Incentive Fees

| Incentive Fee Type | Incentive Amount |
|---|---|
| No contact incentive[1] | $100 |
| Paid in Full (previously 60+ days past due) | 1.50% of UPB – Minimum: $500; Maximum: $5,000 |
| Short Payoff (Refinance or Note Sale) | 1.25% of UPB – Minimum: $500; Maximum: $5,000 |
| Modifications[2] | 1.50% of UPB |
| Payment Plan or other workouts | 0.75% of UPB |
| Short Sale[3] | 1.50% of Sales Price – Minimum: $500; Maximum: $5,000 |
| Deed in Lieu | 0.5% of UPB – Minimum: $500; Maximum: $3,000 |
| REO Disposition[4] | 1.00% of Sales Price – Minimum: $750; Maximum: $5,000 |

[1]  To earn the no contact incentive fee, the Subservicer must take a no contact account and establish productive contact with the borrower (even if that productive contact does not result in a workout).

[2]  In order for the Subservicer to earn the modification incentive fee, the borrower must remain current for 12 months post-modification.

[3]  The short sale incentive fee will be reduced if the Subservicer is able to collect a referral or transaction management fee from the listing broker.

[4]  The REO incentive fee will be targeted at 1% of REO sale price, but will vary based on time to liquidation and the percent of market value received. Additionally, this fee will be reduced if the Subservicer is able to collect a referral or transaction management fee from the listing broker.

- E 1 -

*JOE*

**Exhibit F**

**Fee Schedule for Institutional Investors' Counsel**

1. On a current, monthly basis following the Signing Date, Bank of America shall pay the reasonable out-of-pocket costs incurred after the Signing Date by Gibbs & Bruns LLP, as the Institutional Investors' counsel, in fulfilling the Institutional Investors' obligations in connection with the Institutional Investor Agreement, including without limitation any reasonable fees and out-of-pocket costs incurred by the Institutional Investors' local counsel retained in connection with the Intervention contemplated by the Institutional Investor Agreement.

2. Within thirty (30) days of the Approval Date, Bank of America shall pay the total sum of eighty-five million dollars ($85,000,000.00) to Gibbs & Bruns LLP as attorneys' fees (and for pre-Signing Date out-of-pocket costs) for the Institutional Investors' counsel; provided that if any Covered Trusts become Excluded Covered Trusts, such fees will be reduced by a percentage amount equal to the percentage of the unpaid principal balance (as of the last Trustee report before the Approval Date) of all 530 Covered Trusts contained in such Excluded Covered Trusts. For purposes of calculating the percentage of unpaid principal balance for any Excluded Covered Trusts in connection with this paragraph, the unpaid principal balance of any Covered Trust that became an Excluded Covered Trust at the election of Bank of America or Countrywide pursuant to Paragraph 3(f)(iv) of the Settlement Agreement shall be excluded. This payment of attorneys' fees shall not be deducted or credited in any way against, and is over and above, the Settlement Payment.

- F-1 -



**EXHIBIT 18 –** *ROMAN PINO v. THE BANK OF NEW YORK MELLON, FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2006-OC8, MORTGAGE PASS THROUGH CERTIFICATES 2006-0C8,* SC11-697

# Supreme Court of Florida

---

No. SC11-697

---

**ROMAN PINO,**
Petitioner,

**vs.**

**THE BANK OF NEW YORK, etc., et al.,**
Respondents.

[February 7, 2013]
**REVISED OPINION**

PARIENTE, J.

The issue we address in this case involves an interpretation of the applicable Florida Rules of Civil Procedure governing voluntary dismissals and the extent of the trial court's inherent authority to remedy alleged fraud on the court through the reinstatement of a dismissed lawsuit. Although the context of the issue as presented in this case arises out of a widespread problem associated with fraudulent documentation filed by various financial institutions seeking to foreclose on real property throughout the state, the specific question we confront centers on the proper interpretation of the Florida Rules of Civil Procedure pertaining to voluntary dismissals and the extent of a trial court's inherent

authority, which is an issue that affects all civil cases in this state.

This case is not about whether a trial court has the authority in an ongoing civil proceeding to impose sanctions on a party who has filed fraudulent documentation with the court. Rather, the specific and narrow question we are asked to resolve is whether an allegation of fraud on the court empowers a trial court to strike a notice of voluntary dismissal, which was properly served by the plaintiff pursuant to Florida Rule of Civil Procedure 1.420(a)(1), to reinstate the dismissed action in order to then again dismiss the action with prejudice as a consequent sanction.[1]  In this case, the defendant in the trial court, Roman Pino, who had defaulted on his mortgage, sought to have a notice of voluntary dismissal of the mortgage foreclosure action struck and the case reinstated in order for the trial court to then dismiss the action with prejudice as a sanction to the mortgage holder for allegedly filing fraudulent documentation regarding ownership of the mortgage note.

Sitting en banc, the Fourth District Court of Appeal in Pino v. Bank of New York Mellon, 57 So. 3d 950, 952 (Fla. 4th DCA 2011), held that a trial court lacks the authority to set aside a plaintiff's notice of voluntary dismissal at the request of a defendant where the plaintiff has not obtained any affirmative relief before

---

1. Amicus briefs were filed by the law firm of Kaufman, Englett, and Lynd; the Mortgage Bankers Association and the Florida Bankers Association; and the Florida Land Title Association and the American Land Title Association.

210

dismissing the case. Because the underlying facts of this case centered on the broader issue of mortgage foreclosure complaints that appeared to be tainted by fraudulent documentation filed on behalf of various financial institutions, the Fourth District certified the following question as one of great public importance:

> DOES A TRIAL COURT HAVE JURISDICTION AND
> AUTHORITY UNDER RULE 1.540(B), FLA. R. CIV. P., OR
> UNDER ITS INHERENT AUTHORITY TO GRANT RELIEF
> FROM A VOLUNTARY DISMISSAL WHERE THE MOTION
> ALLEGES A FRAUD ON THE COURT IN THE PROCEEDINGS
> BUT NO AFFIRMATIVE RELIEF ON BEHALF OF THE
> PLAINTIFF HAS BEEN OBTAINED FROM THE COURT?

Id. at 955. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.

We answer the certified question in the negative and hold that when a defendant alleges fraud on the court as a basis for seeking to set aside a plaintiff's voluntary dismissal, the trial court has jurisdiction to reinstate the dismissed action only when the fraud, if proven, resulted in the plaintiff securing affirmative relief to the detriment of the defendant and, upon obtaining that relief, voluntarily dismissing the case to prevent the trial court from undoing the improperly obtained relief. Any affirmative relief the plaintiff obtained against the defendant as a result of the fraudulent conduct would clearly have an adverse impact on the defendant, thereby entitling the defendant to seek relief to set aside the voluntary dismissal pursuant to Florida Rule of Civil Procedure 1.540(b)(3). Where the plaintiff does not obtain affirmative relief before seeking the dismissal, measures other than

- 3 -



reinstating the dismissed action exist to protect against a plaintiff's abuse of the judicial process. We also conclude that a trial court does not have the inherent authority to strike the notice of voluntary dismissal in such a circumstance. Because in this case the Bank of New York Mellon (BNY Mellon) did not obtain any affirmative relief against Pino before the complaint was dismissed, and because the trial court did not have inherent authority to strike the notice of voluntary dismissal, we approve the result reached by the Fourth District in <u>Pino</u> and write to fully explain our reasoning.

## FACTS AND PROCEDURAL HISTORY

In October 2008, BNY Mellon commenced an action in the trial court to foreclose a mortgage held on real property owned by Roman Pino. No party disputes that Pino was in default of the mortgage at the time the suit was filed. BNY Mellon attached to its complaint a copy of the purported mortgage at issue, but BNY Mellon was neither listed nor referenced anywhere on the document. Instead, the attached mortgage listed another entity, Silver State Financial Services, Inc. (SSFS), as the lender, and yet another entity, Mortgage Electronic Registration Systems, Inc. (MERS), as the mortgagee.

Despite not being listed on any of the attached documentation, BNY Mellon alleged in the October 2008 complaint that it owned and held the promissory note and mortgage by assignment. A document evidencing such an assignment or

- 4 -

transfer was not attached, and the complaint was silent as to whether the note had ever been negotiated and transferred to BNY Mellon in the manner provided by law.[2] BNY Mellon further alleged that the original note had been "lost, destroyed or stolen."

Pino initially moved to dismiss BNY Mellon's complaint for, among other things, the failure to state a cause of action. In his motion, Pino alleged that the October 2008 complaint was defective because BNY Mellon had failed to attach either a copy of the note or a copy of the assignment (or any other evidence of a transfer of ownership). Pino claimed the assignment was crucial to establishing BNY Mellon as a real party in interest to this foreclosure action.

In an apparent attempt to remedy the defects of the original complaint, BNY Mellon filed an amended complaint in February 2009. The amended complaint contained allegations nearly identical to those set forth in the original October 2008 complaint, but the amended complaint no longer stated that the original note had been lost, destroyed, or stolen. In fact, attached to the amended complaint were copies of two documents not included with the original complaint: one

---

2. Section 673.2011(1), Florida Statutes (2008), defines the term "negotiation" as "a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder." If an instrument is payable to an identified person, "negotiation requires transfer of possession of the instrument and its indorsement by the holder." § 673.2011(2), Fla. Stat. (2008).

-5-

71 3

entitled "Adjustable Rate Note" and the other entitled "Assignment of Mortgage."

The Adjustable Rate Note, dated July 25, 2006, listed SSFS as the lender. The Assignment of Mortgage showed MERS, through its assignor, Countrywide Home Loans, Inc., transferring and assigning the subject note and mortgage to BNY Mellon. The date of execution of the attached Assignment of Mortgage was listed as September 19, 2008—twenty days before BNY Mellon had filed the original October 2008 complaint.

In a motion for sanctions brought pursuant to section 57.105, Florida Statutes (2009), and dated February 17, 2009, Pino alleged that the unrecorded Assignment of Mortgage in the amended complaint was fraudulently backdated and had been created with the intent to commit fraud on the court. Section 57.105 authorizes sanctions in the form of attorney's fees and other expenses if a trial court determines the party or the party's attorney knew or should have known that at the time a claim or defense was presented that the claim or defense "[w]as not supported by the material facts necessary to establish the claim or defense" or "[w]ould not be supported by the application of then-existing law to those material facts." § 57.105(1)(a)-(b), Fla. Stat. (2009). The statute also provides for a twenty-one-day safe harbor provision allowing the party to withdraw or correct "the challenged paper, claim, defense, contention, allegation, or denial." § 57.105(4), Fla. Stat. (2009).

- 6 -

214

To prove these factual allegations, Pino explained that he had initiated discovery and that upon doing so he would move to dismiss the case for fraud on the court.[3] Pino subsequently scheduled depositions of various notaries and witnesses—all employees of BNY Mellon's law firm—to take place on March 12, 2009. However, before the scheduled depositions occurred, and within the twenty-one-day safe harbor period set forth in section 57.105(4), BNY Mellon served a notice of voluntary dismissal dated March 9, 2009, dismissing the foreclosure complaint without prejudice pursuant to Florida Rule of Civil Procedure 1.420(a)(1).

Pino did not act on any asserted impropriety in BNY Mellon's taking of a voluntary dismissal without prejudice until BNY Mellon refiled the foreclosure action. On August 13, 2009, approximately five months after serving the notice of voluntary dismissal, BNY Mellon refiled an identical action against Pino to foreclose on the same mortgage with the assistance of the same law firm that had filed the initial action. Like the amended February 2009 complaint, the August 2009 complaint did not claim that the note was lost, missing, or stolen. However, attached to the August 2009 complaint was a new Assignment of Mortgage notarized on July 14, 2009—after the voluntary dismissal had been filed in the

---

3. Pino also filed a motion to dismiss BNY Mellon's amended February 2009 complaint in which he repeated his allegation that the Assignment of Mortgage appeared to be fraudulently backdated in order to avoid dismissal.

- 7 -

215

original action. This new assignment was executed, witnessed, and notarized by persons different from those who were involved with the prior purportedly fraudulent assignment.

Invoking Florida Rule of Civil Procedure 1.540(b), Pino filed a motion in the original, voluntarily dismissed action seeking to strike BNY Mellon's notice of voluntary dismissal on the grounds of fraud on the court and to dismiss that action with prejudice as a consequent sanction.[4] He also requested an evidentiary hearing to prove these allegations of fraud. BNY Mellon opposed the motion, arguing that the "fraud on the court" exception to the absolute right of voluntary dismissal was available only where the party voluntarily dismissing the case had obtained "affirmative relief" prior to dismissing the action. Because it had not obtained any affirmative relief, in that it did not foreclose on Pino's mortgage before voluntarily dismissing the case, BNY Mellon argued that the exception did not apply.

The trial court held a hearing on Pino's rule 1.540(b) motion, during which the court did not take any sworn testimony or evidence. At the hearing, Pino's counsel conceded that BNY Mellon had not obtained "affirmative relief" prior to filing the notice of the voluntary dismissal because BNY Mellon had never

---

4. Rule 1.540(b) provides in relevant part: "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, decree, order, or proceeding for . . . fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." Fla. R. Civ. P. 1.540(b).

- 8 -

216

foreclosed on Pino's property.  However, Pino argued that BNY Mellon had

secured a "benefit" of being shielded from the discovery of fraud.  Relying solely

on the written submissions of the parties and the arguments of counsel, the trial

court rejected Pino's argument and denied the rule 1.540(b) motion to strike BNY

Mellon's previously served notice of voluntary dismissal.

The Fourth District, sitting en banc, affirmed the trial court's denial.  See

Pino, 57 So. 3d at 952.  First, the Fourth District reviewed the narrow exceptions

Florida courts have carved out of the near-absolute entitlement that Florida's

voluntary dismissal rule 1.420(a) provides to litigants and concluded that none

applied in this case.  The "most applicable" exception to the right of voluntary

dismissal, the Fourth District stated, was established in Select Builders of Florida,

Inc. v. Wong, 367 So. 2d 1089 (Fla. 3d DCA 1979).  Pino, 57 So. 3d at 952.

In Select Builders, the trial court had granted the plaintiff relief by

expunging a document from public records and quieting title to a parcel of real

property.  Select Builders, 367 So. 2d at 1090.  After it was discovered that the

plaintiff had committed fraud on the court, the defendants moved for sanctions and

the trial court ordered the plaintiff to, among other things, deposit money from the

sale of the property with a third party.  Id.  The plaintiff then filed a notice of

voluntary dismissal, which the trial court struck upon request of the defendants.

Id.  The Third District held that the trial court correctly retained jurisdiction over

- 9 -

217

the dismissed action to prevent fraud on the court, reasoning as follows: "The plaintiff had obtained the affirmative relief it sought, its actions in the cause in the trial court may have been fraudulent on the court and it certainly was within its inherent power [as an equity court] to protect its integrity." Id. at 1091.

Like the trial court in the instant case, the Fourth District interpreted this holding in Select Builders as requiring BNY Mellon to have obtained affirmative relief from the trial court before the court could retain jurisdiction to strike BNY Mellon's notice of voluntary dismissal and reinstate the dismissed action. Pino, 57 So. 3d at 953. The Fourth District reasoned that in contrast to Select Builders, here, BNY Mellon had not obtained any type of affirmative relief, rendering Select Builders distinguishable. Id. The Fourth District therefore held that "[e]ven if the assignment of mortgage was 'fraudulent' in that it was not executed by the proper party, it did not result in any relief in favor of BNY Mellon." Id.

Second, the Fourth District addressed Pino's argument that rule 1.540(b) provided an additional method of seeking relief from a notice of voluntary dismissal. The Fourth District cited to this Court's decision in Miller v. Fortune Insurance Co., 484 So. 2d 1221, 1224 (Fla. 1986), for the proposition that a defendant could invoke rule 1.540(b) to strike a notice of voluntary dismissal to obtain relief since such a dismissal constituted a "proceeding" within the meaning of that rule. Pino, 57 So. 3d at 953. Similar to its analysis of Select Builders, the

- 10 -

218

Fourth District again concluded that "[a] defendant may obtain such 'relief' when a plaintiff has obtained a ruling that has adversely impacted the defendant." Id. For this construction of rule 1.540(b), the Fourth District turned to the dictionary definition of the term "relieve" as the term is used in the rule:

> "Relieve" means "[t]o ease or alleviate (pain, distress, anxiety, need, etc.) . . . to ease (a person) of any burden, wrong, or oppression, as by legal means." The Random House Dictionary of the English Language 1212 (1967). A defendant may obtain such "relief" when a plaintiff has obtained a ruling that has adversely impacted the defendant. Here, the defendant has not been adversely impacted by a ruling of the court. The fact that a defendant may have incurred attorney's fees and costs is not an adverse impact recognized as meriting relief. See Serv. Experts, LLC v. Northside Air Conditioning & Elec. Serv. Inc., [56 So. 3d 26] (Fla. 2d DCA 2010).

Pino, 57 So. 3d at 953-54. The Fourth District held that Pino was not entitled to seek relief pursuant to rule 1.540(b) because he had not suffered an adverse ruling or impact from the notice of voluntary dismissal. Id. at 954.

Finally, the Fourth District discussed a trial court's inherent authority to protect judicial integrity in the litigation process. See id. The Fourth District acknowledged that dismissal of an action could be used as a sanction when "fraud on the court" was involved, but in the district court's view, it would not be "an appropriate exercise of the inherent authority of the court to reopen a case voluntarily dismissed by the plaintiff simply to exercise that authority to dismiss it, albeit with prejudice." Id. According to the Fourth District, a trial court would have inherent authority to reopen a voluntarily dismissed case at the request of a

- 11 -

219

defendant only where the defendant had been "seriously prejudiced." Id. Because Pino did not allege any prejudice and may have in fact benefited from the dismissal by forestalling the foreclosure, the district court concluded that this rule did not apply. Id.

The Fourth District explained that the appropriate procedure would be to follow rule 1.420, where after the filing of a notice of voluntary dismissal, "Pino would be entitled to his costs and possibly his attorney's fees," with payment as a precondition to the second suit. Id. The Fourth District further observed that a referral of BNY Mellon's trial attorney for a possible violation of the Code of Professional Responsibility was in order. See id. at 954 & n.2.

Notwithstanding these remedies, the Fourth District recognized that this case presented a question of great public importance because "many, many mortgage foreclosures appear[ed] [to be] tainted with suspect documents." Id. at 954. Responding to Pino's request to sanction BNY Mellon by denying it the equitable right to foreclose on the mortgage, the district court observed that if this sanction were available after a voluntary dismissal, "it may dramatically affect the mortgage foreclosure crisis in this State." Id. at 954-55. Consequently, the Fourth District certified the question above to this Court. Id. at 955.

Judge Polen dissented because he would have held that the trial court had jurisdiction and authority to consider the motion under rule 1.540(b) on its merits

- 12 -

and to take appropriate action, including striking a voluntary dismissal filed in aid of fraudulent conduct. See Pino, 57 So. 3d at 959-60 (Polen, J., dissenting).[5] He wrote that a party "should not escape responsibility and appropriate sanctions for unsuccessfully attempting to defraud a court by purposefully evading the issue through a voluntary dismissal." Id. at 959.

Following the Fourth District's affirmance, Pino sought this Court's review. After the Court accepted jurisdiction and Pino filed his initial brief on the merits, the parties filed a joint Stipulated Dismissal pursuant to Florida Rule of Appellate Procedure 9.350, advising that they had settled this matter and stipulated to its dismissal. The Court denied the parties leave to dismiss this review proceeding and exercised its discretion to retain jurisdiction over this cause. See Pino v. Bank of N.Y. Mellon, 76 So. 3d 927, 931 (Fla. 2011). We now address the merits.

## ANALYSIS

Although this case arises out of a mortgage foreclosure action, we do not decide broader issues related to mortgage foreclosures in general, such as whether a copy of an assignment of mortgage is necessary to establish standing to foreclose on the mortgage or whether the rights of affected third parties who later purchase foreclosed properties are protected when collateral attacks are brought against

---

5. In the introductory footnote to his dissent, Judge Polen explained that the dissent was actually written by Judge Farmer, who had since retired and could no longer participate in this matter. Id. at 955 n.3.

- 13 -

221

otherwise final court proceedings. Rather, the specific issue we decide in this case, which also has implications for civil actions outside of the mortgage foreclosure context, is whether an allegation of fraud on the court empowers a trial court to reopen a lawsuit at the request of a defendant after the plaintiff has already voluntarily dismissed that suit, but where the plaintiff did not obtain any affirmative relief.

Answering this question requires us to construe and interpret the Florida Rules of Civil Procedure and the trial court's inherent authority to protect judicial integrity in the litigation process. This is a pure question of law, subject to de novo review. See Bosem v. Musa Holdings, Inc., 46 So. 3d 42, 44 (Fla. 2010) ("Because this is a pure question of law, our standard of review is de novo."); Saia Motor Freight Line, Inc. v. Reid, 930 So. 2d 598, 599 (Fla. 2006) (reviewing de novo an interpretation of Florida Rule of Civil Procedure 1.525); Borden v. E.-European Ins. Co., 921 So. 2d 587, 591 (Fla. 2006) ("This issue involves a question of statutory interpretation and thus is subject to de novo review."); S. Baptist Hosp. of Fla., Inc. v. Welker, 908 So. 2d 317, 319 (Fla. 2005) (reviewing de novo a certified question that involved a pure question of law). We begin with Florida's voluntary dismissal rule.

### I. Plaintiff's Right of Voluntary Dismissal

A plaintiff's right in this state to voluntarily dismiss a civil action once

- 14 -

without prejudice is governed by Florida Rule of Civil Procedure 1.420(a)(1). Since the 1960s, Florida's voluntary dismissal rule has provided plaintiffs with a very broad right and time period within which to dismiss lawsuits. See Fla. R. Civ. P. 1.35(a)(1) (1966) (providing plaintiffs with the right to voluntarily dismiss a civil action before a hearing on a motion for summary judgment or until the jury retires). When BNY Mellon invoked rule 1.420(a)(1) to voluntarily dismiss the foreclosure action it had instituted against Pino, the language of that provision provided in full:

> Except in actions in which property has been seized or is in the custody of the court, an action may be dismissed by plaintiff without order of court (A) before trial by serving, or during trial by stating on the record, a notice of dismissal at any time before a hearing on motion for summary judgment, or if none is served or if the motion is denied, before retirement of the jury in a case tried before a jury or before submission of a nonjury case to the court for decision, or (B) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication on the merits when served by a plaintiff who has once dismissed in any court an action based on or including the same claim.

Fla. R. Civ. P. 1.420(a)(1) (2009) (emphasis added).[6]

---

6. Effective January 1, 2011, the Court amended rule 1.420(a)(1) to allow "a claim, or any part of an action or claim," rather than just an "action," to be voluntarily dismissed. In re Amends. to the Fla. R. of Civ. P., 52 So. 3d 579, 587 (Fla. 2010). BNY Mellon filed the subject notice of voluntary dismissal before this rule amendment went into effect. The rule amendment has no bearing on the question at issue in this case.

- 15 -

223

Under its terms, rule 1.420(a)(1) authorizes a plaintiff to take one voluntary dismissal without prejudice, unless "otherwise stated in the notice or stipulation," by serving "a notice of dismissal at any time before a hearing on motion for summary judgment, or if none is served or if the motion is denied, before retirement of the jury in a case tried before a jury or before submission of a nonjury case to the court." Id. Until either time period delineated in the rule expires, this Court has long construed the plaintiff's right to take a voluntary dismissal to be "absolute." Fears v. Lunsford, 314 So. 2d 578, 579 (Fla. 1975). The trial court has no authority or discretion to deny the voluntary dismissal. The dismissal is effective upon service. See Fla. R. Civ. P. 1.420(a)(1).

It is well accepted that the effect of a plaintiff's voluntary dismissal under rule 1.420(a)(1) is jurisdictional. The voluntary dismissal serves to terminate the litigation, to instantaneously divest the court of its jurisdiction to enter or entertain further orders that would otherwise dispose of the case on the merits, and to preclude revival of the original action. In Randle-Eastern Ambulance Service, Inc. v. Vasta, 360 So. 2d 68 (Fla. 1978), the Court embraced this principle of law, holding that voluntary dismissals taken pursuant to rule 1.420 are acts of finality that deprive the trial court of jurisdiction over the dismissed case:

> The right to dismiss one's own lawsuit during the course of trial is guaranteed by Rule 1.420(a), endowing a plaintiff with unilateral authority to block action favorable to a defendant which the trial judge might be disposed to approve. The effect is to remove completely

- 16 -

*224*

> from the court's consideration the power to enter an order, equivalent
> in all respects to a deprivation of "jurisdiction." If the trial judge loses
> the ability to exercise judicial discretion or to adjudicate the cause in
> any way, it follows that he has no jurisdiction to reinstate a dismissed
> proceeding. The policy reasons for this consequence support its
> apparent rigidity.

Id. at 69. Our pronouncement in Randle-Eastern was, and still is, consistent with

the manner in which federal appellate courts have interpreted the corresponding

voluntary dismissal provision set forth in Federal Rule of Civil Procedure 41(a)(1):

> The [filing of a Rule 41(a)(1)(i) notice] itself closes the file.
> There is nothing the defendant can do to fan the ashes of that action
> into life and the court has no role to play. This is a matter of right
> running to the plaintiff and may not be extinguished or circumscribed
> by adversary or court. There is not even a perfunctory order of court
> closing the file. Its alpha and omega was the doing of the plaintiff
> alone. The effect of the filing of a notice of dismissal pursuant to
> Rule 41(a)(1)(i) is to leave the parties as though no action had been
> brought. Once the notice of dismissal has been filed, the [trial] court
> loses jurisdiction over the dismissed claims and may not address the
> merits of such claims or issue further orders pertaining to them.

Janssen v. Harris, 321 F.3d 998, 1000 (10th Cir. 2003) (alteration in original)

(quoting Duke Energy Trading & Mktg., L.L.C. v. Davis, 267 F.3d 1042, 1049

(9th Cir. 2001)).

    Given its historically liberal construct, the plain language of Florida's rule

1.420(a)(1) does not take into account a plaintiff's motive in seeking the dismissal,

nor does it expressly preclude a plaintiff from taking a dismissal where the

objective is tactical. In fact, the rule presupposes that the plaintiff will have a

tactical reason for voluntarily dismissing its lawsuit at a particular point in time.

- 17 -

See, e.g., DeLuca v. Harriman, 402 So. 2d 1205, 1206 (Fla. 2d DCA 1981) ("Florida Rule of Civil Procedure 1.420(a) provides for a broad right of voluntary dismissal for the plaintiff, which, in a majority of cases, the plaintiff would use for tactical advantages."). Plaintiffs frequently use the right of voluntary dismissal as a tool to cure defects that existed in the dismissed action.

In a general sense then, rule 1.420(a)(1) granted to BNY Mellon the right to freely terminate its original foreclosure action. Unless the actions in this case fall within a specific recognized exception or the Court were to amend the Florida Rules of Civil Procedure to change longstanding and well-established liberal procedures for voluntary dismissals, BNY Mellon had the authority to utilize the voluntary dismissal rule to dismiss the case by serving a notice of voluntary dismissal. We thus next discuss the recognized exceptions.

### II. Exceptions to the Divestiture of Jurisdiction

While the language of rule 1.420(b) clearly affords a plaintiff the absolute right to voluntarily dismiss a case once without prejudice, this Court and Florida's district courts of appeal have recognized specific situations in which the trial court will not be divested of jurisdiction by virtue of the plaintiff's notice of voluntary dismissal. Pino's motion to strike BNY Mellon's voluntary dismissal and reinstate the dismissed action was brought pursuant to Florida Rule of Civil Procedure 1.540(b), which provides a litigant relief from a final judgment based upon fraud.

- 18 -

Pino also relied on the case-made exception that permits a trial court to strike a voluntary dismissal under its inherent authority, and the Fourth District has asked us whether inherent authority would give the trial court the authority to strike a notice of voluntary dismissal. Each of these exceptions is examined in turn. Finally, we address the suggestion of the dissent below that Florida Rule of Civil Procedure 1.110(b) adds significant authority for the court system to act in mortgage foreclosure cases "when there has been . . . a colorable showing of false or fraudulent evidence." Pino, 57 So. 3d at 959 (Polen, J., dissenting).

### a. Relief Pursuant to Rule 1.540(b)

In the present case, Pino sought relief pursuant to rule 1.540(b)(3) in an attempt to have the trial court reinstate BNY Mellon's previously dismissed foreclosure case based on the fraud exception in order to sanction BNY Mellon by dismissing the case with prejudice. Rule 1.540, which this Court has characterized as the "one exception to the rule of absolute finality," Bane v. Bane, 775 So. 2d 938, 941 (Fla. 2000), provides in pertinent part:

> (b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud; etc. <u>On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, decree, order, or proceeding for the following reasons</u>: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial or rehearing; <u>(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party</u>; (4) that the judgment or decree is void; or (5) that the judgment or decree has

- 19 -

*227*

> been satisfied, released, or discharged, or a prior judgment or decree
> upon which it is based has been reversed or otherwise vacated, or it is
> no longer equitable that the judgment or decree should have
> prospective application. . . .

Fla. R. Civ. P. 1.540(b) (emphasis added). This language empowers a trial court,

upon a proper motion and when the terms are just, "to relieve a party or a party's

legal representative from a final judgment, decree, order, or proceeding" based

upon any of the five enumerated grounds, including fraud. Stated differently, the

rule requires the occurrence of an event (i.e., a judgment, decree, order, or

proceeding) from which the party invoking the rule needs relief after the cause has

become final.

In Miller v. Fortune Insurance Co., 484 So. 2d 1221, 1224 (Fla. 1986), this

Court construed the term "proceeding" as used in rule 1.540(b) to encompass

voluntary dismissals taken pursuant to rule 1.420(a)(1) and held that the limited

jurisdiction conferred on trial courts to grant relief under rule 1.540(b) includes the

power to set aside voluntary dismissals. Id. The plaintiff's attorney in Miller filed

a voluntary motion to dismiss the case "with prejudice," but eleven months later

moved to strike the language "with prejudice" and to substitute it for the language

"without prejudice." Id. at 1221-22. As authority for the change, the plaintiff cited

rule 1.540(b), which provides for relief from a final proceeding due to mistake,

inadvertence, or excusable neglect. See id. at 1222. The plaintiff claimed the error

was a "secretarial error," and a supporting affidavit by the secretary stated that the

- 20 -

secretary had mistakenly typed "with prejudice." Id.

The district court affirmed the trial court's denial of the plaintiff's motion, but this Court quashed the district court's decision and agreed that "[r]ule 1.540(b) may be used to afford relief to all litigants who can demonstrate the existence of the grounds set out under the rule." Id. at 1224 (quoting Shampaine Indus. v. S. Broward Hosp. Dist., 411 So. 2d 364, 368 (Fla. 4th DCA 1982)). The Court observed that the trial court would have limited jurisdiction to determine whether it had jurisdiction under the rule to grant relief, stating in pertinent part:

> Of course, the trial court has jurisdiction to determine whether it has jurisdiction to grant relief. In any case where jurisdiction is a question, the court must have an opportunity to rule on the jurisdictional question, and thus all rules of jurisdiction inherently provide authority for the court to assume jurisdiction for the limited purpose of determining whether a basis exists for the court to proceed further. "A court has the power and duty [i.e. has jurisdiction] to examine and to determine whether it has jurisdiction of a matter presented to it . . . ." 20 Am. Jur. 2d Courts § 92 (1965) (footnotes omitted). There is no inconsistency, then, in holding that a court has no jurisdiction, but that the determination of jurisdiction cannot be made without exercising jurisdiction to the extent necessary to make the determination. In a proceeding on a rule 1.540 motion, the court's final determination of whether to grant relief will inherently include a ruling on jurisdiction. This is different from most judicial acts, but arises because of the unusual procedural status of rule 1.540, which exists to provide jurisdiction where otherwise there would be none.

Id. at 1223-24 (emphasis added). Based on this reasoning, the Court remanded with instructions to the trial court to conduct a hearing to determine if the facts established mistake, inadvertence, or excusable neglect for relief under rule

- 21 -

1.540(b).  Id. at 1224.

The Amici for the Mortgage Bankers Association and the Florida Bankers Association argue that Miller involved an erroneous dismissal with prejudice and that rule 1.540 applies only to dismissals with prejudice.  However, this Court's decision in Miller did not alter the general principle set forth in Randle-Eastern that a plaintiff's voluntary dismissal is an act of finality depriving the trial court of jurisdiction over the dismissed case.  Miller simply recognized that one exception to this rule exists: a trial court retains jurisdiction under rule 1.540(b) to relieve a party "from the act of finality in a narrow range of circumstances" set forth in the rule.  Miller, 484 So. 2d at 1223.  This rule can be invoked by either the defendant or the plaintiff and regardless of whether the voluntary dismissal was taken with or without prejudice.  Miller never drew a distinction between dismissals with prejudice and those without prejudice for the purposes of seeking relief under rule 1.540(b).  We therefore reject the argument put forth by the Amici for the Mortgage Bankers Association and the Florida Bankers Association for drawing this distinction.

The problem with the defendant's attempt to use rule 1.540(b) to have this case reinstated is found in the actual language of rule 1.540(b).  While rule 1.540(b) may be used to afford relief to all litigants who can demonstrate the existence of one of the five grounds enumerated therein, including fraud, the rule is

- 22 -

230

nevertheless limited in its application to "relie[ving] a party or a party's legal representative from a final judgment, decree, order, or proceeding." Fla. R. Civ. P. 1.540(b) (emphasis added). We agree with the Fourth District that in the context of a litigant seeking relief from a plaintiff's voluntary dismissal, he or she may obtain such "relief" only where the voluntary dismissal being challenged under rule 1.540(b) subjects the litigant to some adverse impact from which he or she must be relieved.

Rule 1.540(b) does not define the term "relieve," but Merriam-Webster's Collegiate Dictionary 988 (10th ed. 1999), defines it in the following manner: "[T]o set free from an obligation, condition, or restriction . . . to ease of a burden, wrong, or oppression by judicial or legislative interposition . . . to bring about the removal or alleviation of." See Barco v. Sch. Bd. of Pinellas Cnty., 975 So. 2d 1116, 1122 (Fla. 2008) ("It is appropriate to refer to dictionary definitions when construing statutes or rules."). Voluntary dismissals are unique and distinct from other types of judgments, decrees, orders, or proceedings from which a litigant may seek relief, in that ordinarily there is no adverse obligation, condition, or restriction that has been placed upon the defendant as a result of the voluntary dismissal itself. Instead, the opposite appears to be true; the voluntary dismissal tends to benefit the defendant because it terminates the litigation then pending against the defendant and extinguishes all obligations, conditions, or restrictions

- 23 -

231

flowing therefrom.

Florida's case law is replete with examples that almost exclusively show plaintiffs invoking rule 1.540(b) to seek relief and set aside voluntary dismissals inadvertently taken with prejudice. See, e.g., Miller, 484 So. 2d at 1223-24; Diaz, Reus & Targ, LLP v. Bird Wingate, LLC II, 66 So. 3d 974, 974-75 (Fla. 3d DCA 2011); Wells Fargo Bank, NA v. Haecherl, 56 So. 3d 892, 894 (Fla. 4th DCA 2011); Rabello v. Alonso, 927 So. 2d 45, 46 (Fla. 3d DCA 2006); DiPiazza v. Palm Beach Mall, Inc., 722 So. 2d 831, 832 (Fla. 2d DCA 1998); Davidson v. Lenglen Condo Assoc., 602 So. 2d 687, 688 (Fla. 4th DCA 1992); Freeman v. Sanders, 562 So. 2d 834, 834-35 (Fla. 1st DCA 1990). This makes sense, of course, because a plaintiff who unintentionally files a dismissal with prejudice to the commencement of another action, like in Miller, is adversely impacted by the dismissal—the plaintiff can no longer bring the same cause of action against the defendant because of res judicata principles. See, e.g., Haecherl, 56 So. 3d at 893-95 (holding that a plaintiff bank was entitled to seek relief pursuant to rule 1.540(b) in order to relieve itself of a voluntary dismissal inadvertently taken "with prejudice" because the bank "was adversely impacted by the notice of voluntary dismissal").

In this case, however, it is the defendant who is seeking relief from the plaintiff's own voluntary dismissal. When it is a defendant who employs rule 1.540(b) as the vehicle to set aside or relieve itself from a plaintiff's voluntary

- 24 -

232

dismissal, the adverse impact is not as easily identifiable because a voluntary dismissal generally accomplishes nothing from which a defendant would need relief. Under this scenario, common sense dictates that a party would not have a reason to challenge a proceeding in which he or she has not been adversely impacted. Indeed, our review of this issue reveals that examples in which a defendant has attempted to demonstrate some form of adverse impact due to a plaintiff's voluntary dismissal have arisen, for the most part, outside of the rule 1.540(b) context, such as in cases like this one where fraud has been alleged on the part of the plaintiff prior to the plaintiff taking the voluntary dismissal.[7]

The case almost exclusively cited as the origin of this fraud exception is Select Builders, wherein the plaintiff commenced an action to expunge from the public records a federal court injunction that was allegedly improperly filed by the defendants. 367 So. 2d at 1090. After legal skirmishes ensued between the parties, the trial court granted the plaintiff's requested relief by issuing an order expunging the document from the public records, quieting title to the real property

---

7. See, e.g., Freeman v. Mintz, 523 So. 2d 606, 608 (Fla. 3d DCA 1988) (defendant attempted to set aside the plaintiff's filing of a voluntary dismissal after the trial court had orally announced it would grant the defendant's motion to involuntarily dismiss the case with prejudice but before the trial court had an opportunity to enter a written order of involuntary dismissal); Ambory v. Ambory, 442 So. 2d 1087, 1087-88 (Fla. 2d DCA 1983) (defendant attempted to set aside the plaintiff's voluntary dismissal, which was filed the day after the trial court orally announced that it was involuntarily dismissing the case but before the court entered a formal order of voluntary dismissal with prejudice).

- 25 -

at issue, and enjoining the defendants from filing any like documents without first domesticating the documents in Florida. Id. When it later came to light that the plaintiff may have perpetrated a fraud on the trial court in obtaining the order expunging the document, the court vacated its previous order. Id.

The defendants moved for sanctions against the plaintiff, contending that it "misled the [trial] court and committed certain procedural irregularities." Id. In response, the trial court ordered the plaintiff to take immediate steps to place the parties and the property in a status quo. Id. The trial court also required the plaintiff to deposit certain monies that it received from the sale of the property to a third party. Id. The plaintiff then filed a notice of voluntary dismissal pursuant to rule 1.420(a)(1). Id. After the defendants moved to strike the voluntary dismissal, the trial court granted the motion, struck the plaintiff's voluntary dismissal, and retained jurisdiction over the cause. Id.

The Third District in Select Builders affirmed, finding the trial court "to be correct in striking the voluntary dismissal and reinstating the matter to prevent a fraud on the court." Id. at 1091. The district court explained that the plaintiff "had obtained the affirmative relief it sought, its actions in the cause in the trial court may have been fraudulent on the court and it certainly was within its inherent power [as an equity court] to protect its integrity." Id. The Third District then distinguished other cases in which the plaintiff's right to take a voluntary dismissal

- 26 -

234

was absolute: "First, the plaintiff in the cited cases had not received affirmative relief from an equity court and, secondly, no question of fraud on the court was involved." Id.

Although this Court has never discussed Select Builders, Florida's intermediate appellate courts have recognized the Select Builders exception on a variety of occasions. Yet, rarely has it been invoked as a basis for affirming the trial court's striking of a plaintiff's voluntary dismissal at a defendant's request.[8] Generally, decisions by other courts acknowledging the exception from Select Builders have simply noted its existence without applying it.[9] Other decisions have interpreted the Select Builders exception to apply where the notice of

---

8. Pino has not cited to any reported decision in addition to Select Builders that has actually affirmed a trial court's use of the rule announced in that case. We have only located one other instance, but that decision did not provide any reasoning for doing so. See Blain v. Blain, 54 So. 3d 547, 547-48 (Fla. 3d DCA 2011).

9. See, e.g., Patterson v. Allstate Ins. Co., 884 So. 2d 178, 180 (Fla. 2d DCA 2004) (recognizing the fraud exception, but not applying it); Tobkin v. State, 777 So. 2d 1160, 1164 (Fla. 4th DCA 2001) (recognizing the fraud exception, but not applying it because there was no indication that the party who filed the voluntary dismissal perpetrated fraud on the court); Durie v. Hanson, 691 So. 2d 485, 486 n.2 (Fla. 5th DCA 1997) (recognizing the exception from Select Builders but concluding that it was "not applicable to the instant case"); Marine Contractors, Inc. v. Armco, Inc., 452 So. 2d 77, 79 & n 2 (Fla. 2d DCA 1984) (noting the right to seek a voluntary dismissal was "almost absolute" because "[o]ne possible exception [was] where the party taking the voluntary dismissal perpetrates a fraud on the court"); Romar Int'l, Inc. v. Jim Rathman Chevrolet/Cadillac, Inc., 420 So. 2d 346, 347 (Fla. 5th DCA 1982) (recognizing the fraud exception, but not applying it).

- 27 -

235

voluntary dismissal itself was considered an attempt to commit fraud on the court.[10] Still others have required a showing both that the plaintiff used the voluntary dismissal to perpetrate fraud and that the plaintiff fraudulently secured "affirmative relief" before taking the dismissal.[11]

In Bevan v. D'Alessandro, 395 So. 2d 1285, 1285-86 (Fla. 2d DCA 1981), for example, the Second District reversed the trial court's entry of a dismissal with prejudice of the plaintiff's replevin action for failure to prosecute because the trial court's order was entered after the plaintiff had voluntarily dismissed the case. The Second District distinguished the case before it from Select Builders on the basis that the plaintiff had received no affirmative relief and that his actions did not rise to the level of fraud on the court, stating as follows:

> We are aware that in Select Builders of Florida, Inc. v. Wong, 367 So. 2d 1089 (Fla. 3d DCA 1979), the court carved out a narrow exception to the general rule, holding a voluntary dismissal inoperative in situations where fraud on the court was attempted by

---

10. See, e.g., Fitzgerald v. Fitzgerald, 790 So. 2d 1216, 1217 (Fla. 2d DCA 2001) (concluding that the trial court was required to accept a notice of voluntary dismissal where "the trial court made no finding of fraud, and there is no basis in the record to find that the notice constituted a fraud on the court" (emphasis added)); Romar Int'l, Inc., 420 So. 2d at 347 ("A narrow exception [to the plaintiff's right to voluntarily dismiss his lawsuit] exists where a fraud on the court is attempted by the filing of the voluntary dismissal . . . ." (emphasis added)).

11. See, e.g., Serv. Experts, LLC, 56 So. 3d at 32 (acknowledging the affirmative relief requirement from Select Builders, but noting that other courts have interpreted the fraud exception to apply where the notice of dismissal itself was considered an attempt to commit fraud on the court).

- 28 -

236

> the filing of a voluntary dismissal. There, however, the plaintiff had received affirmative relief to which he was not entitled and sought to avoid correction of the trial court's error by taking a voluntary dismissal. Here, on the other hand, [the plaintiff] has received no affirmative relief, nor does his action in taking a voluntary dismissal rise to the level of a fraud on the court under the circumstances. Therefore, although we feel [the plaintiff] has thwarted the intent and purpose of the rule, his absolute right to the benefits of rule 1.420(a)(1) superseded his responsibility to comply with rule 1.420(e).

Bevan, 395 So. 2d at 1286 (emphasis added).

The Second District reaffirmed this holding most recently in Service Experts, LLC v. Northside Air Conditioning & Electrical Service, Inc., 56 So. 3d 26, 31-32 (Fla. 2d DCA 2010). In Service Experts, after almost two years of litigation, after the defendants served offers of judgment, after the close of discovery, and after the defendants moved for summary judgment (but before the hearing on the summary judgment motion), the plaintiff filed a notice to voluntarily dismiss its complaint without prejudice. Id. at 28. The defendants responded by filing a motion to strike the plaintiff's notice of voluntary dismissal or for an entry of a dismissal with prejudice, arguing in part that the plaintiff had perpetrated fraud on the court by filing two fraudulent affidavits with respect to a motion for sanctions the defendants had pending against the plaintiff. Id.

The Second District reversed the trial court's order permitting an evidentiary hearing to determine whether fraud had been perpetrated on the court. Id. at 29. According to the district court, Select Builders was inapposite because the

- 29 -

*237*

plaintiff's voluntary dismissal did not prevent the court from taking away any

relief the plaintiff had obtained through fraudulent means:

> This case is distinguishable from <u>Select Builders</u> and the other
> cases cited above. The Northside defendants' allegations of fraud
> were only related to [the plaintiff's] filing of two affidavits in
> response to the Northside defendants' section 57.105 motion for
> sanctions. The Northside defendants contend that the two affidavits
> contained false statements and were filed "to convince the court that
> [the plaintiff] had a good faith basis to file" the lawsuit. Yet, the trial
> court never ruled on the merits of the Northside defendants' section
> 57.105 motion for sanctions, and there is no record evidence that the
> trial court relied on the two affidavits <u>to confer upon [the plaintiff's]</u>
> <u>any affirmative relief or benefit</u>. The Northside defendants rightfully
> argued at that time in their reply to [the plaintiff's] opposition to the
> section 57.105 motion that "the court should not decide this motion
> until it has determined which party has prevailed." Thus, unlike
> <u>Select Builders</u>, this is not a case where the plaintiff engaged in fraud
> which resulted in affirmative relief from the court and, upon obtaining
> that relief, voluntary dismissed the case to prevent the court from
> taking away the ill-gotten relief. Without evidence of ill-gotten relief
> connected to the fraud allegations, the Northside defendants'
> allegations were insufficient to support striking the notice of voluntary
> dismissal on the basis of fraud.

<u>Id.</u> at 32.

We agree with the Second District that <u>Select Builders</u> is a narrow rule that

applies where the voluntary dismissal prevents the court from undoing affirmative

relief that has been improperly obtained by the plaintiff. In other words, where

fraud is alleged by the defendant as a basis for seeking to set aside the plaintiff's

voluntary dismissal, relief may be warranted when the plaintiff's fraud resulted in

the plaintiff securing affirmative relief from the court to the detriment of the

- 30 -

*238*

defendant and, upon obtaining that relief, the plaintiff voluntarily dismissed the case to prevent the court from undoing the improperly obtained relief. Although Select Builders neither references nor discusses rule 1.540(b)(3) as a basis for vacating a voluntary dismissal, we read the case as being consistent with the rule and as providing one example of an application of that rule as employed by a defendant.

In sum, to obtain the benefit of rule 1.540(b) on the basis of a plaintiff's voluntary dismissal, a defendant must suffer adverse impact as a result of the plaintiff's receipt of affirmative relief from which the defendant should be alleviated. This requirement is found in the language of the rule itself, which is limited in application to "reliev[ing] a party or a party's legal representative from a final judgment, decree, order, or proceeding." Fla. R. Civ. P. 1.540(b) (emphasis added). In other words, the voluntary dismissal being challenged under rule 1.540(b) must subject the litigant to some adverse impact from which he or she needs relief. Applied in the context of a voluntary dismissal taken after fraudulent conduct by a plaintiff, any affirmative relief the plaintiff obtained against the defendant as a result of fraudulent conduct would clearly have an adverse impact on the defendant, thereby entitling the defendant to seek redress under rule 1.540(b)(3). On the other hand, where the alleged fraud does not lead to the plaintiff obtaining affirmative relief to the detriment of the defendant, rule

- 31 -

239

1.540(b)(3) would not be the proper vehicle for a trial court to reopen a case voluntarily dismissed by a plaintiff.

### b. Trial Court's Inherent Authority

The certified question also asks this Court whether a trial court has the inherent authority to strike a notice of voluntary dismissal where the defendant has alleged fraud on the court. In its decision, the Fourth District discussed two lines of cases involving a trial court's inherent authority. Neither is applicable to the situation presented by this case.

The first is where a trial court grants relief from fraudulent conduct in the context of a pending action.[12] In that line of cases, the defendant moved for the

---

12. See, e.g., Wenwei Sun v. Aviles, 53 So. 3d 1075, 1077-78 (Fla. 5th DCA 2010) (affirming trial court's dismissal of plaintiff's action based on fraud on the court when plaintiff and his wife and daughter "lied on virtually every discovery occasion . . . making it virtually impossible for the appellees to defend against the damage claims advanced by the appellants"); Sky Dev., Inc. v. Vistaview Dev., Inc., 41 So. 3d 918, 919-20 (Fla. 3d DCA 2010) (affirming trial court's dismissal of plaintiff's action based on fraud on the court where corporate office tampered with witness during a deposition and the trial); Ramey v. Haverty Furniture Cos., 993 So. 2d 1014, 1020 (Fla. 2d DCA 2008) (affirming trial court's dismissal of plaintiff's action based on fraud on the court where plaintiff "provided intentionally false deposition testimony and interrogatory answers"); Hutchinson v. Plantation Bay Apts., LLC, 931 So. 2d 957, 960 (Fla. 1st DCA 2006) (affirming trial court's dismissal of plaintiff's action based on fraud on the court where plaintiffs attempted to conceal the dog attack that caused injuries attributable to the fall at issue and attempted to conceal past symptoms); Piumno v. R.F. Concrete Constr., Inc., 904 So. 2d 658, 658 (Fla. 4th DCA 2005) (affirming trial court's dismissal of plaintiff's action based on fraud on the court where plaintiff made a number of misrepresentations "regarding his prior injuries and litigation history,

- 32 -

240

sanction of dismissal of an ongoing proceeding, not the sanction of reopening a previously dismissed case just to dismiss it again with prejudice. See Pino, 57 So. 3d at 954 ("[A] court possesses the authority to protect judicial integrity in the litigation process. However, the cases cited in support of a court exercising such authority all involved the court granting a [defendant's] motion for involuntary dismissal where the plaintiff had engaged in deceitful conduct during a still pending case."). We therefore agree with the Fourth District's conclusion that this line of cases is inapposite here.

The second line of cases discussed by the Fourth District involves the "serious prejudice" exception. Relying on precedent discussing this common law exception, the Fourth District held that under certain circumstances, a trial court would have the inherent authority to strike a notice of voluntary dismissal and reopen the dismissed case, but only where the defendant has been "seriously prejudiced" by the dismissal. Pino, 57 So. 3d at 954; see also Ormond Beach Assocs. Ltd. v. Citation Mortgage, Ltd., 835 So. 2d 292, 295 (Fla. 5th DCA 2002) (holding that a court may strike a plaintiff's notice of voluntary dismissal "where the defendant demonstrates serious prejudice, such as where he is entitled to receive affirmative relief or a hearing and disposition of the case on the merits, has

---

and filed a false affidavit intended to obfuscate the truth and hamper the defendant's ability to defend").

- 33 -

*241*

acquired some substantial rights in the cause, or where dismissal is inequitable");
Servs. Experts, 56 So. 3d at 30 (relying on Ormond Beach to recite the same);
Patterson v. Allstate Ins. Co., 884 So. 2d 178, 179-80 (Fla. 2d DCA 2004) (same).

This so-called exception originated in several older equity cases decided by
the Court during the first half of the twentieth century. See Shaw v. Morrison, 199
So. 566, 567 (Fla. 1941); Willson v. Buxton, 149 So. 329, 330-31 (Fla. 1933);
Demos v. Walker, 126 So. 305, 306 (Fla. 1930); Abney v. Hurner, 121 So. 883,
884 (Fla. 1929); Smith v. Milham, 115 So. 532, 533 (Fla. 1927); Sontag Inv. Co. of
Ind. v. Nautilus Realty Co., 83 So. 389, 390 (Fla. 1919); Mayfield v. Wernicke
Chem. Co., 61 So. 191, 193 (Fla. 1913); Tilghman Cypress Co. v. John R. Young
Co., 53 So. 939, 940 (Fla. 1910). These cases, however, predate the contemporary
rules of civil procedure when the acceptance of a dismissal of an action in equity
was within a trial court's discretion. Under a plain reading of rule 1.420(a)(1), the
trial court now has no authority or discretion to deny a plaintiff's service of a
notice of voluntary dismissal, as the dismissal is effective upon service. See Fla.
R. Civ. P. 1.420(a)(1). Therefore, we conclude that the common law "serious
prejudice" standard no longer remains a viable mechanism for a trial court to strike
a plaintiff's voluntary dismissal as a separate ground.

### c. Florida Rule of Civil Procedure 1.110(b)

We also address the Fourth District's dissenting opinion and its suggestion

- 34 -

242

that amended Florida Rule of Civil Procedure 1.110(b) "add[ed] significant

authority for the court system to take appropriate action when there has been, as

here, a colorable showing of false or fraudulent evidence." Pino, 57 So. 3d at 959

(Polen, J., dissenting). However, we disagree that the language of rule 1.110(b)

provides a trial court with the authority to reopen a case that has been voluntarily

dismissed. As amended in 2010, rule 1.110(b) requires verification of foreclosure

complaints and provides in pertinent part:

> When filing an action for foreclosure of a mortgage on residential real
> property the complaint shall be verified. When verification of a
> document is required, the document filed shall include an oath,
> affirmation, or the following statement:
> "Under penalty of perjury, I declare that I have read the foregoing,
> and the facts alleged therein are true and correct to the best of my
> knowledge and belief."

Fla. R. Civ. P. 1.110(b). When this amendment went into effect, this Court stated

the reasons for the change as follows:

> [R]ule 1.110(b) is amended to require verification of mortgage
> foreclosure complaints involving residential real property. The
> primary purposes of this amendment are (1) to provide incentive for
> the plaintiff to appropriately investigate and verify its ownership of
> the note or right to enforce the note and ensure that the allegations in
> the complaint are accurate; (2) to conserve judicial resources that are
> currently being wasted on inappropriately pleaded "lost note" counts
> and inconsistent allegations; (3) to prevent the wasting of judicial
> resources and harm to defendants resulting from suits brought by
> plaintiffs not entitled to enforce the note; and (4) to give trial courts
> greater authority to sanction plaintiffs who make false allegations.

In re Amends. to the Fla. Rules of Civ. Pro., 44 So. 3d 555, 556 (Fla. 2010)

- 35 -

243

(emphasis added). While the intended purpose of the rule amendment was to give trial courts more power to sanction plaintiffs who make false allegations in mortgage foreclosure filings, it did not vest trial courts with the authority to strike a voluntary dismissal, reinstate the dismissed action, and then dismiss the action with prejudice as a consequent sanction.

### III. Sanctions Under Section 57.105, Florida Statutes

As discussed above, rule 1.540(b)(3) does not empower a trial court to strike a notice of voluntary dismissal where the alleged fraud does not lead the plaintiff to obtain affirmative relief to the detriment of the defendant; nor does the trial court have the inherent authority, or authority under rule 1.110(b), to strike a notice of voluntary dismissal for the purposes of reinstating a case in order to dismiss it with prejudice as a sanction. However, we emphasize that this does not mean a trial court is powerless to sanction fraudulent conduct. A notice of voluntary dismissal does not divest a trial court of jurisdiction to award sanctions under section 57.105, Florida Statutes (2012), even after a voluntary dismissal is taken.

Section 57.105 generally "provides the basis for sanctions against parties and counsel who assert frivolous claims or defenses or pursue litigation for the purpose of unreasonable delay." Bionetics Corp. v. Kenniasty, 69 So. 3d 943, 944 (Fla.), cert. denied, 132 S. Ct. 848 (2011). The statute was amended, effective in 2002, to include a twenty-one-day safe harbor provision, which provides that a

- 36 -

244

party may not seek sanctions under section 57.105 unless "the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected" within twenty-one days. Id. (quoting § 57.105(4), Fla. Stat. (2009)). Because the rule allows a party to withdraw the offending pleading, the question arises as to whether this safe harbor provision requires that a motion for sanctions under section 57.105 be filed prior to the dismissal of the case, but allows a party to voluntarily dismiss the case within twenty-one days of the service of the rule 57.105 motion to avoid sanctions.

To answer this question, we examine the comparable federal counterpart to section 57.105—Federal Rule of Civil Procedure 11. Before Rule 11 was amended to include a similar twenty-one-day safe harbor provision, the United States Supreme Court in Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 395 (1990), held that a trial court has jurisdiction to impose sanctions under Rule 11, even after a plaintiff voluntarily dismisses a civil action. In affirming the trial court's award of sanctions, the Supreme Court reasoned that "a voluntary dismissal does not expunge the Rule 11 violation" since the violation "is complete when the paper is filed." Id.[13]

---

13. Florida's appellate courts reached a similar conclusion. See Coney v. State, 995 So. 2d 1038, 1044 (Fla. 4th DCA 2008) ("Coney filed a notice of voluntary dismissal, but the filing of a voluntary dismissal does not divest a court of jurisdiction to enter an order authorizing sanctions."); Van Meter v. State, 726 So. 2d 388, 389 (Fla. 1st DCA 1999) ("A trial court retains jurisdiction to make a

- 37 -

245

After the Supreme Court's decision in Cooter, Federal Rule 11 was amended to include a "safe harbor" provision, which requires that the party moving for sanctions notify the non-moving party of its intention to move for sanctions and that the Rule 11 motion "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed. R. Civ. P. 11(c)(2). Courts have interpreted this to mean that the rule established by Cooter was "partially superceded by the amendment of Rule 11 in 1993 to include a 'safe harbor' provision." De la Fuente v. DCI Telecomms., Inc., 259 F. Supp. 2d 250, 257 n.4 (S.D.N.Y. 2003). As one court has explained:

> This safe harbor provision requires that a party seeking Rule 11 sanctions wait 21 days from the service of their motion before filing it with the court, in order to give the party the opportunity to withdraw or appropriately correct the challenged paper, claim, defense, contention, allegation, or denial. Fed. R. Civ. P. 11(c)(1)(A). Thus, a court can no longer issue Rule 11 sanctions in a case where, as in Cooter & Gell, a complaint was voluntarily dismissed within 21 days of a request for Rule 11 sanctions.

Id. In light of the safe harbor provision, a motion for sanctions under Rule 11 must be submitted prior to the dismissal of a case for a court to have jurisdiction because

---

determination pursuant to section 57.105, Florida Statutes, concerning the reasonableness of litigation even after the filing of a notice of voluntary dismissal."). Both Coney and Van Meter dealt with prisoners who had repeatedly filed frivolous pleadings. In those cases, the trial and appellate courts held they possessed authority to impose sanctions after the prisoners had voluntarily dismissed their cases.

- 38 -



the rule allows the party to withdraw the offending pleading. *See, e.g.*, Hockley by Hockley v. Shan Enters. Ltd. P'ship, 19 F. Supp. 2d 235, 241 (D.N.J. 1998) ("Since Shan withdrew its position when it voluntarily dismissed its claims, it is not subject to Rule 11 sanctions."); Photocircuits Corp. v. Marathon Agents, Inc., 162 F.R.D. 449, 452 (E.D.N.Y. 1995) (holding that 1993 Rule 11 superseded Cooter & Gell and precluded award of sanctions following a voluntary dismissal of the action); Morroni v. Gunderson, 169 F.R.D. 168, 171 (M.D. Fla. 1996) (holding that "a party who seeks Rule 11 sanctions based upon allegations in a complaint, cannot wait until the action has been voluntarily dismissed by the opposing party because the party who voluntarily dismisses a case has withdrawn the offending pleading by dismissing the case").

Florida's statutory twenty-one-day safe harbor provision is nearly identical to its federal counterpart, *see* § 57.105(4), Fla. Stat. (2009), and we interpret this state's provision similarly. If the plaintiff does not file a notice of voluntary dismissal or withdraw the offending pleading within twenty-one days of a defendant's request for sanctions under section 57.105, the defendant may file the sanctions motion with the trial court, whereupon the trial court will have continuing jurisdiction to resolve the pending motion and to award attorney's fees under that provision if appropriate, regardless of the plaintiff's subsequent dismissal.

- 39 -

247

## IV. This Case

Turning to this case, before BNY Mellon filed a notice of voluntary dismissal, Pino served upon BNY Mellon a request for sanctions pursuant to section 57.105, alleging that a fraudulently backdated assignment of mortgage had been attached to BNY Mellon's amended complaint. Pino further alleged that upon proving such fraud, he would move to dismiss the foreclosure action. His motion did not actually seek to dismiss the case. Pino did not have an opportunity to file the sanctions motion with the court and prove these allegations because BNY Mellon voluntarily dismissed the suit pursuant to rule 1.420(a)(1) within the safe harbor time period set forth in section 57.105.

Five months later, BNY Mellon commenced a new action, and Pino then filed a motion in the previously dismissed action seeking to set aside BNY Mellon's voluntary dismissal and to reinstate the matter in light of an allegation of fraud on the court. Pino further sought to have the case dismissed with prejudice as a consequent sanction.

Rule 1.540(b), which Pino invoked to have the voluntary dismissal set aside, is limited to relieving a party of a proceeding (here, the voluntary dismissal) where the movant (here, Pino) establishes that he or she has been adversely impacted by the proceeding. A defendant can establish an adverse effect from a plaintiff's voluntary dismissal under rule 1.540(b)(3) where the plaintiff has fraudulently

- 40 -

248

obtained affirmative relief prior to the dismissal and the plaintiff then takes the dismissal to prevent the court from undoing any improperly obtained relief the court previously granted. In such an instance, the trial court has jurisdiction to conduct an evidentiary hearing to determine if the fraud has been proven, and if so, to then grant the appropriate relief.

In this case, however, Pino conceded that BNY Mellon did not obtain affirmative relief prior to taking the voluntary dismissal. Even if the assignment of mortgage attached to the amended complaint was fraudulently backdated, BNY Mellon did not actually foreclose on the mortgage. Sanctions pursuant to section 57.105 were unavailable because BNY Mellon dismissed the case within twenty-one days of Pino's request for sanctions. Under the facts of this case, Pino could not obtain the relief of setting aside the voluntary dismissal and reinstating the dismissed action in order to obtain the sanction of dismissal with prejudice.

Other measures to protect against a plaintiff's abuse of the judicial process exist outside of reinstating the dismissed action. First, BNY Mellon has lost the benefit of its one free voluntary dismissal. If BNY Mellon sought to voluntarily dismiss the foreclosure action again, its dismissal notice would be with prejudice and operate as an adjudication on the merits. See Fla. R. Civ. P. 1.420(a)(1). Second, "[u]pon the voluntary dismissal, Pino would be entitled to his costs and possibly his attorney's fees," and "[t]he court can require payment as a

- 41 -

249

precondition to the second suit." Pino, 57 So. 3d at 954 (citing Fla. R. Civ. P. 1.420(d)). Finally, allegations of an attorney's filing of fraudulent documents in connection with his or her client's lawsuit would warrant a referral of that attorney to The Florida Bar for a possible violation of the Code of Professional Responsibility. See id. at 954 & n.2.

## CONCLUSION

Based on the above, we answer the certified question in the negative. We hold that when a defendant alleges fraud on the court as a basis for seeking to set aside a plaintiff's voluntary dismissal, the trial court has jurisdiction to reinstate the dismissed action only when the fraud, if proven, resulted in the plaintiff securing affirmative relief to the detriment of the defendant and, upon obtaining that relief, voluntarily dismissing the case to prevent the trial court from remedying the effects of the fraudulent conduct. Any affirmative relief the plaintiff obtained against the defendant as a result of the fraudulent conduct would clearly have an adverse impact on the defendant, thereby entitling the defendant to seek relief to set aside the voluntary dismissal pursuant to Florida Rule of Civil Procedure 1.540(b)(3).

In this case, because BNY Mellon did not obtain affirmative relief before taking the voluntary dismissal, the trial court did not have jurisdiction to reinstate the dismissed foreclosure action for the purpose of dismissing the action with prejudice. We also conclude that the trial court did not have the inherent authority

- 42 -

*250*

to strike the notice of voluntary dismissal. Because Pino sought no other available sanctions, and the case has since been resolved between the parties, we need not reach the question of whether the trial court should be able to award monetary sanctions under the circumstances of this case. We therefore approve the result reached by the Fourth District affirming the trial court's denial of Pino's motion.

While affirming the decision of the Fourth District, we also understand the concerns of those who discuss the multiple abuses that can occur from fraudulent pleadings being filed with the trial courts in this state. While rule 1.420(a)(1) has well served the litigants and courts of this state, we request the Civil Procedure Rules Committee review this concern and make a recommendation to this Court regarding whether (a) explicit sanction authority should be provided to a trial court pursuant to rule 1.110(b), even after a case is voluntarily dismissed, (b) rule 1.420(a)(1) should be amended to expressly allow the trial court to retain jurisdiction to rule on any pending sanction motions that seek monetary sanctions for abuses committed by either party during the litigation process, or to allow the trial court explicit authority to include attorney's fees in any award to a party when the dismissed action is reinstated, or (c) to adopt a rule similar to Federal Rule 11 to provide explicit authority for the trial court to impose sanctions.

It is so ordered.

LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., and CANADY, J., concur in result only.

- 43 -

251

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal - Certified Great Public Importance

    Fourth District - Case No. 4D10-378

    (Palm Beach County)

Amanda L. Lundergan and Thomas E. Ice of Ice Legal, P.A., Royal Palm Beach, Florida,

    for Petitioner

Craig Ronald Lynd, Curtis Alan Wilson and Robert J. Horst of Kaufman, Englett and Lynd PLLC, Orlando, Florida,

    for Amici Curiae Kaufman, Englett and Lynd, PLLC

Katherine Eastmoore Giddings, Nancy Mason Wallace and William Patrick Heller of Akerman Senterfitt, Tallahassee, Florida; Bruce S. Rogow and Tara A. Campion of Bruce S. Rogow, P.A., Fort Lauderdale, Florida,

    for Respondents

Kenneth Bradley Bell of Clark, Partington, Hart, Larry, Bond & Stackhouse, Pensacola, Florida,

    for Amici Curiae Florida Land Title Association

Mitchell Wayne Berger, Fred Owen Goldberg, and Elaine Johnson James of Berger, Singerman, LLP, Boca Raton, Florida,

    for Amici Curiae Mortgage Bankers Association

- 44 -

252